1  C. D. Michel - S.B.N. 144258
   Clinton B. Monfort - S.B.N. 255609
2  Sean A. Brady - S.B.N. 262007
   Anna M. Barvir - S.B.N. 268728
3  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
   Telephone: (562) 216-4444
5  Facsimile:  (562) 216-4445
   Email: cmichel@michellawyers.com
6
7  Attorneys for Plaintiffs

8           **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                  **SAN JOSE DIVISION**

11 | LEONARD FYOCK, SCOTT           ) **CASE NO: CV13-05807 RMW**
   | HOCHSTETLER, WILLIAM           )
12 | DOUGLAS, DAVID PEARSON,        ) **DECLARATION OF MASSAD**
   | BRAD SEIFERS, and ROD          ) **AYOOB IN SUPPORT OF MOTION**
13 | SWANSON,                       ) **FOR PRELIMINARY INJUNCTION**
                                    )
14 |         Plaintiffs             )
                                    )
15 |     vs.                        )
                                    )
16 | THE CITY OF SUNNYVALE, THE     )
   | MAYOR OF SUNNYVALE,            )
17 | ANTHONY SPITALERI in his       )
   | official capacity, THE CHIEF OF )
18 | THE SUNNYVALE DEPARTMENT )
   | OF PUBLIC SAFETY, FRANK        )
19 | GRGURINA, in his official capacity, )
   | and DOES 1-10,                 )
20 |                                )
   |         Defendants.            )
21 |                                )
   |_____)

22

23

24

25

26

27

28

                 DECLARATION OF MASSAD AYOOB

# DECLARATION OF MASSAD AYOOB

1.    I, Massad Ayoob, am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.    I have been a competitive handgun shooter since the late 1960s, a published writer in the field of defensive firearms since 1971, and a firearms instructor since 1972. My resume is attached. I have served for more than thirty years each as handgun editor for Guns magazine and law enforcement editor for American Handgunner magazine.  I served for 19 years as chair of the Firearms and Deadly Force Training Committee for the American Society of Law Enforcement Trainers, and have served for ten years on the advisory board of the International Law Enforcement Educators and Trainers Association.  I have served as an expert witness on firearms, firearms training standards, deadly force training standards, dynamics of violent encounters, and related subject matter areas since 1979.  I have also been an instructor in disarming and firearm retention (i.e., the countering of a disarming attempt) since 1980 and became a trainer of other instructors in those disciplines in 1990.

3.    In my role as a self-defense and weapons expert, including as an expert witness, I have researched incidents of defensive gun uses by law-abiding citizens, including by both private citizens and law enforcement officers. My opinions about defensive guns uses provided herein are based, in part, on the information I have learned during such research.

**Ten Round Magazine Limit: Disparate**

**Impact on Law-Abiding Citizens**

4.    Limiting the law-abiding citizen to a magazine of ten rounds or less will clearly limit their ability to protect themselves from violent criminals in certain situations. Such limits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-defense in those crime incidents necessitating that

the victim fire many rounds in order to stop the aggressive actions of offenders.

5.    An illustrative, real-world example is the case of Susan Gonzalez. She and her husband were attacked by two intruders within their home one night. The attackers shot both of them multiple times, but she was able to escape to their bedroom where she located her husband's semi-automatic pistol, while her husband bravely physically fought the attackers off into the front room. She entered the room where the attackers were struggling with her husband, and, not wanting to shoot her husband, discharged three warning shots in the air, hoping the attackers would flee. They did not.

6.    One attacker charged toward her, causing her to flee back to the bedroom. From an opening in the bedroom she could see the attacker lying in wait for her in the kitchen. So she used her knowledge of the house to exit the bedroom from and approach the attacker from behind via another door leading to the kitchen. She pointed the pistol at the attacker and discharged seven rounds in his direction, gravely wounding him, but not immediately killing him.

7.    The wounded attacker was still able to exit the house aided by his accomplice. The other attacker reentered the house and demanded Mr. Gonzalez give him keys to an automobile to escape. During his search for keys in the bedroom he located Mrs. Gonzalez who was out of ammunition. He put the gun to her temple and demanded the keys, which she gave him.

