1  C. D. Michel - S.B.N. 144258
   Clinton B. Monfort - S.B.N. 255609
2  Sean A. Brady - S.B.N. 262007
   Anna M. Barvir - S.B.N. 268728
3  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
   Telephone: (562) 216-4444
5  Facsimile:  (562) 216-4445
   Email: cmichel@michellawyers.com
6
7  Attorneys for Plaintiffs

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

| | |
|---|---|
| 11  LEONARD FYOCK, SCOTT HOCHSTETLER, WILLIAM DOUGLAS, DAVID PEARSON, BRAD SEIFERS, and ROD SWANSON, <br><br> Plaintiffs <br><br> vs. <br><br> THE CITY OF SUNNYVALE, THE MAYOR OF SUNNYVALE, ANTHONY SPITALERI in his official capacity, THE CHIEF OF THE SUNNYVALE DEPARTMENT OF PUBLIC SAFETY, FRANK GRGURINA, in his official capacity, and DOES 1-10, <br><br> Defendants. | **CASE NO: CV13-05807 RMW** <br><br> **DECLARATION OF STEPHEN HELSLEY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

1
DECLARATION OF STEPHEN HELSLEY

# DECLARATION OF STEPHEN HELSLEY

1. I am a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and finally Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms. I have qualified as an expert in both criminal and civil matters. I was the department's principal firearms instructor for many years and am an FBI certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, Virginia. Additionally, I am a member of the American Academy of Forensic Sciences and a technical advisor to the Association of Firearm and Tool Mark Examiners. I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for US and Russian journals. For the past twenty years, I was first a state liaison and, then later, a consultant to the National Rifle Association. Throughout my adult life I have been an active participant in handgun, rifle and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s. Finally, I am a collector of firearm related books – of which I have approximately three thousand. Included in my book collection are forty nine different issues of *Gun Digest*, the earliest of which is from 1944. It is a standard resource that is widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

2. The combination of my consulting work, writing and free time activities puts me in constant contact with gun stores, shooting ranges, gun shows and gun

owners. I am also in frequent contact with retirees from DOJ and other law enforcement agencies. It is clear to me from my collective experiences that handguns with a potential magazine capacity of more than 10-rounds are a common choice for self-protection.

3. The standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of whether its capacity is six, ten, fifteen, or twenty rounds. Various popular handgun models originally came from the manufacturer standard, free from artificial influences like laws restricting capacity, with magazines exceeding ten rounds. Examples include, but are in no way limited to, the Browning High Power (13 rounds) c.1954, MAB PA-15 (15 rounds) c.1966, Beretta Models 81/84 (12/13 rounds) c.1977, S&W Model 59 (14 rounds) c.1971, L.E.S P-18 (18 rounds) c.1980 aka Steyr GB, Beretta Model 92 (15 rounds) c.1980s, and Glock 17 (17 rounds) c.1986. I know there to be many more examples not listed here.

4. Firearms with a capacity exceeding 10-rounds date to the 'dawn of firearms.' In the late-15th Century, Leonardo Da Vinci designed a 33-shot weapon. In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle. A modified 18th Century version of Lorenzoni's design, with a 12-shot capacity, is displayed at the NRA's National Firearms Museum. Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806 -- the magazine for which held twenty-two .46 caliber balls.

5. Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War. During that same period, revolvers with a capacity of 20-rounds were available but enjoyed limited popularity because they were so ungainly.

6. In 1879, Remington introduced the first 'modern' detachable rifle magazine. In the 1890s, semiautomatic pistols with detachable magazines followed.

3

DECLARATION OF STEPHEN HELSLEY

During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced. As those magazines protruded well below the bottom of the pistol's frame, they weren't practical for use with a belt holster – and by extension concealed carry for self-defense.

7. In 1935, Fabrique Nationale introduced the Model P-35 pistol with its fully internal 13-round magazine. It would become one of the most widely used military pistols of all time. During WWII, magazine capacity for shoulder-fired arms was substantially increased while most pistols (excluding the P-35) remained at 10-rounds or less. In the mid-1950s the P-35 was rebranded the High Power and imported to the US.

8. This transition of a firearm from military to civilian use for sport or self-defense is very common. The standards of WWI – the 1903 Springfield rifle and the Colt M1911 pistol are but two of many examples. Civilian sales of both began immediately after the war ended. The Springfield would become the standard for both rifle hunting and target competition. Likewise, the M1911 Colt pistol was a target shooting standard for a half-century or more and popular for self-defense.

9. Between the two world wars, double-action semiautomatic pistols like the Walther PPK and P-38 were introduced. The double–action feature allowed the first shot to be fired in a manner similar to a revolver. Law enforcement agencies in the United States had traditionally used revolvers. However, in the early 1970s, a confluence of events changed that: training funds became widely available and so did the first double action semiautomatic pistol (the S&W M59) with a 14-round magazine. Soon major agencies were transitioning to the M59 and the legion of other makes that followed – CZ, Colt, HK, Sig-Sauer, Glock, Beretta, Ruger, Smith & Wesson, etc. Pistols with magazine capacities as large as 19-rounds quickly replaced the six-shot revolver.

10. Law enforcement demand for the new generation of semiautomatic pistols helped create an increased demand in the civilian market. Comparing 1986 and 2010 handgun sales, one can see evidence of that change. According to the Bureau of Alcohol Tobacco Firearms and Explosives, in 1986, 663,000 pistols were sold in the United States versus 761,000 revolvers. In 2010, revolver sales had dropped to 559,000 while pistol sales had grown to 2,258,000. *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States, Annual Statistical Update (2012).[1] The result of almost four decades of sales to law enforcement and civilian clients is millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely multiple millions of magazines for them. My associates who have such pistols also have a significant number of spare magazines for them. In my case, I have one 19-round and eight 17-round magazines for my Glock.