8.    Fortunately, the attacker decided to spare Mrs. Gonzalez's life, but he could have just as easily pulled the trigger. Had she had more rounds in her magazine, maybe she would not have had to leave her fate to chance. It is impossible to say how many more cases where victims lost (or almost lost, as in Mrs. Gonzalez's case), due to having an insufficient amount of ammunition readily

DECLARATION OF MASSAD AYOOB

available in a self-defense firearm.[1]

9. The published account of this shooting has Mrs. Gonzalez firing three shots into the ceiling, then seven at the homicidal intruder, and then running dry. This would indicate only ten cartridges at her disposal. The gunfight occurred during the ten-year period when the Federal "high capacity magazine ban" was in force. The Ruger 9mm pistol she used, designed to hold fifteen cartridges in the magazine and one more in the firing chamber, was sold during that ten year period of that ban with magazines which could only hold ten rounds. In such a situation, five more shots can make the difference between neutralizing the murderous threat, and being rendered helpless with an empty guns at the hands of a law-breaking, homicidal, heavily armed felon.

10. It is difficult to say exactly how many private citizens have actually fired more than ten rounds in a self-defense shooting, because the amount of rounds fired in self-defense shoots, from my experience in researching such incidents, is very often an omitted fact in written accounts of such defensive gun uses. Oftentimes the accounts just say "multiple shots fired." That could mean more or less than ten, it just cannot be known. This does not seem to be the case, however, with shootings involving police officers, for which, generally the number of shots that were fired is documented. In my experience researching such shootings, officers often fire more than ten rounds. And, cases where an individual officer fired less than 10 rounds, but there were multiple officers shooting, can be fairly characterized as involving more than ten rounds if the multiple officers involved fired over ten rounds in aggregate.

11. Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection

---

[1] Robert A. Waters, Guns Save Lives: True Stories of Americans Defending Their Lives with Firearms 149-59 (2002).

DECLARATION OF MASSAD AYOOB

against the exact same criminals the police are armed to deal with. Tim Gramins of the Skokie, Illinois police department was in a shootout with an armed robber whose car he had pulled over. The gunman came out shooting. The gunman was armed with two semiautomatic pistols, one on his person and one snatched from his car, both of which he fired during the gun battle. He also had in his possession a semiautomatic rifle in his car, which he did not deploy. Gramins fired 33 rounds before the gunman, now fatally wounded, stopped firing. The suspect had absorbed 16 hits by the time he was neutralized, and the officer had been forced to reload twice. The officer was armed with a Glock Model 21 .45 caliber pistol, loaded with a 13 round magazine and a fourteenth in the firing chamber. The officer was down to the last few cartridges in his last magazine at the time he finally won the gunfight. Gramins was wounded in the shooting. As a result of this incident, he now carries a higher-capacity handgun with more spare magazines.[2]

12.    While, as mentioned, the number of rounds fired in a self-defense shoot involving a private citizen is usually not documented, there are nevertheless various accounts of private citizens discharging more than ten rounds during a criminal attack. A South Carolina gun store owner who lived in the rear of his shop was awoken by three men, at least one of them armed, crashing a van into his store. When going to investigate, one of the robbers yelled to another to kill him, so the owner opened fire, discharging thirty rounds, hitting all three attackers, mortally wounding one and causing the rest to flee.

13.    There is also the account of Travis Dean Neel. While sitting in a traffic jam behind an officer with a car pulled over, an occupant emerged from the

---

[2]  Charles Remsberg, Why one Cop Carries 145 Rounds of Ammo on the Job, Police One http://www.policeone.com/patrol-issues/articles/6199620-Why-one-cop-carries-145-rounds-of-ammo-on-the-job/ last updated April 17, 2013).

detained vehicle and opened fire on the officer. Neel responded by retrieving his pistol with three magazines from his backseat and opened fire on the assailant, which resulted in him being fired upon and an ensuing gunfight, during the course of which he prevented the assailants from "finishing off" the officer and (with assistance from an off-duty police officer who joined him in the gunfight with his own handgun) from car-jacking a woman to get away, which may have saved that woman's life. Despite Neel using all three of his fifteen-round magazines, and the several shots fired by the off-duty oficer, the assailants were still able to flee, but could just as easily decided to continue their attack and overcome Neel.[3]

14. Ronald Honeycutt was delivering pizzas when approached by a man with a gun from behind. He turned and fired when he saw a gun in the man's hand, discharging all of his magazine's fifteen rounds, which still did not immediately stop the threat, as the attacker remained upright with the gun pointed at him. But the attacker eventually succumbed to his wounds before being able to rack a round into the firing chamber of his pistol, which he had forgotten to do, and is probably why he was pointing the gun at Honeycutt but never discharged a single round.[4]

15. Additionally, in California, consider the well-documented multiple gunfights with armed robbers experienced by Los Angeles watch shop owner Lance Thomas.[5] More than one of his five shooting incidents required him to fire more than the Sunnyvale ordinance would allow to be in any one handgun. In one of those incidents, Thomas had to fire nineteen shots before the last of his multiple

---

[3] Robert A. Waters, The Best Defense: True Stories of Intended Victims Who Defended Themselves with a Firearm, 23-40 (1998).