11. The retired peace officer, concealed weapon permit holder and the home-owner wants a pistol that can hold significantly more cartridges than a revolver for the same reason a law enforcement office or soldier wants one – to increase his or her chances of staying alive. Gunfights frequently involve a lot of 'missing.' This can be the result of improper aim or impact with barriers such as vehicles or walls. One would be hard pressed to find someone who had been in a gunfight that complained about having too much ammunition.

12. Some believe that anyone defending themselves can just "shoot to wound." Those who grew up in the 1950s likely watched Roy Rogers shoot the gun out of an evildoers hand - or if things got really serious – let loose a grazing wound to the arm to settle matters. Such ideas are a fantasy. Equally as silly is the well-

---

[1] Report available at http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf

5

DECLARATION OF STEPHEN HELSLEY

known 'fact' that a bullet from a .45ACP cartridge will knock someone to the ground no matter where it strikes them.

13. The notion that a bullet can 'knock-down' a person is a largely Hollywood–inspired myth. Most of us learned in school about Sir Isaac Newton's *Third Law of Motion* that states - "For every action, there is an opposite and equal reaction." Put another way –If the recoil of the firearm doesn't knock you down, neither will the bullet. Bullets can penetrate skin, cut arteries, brake bones or interrupt nerve function to accomplish what is generally described as 'stopping power.' A bullet that severs the spine or strikes a certain area of the brain will almost certainly stop an attacker instantly. Bullet design and/or increased velocity may improve performance but placement is still the most critical factor. A hit, or even multiple hits, to less vital areas of the body may allow an attacker to continue the assault. This phenomenon is extensively documented in the citations for American hero's who were awarded the Congressional Medal of Honor. Many of these men continued to fight after suffering multiple gunshot wounds, being struck by shrapnel or having an arm or leg severed. *See*, e.g., The Congressional Medal of Honor, The Names, The Deeds 28-29, 52-53, 284-85 (Sharp & Dunnigan, 1984). A fighter who has overcome fear and is motivated to continue an attack can be difficult to stop. In the infamous 1986 FBI shoot-out with two Florida bank robbers, one of the suspects, Michael Platt, sustained 12 gunshot wounds before dying. Jamie Frater, Top 10 Most Audacious Shootouts in US History, Listserve (October 14, 2009) http://listverse.com/2009/10/14/top-10-most-audacious-shootouts-in-us-history/.

14. "Knockdown" and "Stopping Power" are things I know from personal experience. During my early years as a narcotic agent with the California Department of Justice, I was conducting an undercover investigation of a significant heroin dealer. After purchasing an ounce and a half of heroin from him and the arrest was initiated, he shot me with a .45 first breaking my left arm and

severing an artery (Note: I wasn't 'knocked down.') and then bouncing another round off my spine that exited my right leg. From a prone position I returned fire at the suspect who was mostly concealed by the trunk of his car. My shots that struck the vehicle failed to penetrate sufficiently to reach him. In the exchange that followed I had another round pass through my right leg, while another entered my left side and lodged in the disc between L3 and L4 - where it remains today. Having emptied the 8 rounds in my pistol, I tried to reload. However, with a broken arm and temporary paralysis from the waist down, I was unable to reach my spare magazine in my left rear pants pocket. Fortunately, at that time the suspect quickly surrendered to my converging surveillance team. Very little pain was initially associated with my wounds and I could have 'fought on' if more ammunition had been available. A total of 18-rounds were fired.

15. Four years later, I was making an undercover cocaine purchase with a new member of my team. I had involved myself to evaluate his performance. The three suspects, two of whom were armed (initially unbeknownst to us) had decided that robbery was a better option than delivering the cocaine. The junior agent was taken hostage and was being held in the state undercover car with a sawed-off rifle to the back of his head and a revolver held against his right side. I was across the street in another undercover car with the money the suspects wanted. I informed the surveillance team that I was going to approach the other vehicle to see what I could do. When I got to the car it was difficult to determine what was happening, as it was a dark, rainy night. I told the agent to exit the vehicle and as he opened the car door and dived out, two shots were fired at him – both missed. I returned fire at the area of the muzzle flash inside the car. Of the eight rounds I fired, the automobile glass defeated most. However, one .45 bullet hit the suspect holding the rifle, causing him serious internal injuries. The suspect with the revolver came out of the passenger door and was struck through the shin with a .45 bullet from a member of the surveillance team who had quietly closed-in on the vehicle. After a short pause

the suspects were ordered out of the vehicle. Both of those with gunshot wounds came out fighting. A flashlight to the chin produced the 'stopping power' for the suspect with the internal wound. The suspect with the leg wound was unaware of his injury until he saw the massive blood loss – whereupon he exclaimed "I'm bleeding" and passed out. Twenty-eight rounds were fired into the vehicle with only two hits. For my actions in this incident I was awarded the department's Medal of Valor. The 'take away' from these incidents is that serious bullet wounds aren't necessarily incapacitating and that gunfights can require lots of ammunition.

16. By the time I retired from DOJ, I had switched to a Glock 17 with a 19-round magazine as my duty and then personal defense weapon. I purchased it from the department with a compliment of magazines and have carried it, so equipped, ever since. I am authorized to carry a loaded and concealed firearm pursuant to Penal Code Sections 25455 and 25460. Should my travels take me into Sunnyvale, I would be prohibited from using my magazines for such travel because I transited that city.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on December 23, 2013.

*[signature]*
Stephen Helsley