[4] Chris Bird, Thank God I Had A Gun: True Accounts of Self-Defense 251-274 (2007).

[5] Gun shop owner shoots, kills man during attempted robbery, WIS TV (Aug. 9, 2012, 7:54 AM), http://www.wistv.com/story/19236842/gun-shop-owner-shoots-kills-man-during-atte mpted-robbery (last updated Aug. 19, 2012, 8:22 AM).

DECLARATION OF MASSAD AYOOB

opponents ceased attempting to murder him.[6]

16.    Thomas' strategy was to stage multiple loaded handguns every few feet in his workspace. He could do this, as a sole proprietor with a small shop, a workspace closed to the public, and with buzz-in entry. A pair of brothers used the same strategy in defending themselves against two violent career criminals robbing their Richmond, Virginia jewelry store. They went through multiple firearms staged throughout the store placed in anticipation for such an event.[7] The strategy of staging multiple firearms employed by these shopkeepers is a unique circumstance, however. It would not be practical or safe for most shopkeepers or for homeowners, due to the danger of unexpected children wandering behind the counter or unexpectedly arriving at the given home. Thus, most private citizens could not be expected to have multiple handguns in multiple locations in their home or on their person in order to engage in a defensive gun use.

17.    The homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally do not permit gathering multiple firearms or magazines. Ideally, one hand would be occupied with the handgun itself, and the other, with a telephone to call the police. And, assuming they even had time for a magazine change, most people do not sleep wearing clothing that would allow them to stow spare magazines, etc. on their person.  They would have only what was in the gun.

18.    Most plainclothes police officers do not find it practical to carry multiple handguns, let alone private citizens.  Any suggestion that private citizens

---

[6] See
http://articles.latimes.com/1992-02-21/local/me-2663_1_watch-shop-owner;
http://backwoodshome.com/blogs/MassadAyoob/2012/12/29/why-good-people-need-semiautomatic-firearms-and-high-capacity-magazines-part-i/

[7] *Id.*

DECLARATION OF MASSAD AYOOB

simply get more guns or more ammunition feeding devices would, for the reasons stated above, be impractical.

19.   Criminals bent on causing harm, on the other hand, even assuming they were impeded from obtaining magazines holding over ten rounds due to the ordinance, could simply arm themselves with multiple weapons, and often do.

20.   Criminals have time to assess and plan shootings, whereas victims do not. Whitman, the Texas Tower mass murderer, literally brought a large box of rifles, handguns, a shotgun and ammunition to his sniper perch.[8]   Harris and Klebold had four firearms between them at Columbine.[9]   Holmes in Aurora brought rifle, shotgun, and pistol into the theater.[10]   Hassan was armed with a pistol and a revolver at the Fort Hood.[11]   Lanza entered the elementary school in Newtown, Connecticut armed with a rifle and two pistols, leaving a shotgun in his car.[12]   The mass murderer Cho entered Virginia Tech armed with two pistols and a backpack full of magazines.[13]

21.   None of these murderers' victims had planned to repel an attack by a perpetrator with multiple firearms.

22.   The likelihood of the mass murderer arriving on scene with multiple

---

[8]   http://www.texasmonthly.com/topics/ut-tower-shooting

[9]   http://extras.denverpost.com/news/shot0427a.htm

[10] http://www.latimes.com/news/nation/nationnow/la-na-nn-dark-knight-shooting-2012 0720,0,2147749.story#axzz2nDkU7CWB

[11] http://www.nydailynews.com/news/national/ft-hood-shooter-nidal-hasan-private-legally-bought-pistol-military-weapon-rampage-article-1.414799

[12]   http://www.cnn.com/2012/12/18/us/connecticut-lanza-guns/

[13]   Virginia Tech Review Panel, Report of the Review Panel at pg. 89 available at,http://www.governor.virginia.gov/tempcontent/techPanelReport-docs/FullReport.pdf

DECLARATION OF MASSAD AYOOB

firearms also largely negates the theory that with fewer rounds in the gun, the killer could be more easily disarmed and subdued by unarmed citizens when he first ran empty, before he could reload. Hassan, Holmes, Lanza, or Cho simply could have drawn a second (or third) gun that they had on their persons and shot whoever attempted to grab the empty one.

23. The virtuous citizen, by contrast, cannot practically be expected to have accessible that many guns or that much ammunition at a moment's notice. The victimized citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

24. Virtuous citizens buy their guns to protect themselves from the same criminals police carry guns to protect the citizens, the public, and themselves from. Therefore, armed citizens have historically modeled their choice of firearms on what police carry. The vast majority of California law enforcement agencies, including those in the Bay Area, carry pistols with double-stack magazines whose capacities exceed those of the Sunnyvale ordinance. While on-duty police are exempt from the Ordinance, it is unclear to me whether off duty officers are.

25. The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally two spare magazines holding more than ten rounds on the uniform belt. He or she will normally be wearing body armor, have immediate access to a loaded shotgun and/or loaded patrol rifle with magazines holding more than ten rounds in the patrol car, and will have instant radio access to fellow officers and dispatch if help is needed.

26. The off-duty officer and the law-abiding citizen alike are not likely to have that volume of spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a

DECLARATION OF MASSAD AYOOB

rifle or shotgun. Their only communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

27. It takes even a world champion speed shooter a full second to reload with a fresh magazine. A highly skilled police officer or competitive shooter may be able to accomplish a reload in two seconds. Most people take considerably longer; especially someone who is under the mental duress typically experienced during an attack. Changing a magazine is a fine motor skill, the type of skill which degrades severely in human beings under stress due to vasoconstriction (loss of blood flow to the extremities) and also due to tremors induced by internally-generated adrenaline (epinephrine). This is a well-known physiological reaction that has been in the medical literature and training literature for a century or longer, defined as "fight or flight" response by Dr. Walter Cannon at Harvard Medical School before World War I.

28. By contrast, simply pulling the trigger again on a pistol that still has more ammunition in it can be accomplished in a fraction of a second. Based on my experience in self-defense scenarios, fractions of seconds can mean the difference between the victim successfully repelling an attacker and the victim being subdued. Thus, a magazine change for the person being attacked could be the difference between life and death.[14] The same, however, is not generally true for the attacker. The loss of time for a magazine change is generally of little consequence for the attacker. This is because it is the attacker who gets to choose when, where, how, and whom to attack. So the attacker is not burdened by the surprise and shock factor that the victim is, and, as explained above, is generally prepared for the

[14] http://reason.com/archives/2013/01/16/the-threat-posed-by-gun-magazine-limits

DECLARATION OF MASSAD AYOOB

confrontation with large amounts of arms and ammunition. This is demonstrated by the multiple mass shootings where the attacker made magazine changes without being subdued. The most illustrative example is the Virginia Tech shooting, where the attacker carried with him seventeen magazines for his two semi-automatic pistols, from which he fired 174 rounds.[15] At least five of those magazines had a capacity of only ten rounds and would be legal under the challenged ordinance.[16] While it cannot be said exactly how many magazine changes he made during what was the deadliest mass shooting in the country's history, based on the number of rounds fired and the fact that authorities found seventeen empty magazines at the scene, he had to have made several reloads.[17]

29.     Supporters of the magazine capacity limitation will undoubtedly point to some firearm expert who is comfortable with an eight- or nine-shot pistol, or even a five- or six-shot revolver. It should be noted, however, that the operative term there is "expert."  The individual who has spent a lifetime training in shooting, and may fire hundreds or even thousands of shots on the range per month, has developed a level of skill and confidence that is not practical to expect from the average police officer, let alone the average law-abiding citizen who keeps a firearm in the home or on his person for protection of self and family.

30.     I would also be remiss to fail to also consider the needs of retired law enforcement officers and corrections officers, and the families of such personnel, whether retired or still employed in the justice system.  It is common for violent criminals to threaten revenge on the families of law enforcement personnel, and it is my experience that these people more often than not keep firearms at home for defensive use by their spouses and other responsible family members, should such

---

[15] Virginia Tech Review Panel, *Report of the Review Panel* at pg. 92.

[16] *Id.*

[17] *Id.*

DECLARATION OF MASSAD AYOOB

threats of vengeance be acted out. For the reasons described above, the Sunnyvale ordinance puts those innocent people at an unfair tactical disadvantage.

**Disparate Impact on the Disabled**

31. A particular subset of law-abiding citizens who are disparately, negatively impacted by the Sunnyvale ordinance is the physically disabled. This is true of many categories of the physically challenged.

32. Over the last twelve years, we have seen many war veterans joining the amputee community. Those who have lost fingers or a hand will have great difficulty reloading an empty gun if a ten-round magazine does not prove sufficient to defeat an attacker. Work-related injuries such as carpal tunnel syndrome can greatly slow ability to reload. So can many of the infirmities of age: rheumatism, arthritis, bursitis, etc.

33. The wheelchair-bound individual, and many more mobility-challenged individuals (back issues, ankle issues, knee issues, etc.), cannot run to cover to reload. They will be caught in the open if they have to reload in a fight with one or more armed criminals, and thus will become totally helpless as soon as their ordinance-mandated ten-shot magazine is depleted.

34. Thus, in conclusion, study of events in the real world indicates that the Sunnyvale ordinance as related to magazine capacity can be expected to have little, if any, effect in reducing casualties due to intentional mass murder. However, law-abiding citizens, off-duty and retired criminal justice personnel, families of criminal justice personnel, recipients of death threats, stalking victims, and people working in places of business prone to armed robbery, will be severely disadvantaged by this ordinance in terms of their ability to lawfully protect themselves and others. This impact will be particularly severe upon members of such groups who are physically disabled.

DECLARATION OF MASSAD AYOOB

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed within the United States on December 22, 2013.

Massad Ayoob

DECLARATION OF MASSAD AYOOB

# ATTACHMENT

# *Curriculum Vitae,* **Massad F. Ayoob**

**Areas of Expertise**

Dynamics of violent encounters, training standards for safe weapons handling (law enforcement/civilian), training standards of firearms and use of force (police/civilian), homicide/use of force investigation, personal and professional security, weapon retention/disarming, law enforcement internal investigation/discipline.

**Teaching Experience**

Director, Massad Ayoob Group, 2009-present.

Director, Lethal Force Institute, 1981-2009.

Chair of firearms committee, American Society of Law Enforcement Trainers (ASLET), 1987-2007. Also served on Ethics Committee. Led annual Panel of Experts on firearms/deadly force issues at ASLET's international seminars.

Special Instructor, Chapman Academy of Practical Shooting, 1981-88. Defensive Combat Shooting; Judicious Use of Deadly Force; Advanced Officer Survival Tactics.

International Instructor, PR-24 baton; has lectured several times at annual international seminar. Trains other instructors and trainers of instructors.

Advisory Board member, International Law Enforcement Educators' and Trainers' Association. Have lectured there on investigation and management of police use of force cases at all Annual Meetings since the organization's inception in 2003.

National Instructor, Weapon Retention & Disarming, National Law Enforcement Training Center. Trains other instructors and trainers of instructors. 1990-2009.
Assistant professor teaching weapons and chemical agents, Advanced Police Training Program of New Hampshire, 1974-77.

Co-instructor (w/former world pistol champion Ray Chapman) of Advanced Officer Survival Seminars for the Police Marksman Association.

International Instructor, Persuader Mini-Baton, certified by Joe Truncale.

Instructor, Kubotan self-defense, certified by Soke Takayuki Kubota.

National Instructor, Telescoping baton, certified by CASCO (baton manufacturer).

Instructor, straight baton, certified by COPSTK (baton manufacturer).
Has taught for national, international, and regional seminars of

> FBI. Albuquerque Office. Use of force/Survival. 2012.

> International Association of Law Enforcement Firearms Instructors. Numerous annual meetings.

> Regional seminars for CLE credit on defending deadly force cases (NACDL; Mass. CDL Assn.).

> International Homicide Investigators' Seminar. Investigation of officer-involved shootings and characteristics of self-defense shootings.

> McGill University School of Medicine. Visiting lecturer on medico-legal aspects of gunshot and knife wounds.

> Officer survival tactics taught at: DEA National Academy; Ordnance Expo, Los Angeles; National Tactical Invitational; New England SWAT Seminar; Metro-Dade Police Academy; DEA/Miami.

**Personal Training**

Smith & Wesson Academy: Advanced Combat Shooting (1st in class), Instructor course; Instructor Update (twice); Officer Survival Course (1st in class); Weapon Retention instructor course; advanced revolver shooting course.

Glock: Glock Instructor Course; Glock Armorer Course.

Firearms Instructor Courses: National Rifle Association.

Ordnance Expo: Firearms and Ballistic Evidence; Officer Involved Shooting Investigation; Advanced Officer Involved Shooting Investigation; Officer Survival; Management of Barricaded Suspects.

International Police Academy: Defensive Tactics (Unarmed Combat and Restraint) Instructor Course, rated Master Instructor by sensei James Morell.

NYPD: "Hostage Negotiation for Supervisors", "Post Shooting Tactics", "House Clearing Techniques", "Off Duty Confrontation Tactics", "Summary of Violent Encounter Patterns", "Police Shotgun Program."

Advanced Homicide Investigation. By Vern Geberth, NYPD Ret., author of "Practical Homicide Investigation."

International Homicide Investigators' Seminar (2 occasions).

Medical/Legal Death Investigation (Dade County Medical Examiner's Office).

Americans for Effective Law Enforcement : "Police Civil Liability Seminar."

American Society of Law Enforcement Trainers. "PPCT: Pressure Point Control Tactics ," taught by Bruce Siddle.

Federal Law Enforcement Training Center: BOSS program including officer survival, intelligence briefings on outlaw bike gangs, booby traps, counter-ambush tactics, arrest techniques.

Escrima (stick- and knife-fighting), Grandmaster Remy Presas.

Knife/Counter-Knife courses: Master Paul Vunak, Hank Renhardt, Sensei Jim Maloney, Michael de Bethencourt.

Has studied personally with world handgun champions Ray Chapman, Rob Leatham, Jerry Miculek, and Frank Garcia in advanced shooting programs.

**Has studied special units and their training on-site, including:**

NYPD Firearms & Tactics Unit, Emergency Services Unit, Armed Robbery Stakeout Unit.

LAPD SWAT, Firearms Training Unit.

FBI Firearms Training Unit.

Metro-Dade Police Firearms/SWAT Training Unit

Illinois State Police Ordnance Section.

NH State Police SWAT, EVOC, Firearms Training.

Kentucky State Police, Firearms Training and SRT Training.

Arizona Highway Patrol Firearms Training.

London, England Metropolitan Police firearms training and special services unit (D.11, PT-17, SO-19).

Has reviewed or audited numerous other law enforcement firearms training programs.

**Publication Credits**

***Books:***

"Fundamentals of Modern Police Impact Weapons," Charles C. Thomas, Publishers, 1978.

"In the Gravest Extreme: the Role of the Firearm in Personal Protection," Police Bookshelf, 1979.

"Hit the White Part," Police Bookshelf, 1982.

"The Truth About Self Protection," Bantam, 1983.

"StressFire," Police Bookshelf, 1984.

"StressFire II," Advanced Combat Shotgun," Police Bookshelf, 1992.

"The Semiautomatic Pistol in Police Service and Self Defense," Police Bookshelf, 1988.

"Ayoob Files: the Book," Police Bookshelf, 1995.

"Complete Book of Handguns," Volume 10 (1993) with completely new volume produced annually through 2009, Harris Publications.

"Gun Digest Book of Combat Handgunnery, Fifth Edition," Krause Publications, 2002.

"Gun Digest Book of SIG-Sauer Pistols," Krause Publications, 2004.

"Gun Digest Book of Beretta Pistols," Krause Publications, 2005.

"Gun Digest Book of Combat Handgunnery, Sixth Edition," Krause Publications, 2007.

"Gun Digest Book of Concealed Carry," Krause Publications, 2008.

"Massad Ayoob's Greatest Handguns of the World," Krause Publications, 2010.

"Gun Digest Book of Concealed Carry," Second Edition, Krause, 2012

"Combat Shooting With Massad Ayoob," Krause, 2011

"Complete Book of Handguns," annual editions now through 2013

***Monographs:***

"Gunproof Your Children," Police Bookshelf/Potshot Press

"Handgun Primer," Police Bookshelf/Potshot Press.

"The Police View of Gun Control," Second Amendment Foundation.

"Armed and Alive," Second Amendment Foundation.

***Forewords for Authoritative Texts:***

"The Newhall Incident," by Mike Wood

"Armed: The Essential Guide to Concealed Carry," by Dr. Bruce Eimer

"The Gun Digest Book of the Revolver," by Grant Cunningham

"Mu Tau: The Modern Greek Karate" by James Arvanitis

"Realistic Defensive Tactics" by John Peters

"Modern Centerfire Handguns" by Stanley Trzoniec

"You Can't Miss" by John Shaw

"MasterTips" by Jon Winokur

"Effective Defense" by Gila May-Hayes

"In Self Defense" by Michael Izumi

"The Tactical Pistol" by David Lauck

"The Tactical Rifle" by David Lauck

"Personal Defense for Women" by Gila Hayes

"Lessons From Armed America" by Mark Walters and Kathy Jackson

"Armed Response" by Dave Kenik

"Rule the Night/Win the Fight" by Ed Santos

***Periodicals:***

Handgun Editor, *Guns* magazine

Law Enforcement Editor, *American Handgunner* magazine

Contributing Editor, *Shooting Industry* magazine

Contributing Editor, *On Target* magazine

Firearms Editor, *Backwoods Home* magazine

Associate Editor, *Combat Handguns* magazine

Associate Editor, *Guns & Weapons for Law Enforcement* magazine

Associate Editor, *Gun Week*

Have published thousands of articles in various professional journals and newsstand periodicals, the overwhelming majority related to law enforcement, weaponry, martial arts and personal defense.  Firearms articles have appeared in *Guns, American Handgunner, Handguns, GUNsport, Handgunner, Home Defense, Glock Annual, Colt Annual, Magnum, Gun World, Combat Handguns,* and others.  Martial arts/unarmed combat articles have appeared in *Black Belt, Official Karate, Inside Kung-fu, Inside Karate, Warriors, Fighting Stars,* and other such publications. Law enforcement articles have been published in *American Police Beat, Law & Order, Police, Police Product News, Sentinel, Trooper, Patrolman, Police Marksman, Guardian, Guns & Weapons for Law Enforcement, Guns & Ammo Law Enforcement Annual,* and other police professional journals and law enforcement related periodicals.  Has also been published in *Car & Driver, Gentlemen's Quarterly, Man's Magazine, Modern Jeweler, New Hampshire Outdoorsman, New Hampshire Times, Prism, Sexology, Sports Afield,* and assorted other general interest publications.

***Training Films***

"Massad Ayoob on Concealed Carry," Panteao Productions, 2013

"Massad Ayoob on Home Defense," Panteao Productions, 2011

"StressFire Handgun," 2002

"StressFire Shotgun," 2002

"StressFire Rifle," 2002

"Deadly Force Cases," ALI-ABA, 2001

"Judicious Use of Deadly Force," 1990

"Post Violent Event Trauma," 1990

"LFI Handgun Safety," 1990

"Off Duty Survival," 1993

"Shoot to Live," 1986

"How Close is Too Close," 1986

"Cute Lawyer Tricks," 1986

"Physio-Psychological Aspects of Violent Encounters," 1981

Has appeared in various other training films.

***Quoted as authoritative reference in:***

FBI Journal

"Law Enforcement Handgun Digest" (Grennell)

"Gun Digest Book of Combat Handgunnery, 1st edition (Lewis & Mitchell), 2nd and 3rd editions (Karwan)

"Shooting Schools: An Analysis" (Winter)

"Street Survival: Tactics for Armed Encounters," (Adams, McTernan, Remsberg)

"Tactical Edge: Tactics for High Risk Patrol" (Remsberg)

"Handgun Retention System" (Lindell)

"The Street Smart Gun Book" (Farnam)

"Police Handgun Manual" (Clede)

"Police Shotgun Manual" (Clede)

"High Tech SWAT Weapons" (Bane)

"PR-24 Baton Manual" (Starrett)

"Police Officers Guide" (Clede)

Cited as authoritative reference in numerous other publications.

**Career Accomplishments**

Voted Outstanding American Handgunner of the Year, 1998.

Winner of first annual National Tactical Advocate Award, 1995, awarded by American Tactical Shooting Association.

Winner of the Roy Rogers Award for promotion of firearms safety.

Winner of first George C. Nonte Award for excellence in firearms journalism, 1978.

**Firearms Qualifications and Awards**

Combat Master, NRA Police Revolver

First 5-gun Master, International Defensive Pistol Association

Master, Revolver, National Marksman Sports Society

Master, Automatic, National Marksman Sports Society

Class A, International Practical Shooting Confederation

Grand Mastershot, UK Practical Shooting Association

Master Blaster, Second Chance

Expert, NRA Action Shooting

Honorary Distinguished Expert, Federal Law Enforcement Training Center

Several times top shooter in statewide NH police combat matches, 1973-2003

Five times New England Regional champion in various handgun disciplines

Co-winner with daughter Justine, National Champion Parent/Child Team, National Junior Handgun Championships, 1998

Has won numerous individual/local combat shooting tournaments, has competed successfully in five countries.

**Law Enforcement Experience**

Hooksett (NH) Police Dept.: 1972-73, auxiliary policeman. 1973-1980, fully sworn Police Officer. Duties under four chiefs included patrol, firearms training, community relations and crime prevention assignments, dept. firearms instructor for most of this period. Served in part time capacity with full police authority.

Deerfield (NH) Police Dept.: 1982-1990.  Fully sworn officer, rank of Sergeant ('82-'84) in charge of all police training, and Lieutenant ('84-'90), in charge of police training and crime prevention activities. Served in part time capacity with full police authority.

Grantham (NH) Police Dept.: 1990-present.  Fully sworn Captain and Police Prosecutor. Training, research, and other administrative functions.  Served in part time capacity with full police authority.

**Massad Ayoob case list**

| CASE | LOCALE | ALLEGATION | RETAINED BY |
|------|--------|------------|-------------|
| Littleton v. Belmont County | OH | Wrongful Death | Defendant |
| Florida v. Hecksel | FL | Manslaughter | Defendant |
| Favor v. Walgreen | TX | Wrongful Death | Defendant |
| Texas v. Hubbard | TX | Murder | Defendant |
| Wemouth v. Brunswick | ME | Wrongful Death | Defendant |
| Allen v. Leal | TX | Wrongful Death | Plaintiff |
| California v. Karlson | CA | Murder | Defendant |
| Minick v. County of Sacramento | CA | Wrongful Death | Defendant |
| Jones v. Norwalk | CT | Wrongful Death | Defendant |
| CA v. Matthews | CA | Assault | Defendant |
| Maxim v. Livingstone | FL | Wrongful Shooting Injury | Plaintiff |
| Florida v. Bonenfant | FL | Aggravated Assault | Defendant |
| Cangealose v. Janet Reno & FBI | Wash DC | Wrongful Termination | Plaintiff |
| Null v. Murfreesboro | TN | Wrongful Termination | Plaintiff |
| Missouri v. Beeler | MO | Murder | Defendant |
| Nordlund v. American Armor | NE | Product Liability | Defendant |
| House v. Lawco | UT | Product Liability | Defendant |
| Saldana v. Weitzel | WI | Wrongful Death | Defendant |
| Messing v. Oak Creek | WI | Wrongful Death | Defendant |
| Palmquist v. Selvik | IL | Wrongful Death | Defendant |
| NY v. Gill | NY | Gun Permit Hearing | Defendant |
| Michigan v. Budzyn | MI | Murder | Defendant |
| Wallen v. County of El Dorado | CA | Wrongful Death | Defendant |
| FL v. Jimmy Hecksel | FL | Manslaughter | Defendant |
| Paderez v. Blocker | CA | Product liability | Defendant |
| Blanford v. County of Sacramento | CA | Wrongful Death | Defendant |
| MA v. Robert Tessitore | MA | Manslaughter | Defendant |
| Kulesza v. Marina Bay | MA | Failure to protect | Plaintiff |
| MS v. Patrick Champagne | MS | Manslaughter | Defendant |
| Gorey v. Foley | MI | Wrongful Death | Defendant |
| Tim Alessi v. State of FL | FL | PCR | Appellant |
| TN v. Robert Barnes | TN | Murder | Defendant |
| FL v. Plana | FL | Murder | Defendant |
| Webster & Castle v. Orange County | FL | Wrongful Shooting | Defendant |
| Oxendine v. SRMC | NC | Wrongful Death | Defendant |
| FL v. Ed Michael | FL | Aggravated Assault | Defendant |
| TX v. Terry Graham | TX | Homicide | State |

| | | | |
|---|---|---|---|
| NM v. Billy Anders | NM | Manslaughter | Defendant |
| MD v. Der and Kifer | MD | Manslaughter | Defendants |
| CO v. Larry Lindsey | CO | Aggravated Assault | Defendant |
| WA v. Jay Olsen | WA | Aggravated Assault | Defendant |
| Chambers v. Graham | TX | Wrongful Death | Defendant |
| FL v. Tim Alessi | FL | Murder (appeal) | Defendant |
| CA v. Thomas Mun & Chad Marshall | CA | Homicide (grand jury level) | State |
| FL v. William Wilkerson | FL | Murder | Defendant |
| FL. V. Ronald Robbins | FL | Manslaughter | Defendant |
| WA v. Jay Olsen | WA | Aggravated Assault | Defendant |
| Chambers v. Graham | TX | Wrongful Death | Defendant |
| Arizona v. Larry Hickey | AZ | Aggravated Assault | Defendant |
| Olevarria v. Couture | VA | Wrongful Death | Defendant |
| Aguilar v. ICE | NY | Excessive Force | Defendant |
| Atkinson v. Tulare County | CA | Wrongful Death | Defendant |
| Gutierrez v. Yolo County | CA | Wrongful Death | Defendant |
| WV v. Jonathan Ferrell | WV | Murder | Defendant |