# EXHIBIT A

1   C. D. Michel - S.B.N. 144258
Clinton B. Monfort - S.B.N. 255609
2   Sean A. Brady - S.B.N. 262007
Anna M. Barvir - S.B.N. 268728
3   MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
4   Long Beach, CA 90802
Telephone: 562-216-4444
5   Facsimile: 562-216-4445
Email: cmichel@michellawyers.com

6

7   Attorneys for Plaintiffs

8           **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                **SAN JOSE DIVISION**

11

12   LEONARD FYOCK, SCOTT     )   **CASE NO: CV13-05807 RMW**
HOCHSTETLER, WILLIAM DOUGLAS, )
13   DAVID PEARSON, BRAD SEIFERS, and )   **NOTICE OF MOTION AND MOTION**
ROD SWANSON,                )   **FOR PRELIMINARY INJUNCTION;**
                           )   **MEMORANDUM OF POINTS AND**
14          Plaintiffs        )   **AUTHORITIES IN SUPPORT**
                           )
15            vs.         )   Date:       February 7, 2014
                           )   Time:      9:00 a.m.
16   THE CITY OF SUNNYVALE, THE    )   Location:   San Jose Courthouse
MAYOR OF SUNNYVALE, ANTHONY  )                 Courtroom 6 - 4th Floor
17   SPITALERI, in his official capacity, THE )               280 South 1st Street
CHIEF OF THE SUNNYVALE      )                 San Jose, CA 95113
18   DEPARTMENT OF PUBLIC SAFETY,  )
FRANK GRGURINA, in his official   )
19   capacity, and DOES 1-10,         )
                           )
20          Defendants.     )

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1

## TABLE OF CONTENTS

2

PAGE(S)

3
**NOTICE OF MOTION AND MOTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4
**MEMORANDUM OF POINTS AND AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5
**STATEMENT OF ISSUE TO BE DECIDED**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6
**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7
**STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8
I.   SUNNYVALE MUNICIPAL CODE SECTION 9.44.050:
     MAGAZINE POSSESSION BAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

9

10
II.  THE BANNED MAGAZINES ARE STANDARD EQUIPMENT
     FOR COMMON FIREARMS OWNED BY MILLIONS OF
     LAW-ABIDING CITIZENS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

11

12
     A.   Prevalence of the Prohibited Magazines Among
          Law-Abiding Citizens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

13
     B.   The "Large Capacity" Label Is a Misnomer. . . . . . . . . . . . . . . . . . . 5

14
**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

15
I.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM
     THAT THE ORDINANCE VIOLATES THE SECOND AMENDMENT. . . . . . . . . . . . 6

16

17
     A.   The Second Amendment Protects Arms "Typically
          Possessed By Law-Abiding Citizens for Lawful Purposes". . . . . . . . . 6

18
     B.   The Ordinance Prohibits Law-Abiding Citizens From
          Possessing Arms in Common Use for Lawful Purposes –

19
          It Is Thus Categorically Invalid. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

20
          1.   Firearms Equipped With the Prohibited Magazines
               Are in Common Use for Lawful Purposes. . . . . . . . . . . . . . . . 8

21

22
          2.   Bans on Arms in Common Use for Lawful Purposes
               Are Categorically Invalid Without Resort to
               Means-End Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

23
     C.   If the Court Selects a Level of Means-End Review, Strict

24
          Scrutiny Must Apply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

25
     D.   The Ordinance Is Unconstitutional Under Any Heightened
          Level of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26

27
II.  THE REMAINING PRELIMINARY INJUNCTION FACTORS WARRANT
     RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28

i

1

**TABLE OF CONTENTS (CONT.)**

2

**PAGE(S)**

3

A.      **Irreparable Harm Should Be Presumed Because the**
4       **Ordinance Violates Plaintiffs' Second Amendment Rights** . . . . . . . . . . . . . . 23

5       B.      **Harms to Plaintiffs and to the Public Far Outweigh Any**
        **Harm to the City** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

6

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1

# **TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

## **FEDERAL CASES**

4

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5

*Alliance for Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

6

7

*Brown v. Entm't Merchants Ass'n,*
    131 S. Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

8

*Butler v. State of Michigan,*
    352 U.S. 380 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

9

10

*Carey v. Population Servs., Int'l.,*
    431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11

*Clark v. Jeter,*
    486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

12

13

*Central Hudson Gas & Elec. Corp. v. Pub. Serve Comm'n of N.Y.,*
    447 U.S. 557 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

14

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

15

16

*District of Columbia v. Heller,*
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

17

*Fantasyland Video, Inc. v. Cnty. of San Diego,*
    505 F.3d 996 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18

19

*Griswold v. Connecticut,*
    381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20

*Haynes v. Office of the Att'y Gen. Phill Kline,*
    298 F. Supp. 2d 1154 (D. Kan. Oct. 26, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

21

22

*Heller v. District of Columbia* (*Heller II*),
    670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

23

*Kachalsky v. County of Westchester,*
    701 F.3d 81 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

24

25

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

26

*Kodak v. Holder,*
    342 F. App'x 907 (4th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

27

28

iii

1

# <u>TABLE OF AUTHORITIES</u>

2

**PAGE(S)**

3

## <u>FEDERAL CASES CONT.</u>

4

*Lamont v. Postmaster Gen. of the U.S.,*
    381 U.S. 301 (1965)............................................... 15

5

*Lawrence v. Texas,*
    539 U.S. 558 (2003)............................................... 15

6

7

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994)............................................... 19

8

*McDonald v. City of Chicago,*
    130 S. Ct. 3020 (2010).......................................... 6, 16, 23

9

10

*Monterey Mech. Co. v. Wilson,*
    125 F.3d 702 (9th Cir. 1997).................................... 23

11

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012).................................... 14

12

13

*New Albany DVD, LLC v. City of New Albany,*
    581 F.3d 556 (7th Cir. 2009).................................... 21, 22

14

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992)............................................... 15

15

16

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992).............................................. 18

17

*Reliable Consultants, Inc. v. Earle,*
    517 F.3d 738 (5th Cir. 2008).................................... 15

18

19

*Robb v. Hungerbeeler,*
    370 F.3d 735 (8th Cir. 2004).................................... 22

20

*Preminger v. Principi,*
    422 F.3d 815 (9th Cir. 2005).................................... 24

21

22

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1, 16 (1973)............................................ 15

23

*Stanley v. Georgia,*
    394 U.S. 557 (1969)............................................... 14

24

25

*Tucson Woman's Clinic v. Eden,*
    379 F.3d 531 (9th Cir. 2004).................................... 15, 16

26

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010).................................... 18

27

28

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1

## TABLE OF AUTHORITIES

2
PAGE(S)

3

**FEDERAL CASES CONT.**

4

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17, 18

5

*United States v. Masciandaro*,
   638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

6

7

*United States v. McCartney*,
   357 F. App'x 73 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9

10

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11

*Vincenty v. Bloomberg*,
   476 F.3d 74 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

12

13

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

14

*Zepeda v. U.S. Immigration*,
   753 F.2d 719 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15

16

*44 Liquormart, Inc. v. Rhode Island*,
   517 U.S. 484 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

17

18

**STATUTES, RULES & REGULATIONS**

19

Cal. Penal Code §§ 32310, 32400-50. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 24

20

Cal. Leg. S. 396, 2013-2014 Reg. Sess. (Cal. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21

Sunnyvale, Cal., Muni. Code § 9.44.050. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4

22

23

**ARTICLES, EDITORIALS, & REFERENCE MATERIALS**

24

25

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995). . . . . 23

26

Chad Adams,
   *Complete Guide to 3-Gun Competition* (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

27

28

**TABLE OF AUTHORITIES**

PAGE(S)

**ARTICLES, EDITORIALS, & REFERENCE MATERIALS (CONT).**

Christopher S. Koper et al.,
*An Updated Assessment of the Federal Assault Weapons Ban:
Impacts on Gun Markets and Gun Violence, 1994-2003*, Rep.
to the Nat'l Inst. of Justice, U. S. Dept. of Justice (2004). . . . . . . . . . . . . . . . . . . . . . . .  10

Gary Kleck,
*Targeting Guns: Firearms and Their Control*
(Aldine De Gruyter 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Massad Ayoob,
*The Complete Book of Handguns* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

Rudyard Kipling,
*The Elephant's Child*, in *Just So Stories* 31 (Acra Found. 2013). . . . . . . . . . . . . . . . . .  18

Federal Bureau of Investigation, *Crime in the United States 2012*,
Department of Justice (2012), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/
crime-in-the-u.s .-2012/violent-crime/violent-crime; *id.* at Table 1, http://www.fbi.gov/about-
us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/tables/1tabledatad
ecoverviewpdf/table_1_crime_in_the_united_states_by_volume_and_rate_per_
100000_inhabitants_1993-2012.xls.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

U.S. Dept. of Justice, Bureau of Justice Statistics, National Crime Victimization
Survey, *Criminal Victimization in the United States, 2008 Statistical Tables*,
Table 37 (Marc. 2009), *available at* bjs.gov/content/pub/pdf/ cvus08.pdf. . . . . . . . . . . . . . . .  11

*What Should America Do About Gun Violence?*
Full Comm. Hr'g Before U.S. Sen. Jud. Comm., 113th Cong. at 11 (2013),
available at www.judiciary.senate.gov/pdf/1-30-13kopeltestimony. pdf. . . . . . . . . . . . . . . . .  19

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1

### NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: Notice is hereby given

3

that on February 7, 2014, at 9:00 a.m., or as soon thereafter as counsel may be heard by the

4

above-entitled court, located at 280 South 1st Street, San Jose, California, in the courtroom of the

5

Honorable Judge Ronald Whyte, Plaintiffs will and hereby do move for a preliminary injunction

6

pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.

7

Plaintiffs will seek an order enjoining Defendants City of Sunnyvale, the Mayor of

8

Sunnyvale, Anthony Spitaleri, and the Chief of the Sunnyvale Department of Public Safety, Frank

9

Grgurina, ("the City") from enforcing Sunnyvale Municipal Code section 9.44.050, as it violates

10

Plaintiffs' Second Amendment right to possess protected arms in common use for lawful

11

purposes.

12

This motion shall be based on this notice of motion and motion, the memorandum of

13

points and authorities in support, the declarations and evidence filed concurrently herewith, and

14

upon any further matters the Court deems appropriate.

15

### MEMORANDUM OF POINTS AND AUTHORITIES

16

### STATEMENT OF ISSUE TO BE DECIDED

17

The Second Amendment guarantees the right of law-abiding adults to use arms that are

18

typically possessed by law-abiding citizens for lawful purposes. Millions of law-abiding

19

Americans possess firearms with magazines holding over ten rounds for defense of "hearth and

20

home" – the Second Amendment interest that is "elevated above all others." The City enacted an

21

ordinance banning all law-abiding adults from possessing and using these arms in their homes for

22

any purpose. Does the City's ordinance violate the Second Amendment?

23

### INTRODUCTION

24

This case presents a challenge to the City's ban on the possession and use of magazines

25

capable of holding more than ten rounds of ammunition. Despite the City's "large-capacity"

26

label,  magazines that hold over ten rounds are the standard for millions of handguns and rifles.

27

And they are chosen and currently possessed by millions of law-abiding American citizens for

28

self-defense within their homes.

1

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

In *Heller v. District Columbia*, the Supreme Court held that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. 570, 635 (2008), and that it specifically protects the right to engage in this activity with arms that are commonly used by law-abiding Americans, *id.* at 624-25. Unlike the laws at issue in the majority of post-*Heller* decisions dealing with conduct arguably outside the Second Amendment's "core," the City's ordinance prohibits law-abiding adults from possessing common arms within the sanctity of their homes for use in defending themselves and their families. The law thus affects not just core lawful conduct; it strikes at the Second Amendment's highest purpose as described by the Supreme Court.

While the government might lawfully place some upper limit on ammunition capacity, the City's ten-round limit is well below that which the American people find suitable for self-defense. This Court need not decide what limit might serve a compelling government interest while still comporting with constitutional protections. It is enough that the City's ban goes too far.

As is the case with other fundamental rights, the City cannot deny responsible citizens the right to keep and use protected items because some members of society might use them for nefarious purposes. But that is exactly what the City has done. To prevent criminals from unlawfully using firearms with magazines that hold over ten rounds, the City has decided to pull these magazines from the homes of law-abiding residents. The forced removal from residents' homes will occur just twenty-seven days from the scheduled hearing on this motion.

By flatly banning the possession and use of protected arms, the City's ordinance lies at the extreme end of the gun control continuum. Its approach cannot be reconciled with the protections afforded by the Second Amendment, and it is necessarily unconstitutional under any test the court may apply.

The harm resulting from the ongoing deprivation of Plaintiffs' fundamental rights, as well as the harm invited upon those residents who will be forced to dispose of their lawfully acquired

property with no way to replace it under state law is irreparable.[1] As this case raises serious questions concerning the core exercise of a fundamental right, the Court should issue preliminary relief to preserve the status quo, thus preventing the removal of lawfully acquired items from the homes of law-abiding citizens while the case is decided on the merits.

## STATEMENT OF FACTS

**I. Sunnyvale Municipal Code Section 9.44.050: Magazine Possession Ban**

The City of Sunnyvale recently enacted Municipal Code section 9.44.050 ("the Ordinance"), which bans the possession of ammunition feeding devices or "magazines" with the capacity to accept more than ten rounds.[2] All persons in possession of these magazines have just ninety days to remove them from the City, surrender them to the Sunnyvale Department of Public Safety for destruction, or sell or transfer them to a properly licensed vendor in accordance with state law. Sunnyvale, Cal., Muni. Code § 9.44.050(b).[3] The ban even requires that active-duty officers discontinue possession of their non-duty magazines capable of holding more than ten rounds. Anyone who fails to comply with the City's mandate is subject to criminal penalties, including incarceration. Sunnyvale., Cal., Muni. Code § 706.

The individual plaintiffs, Leonard Fyock, William Douglas, David Pearsons, Brad Seifers, and Rod Swanson, are responsible and law-abiding residents of Sunnyvale who are not prohibited from owning or possessing firearms. Fyock Decl. ¶¶ 2-3; Douglas Decl. ¶¶ 2-3; Pearsons Decl. ¶¶ 2-3, Seifers Decl. ¶¶ 2-3; Swanson Decl. ¶¶ 2-3. They each currently own lawfully acquired magazines capable of holding more than ten rounds of ammunition, but section 9.44.050 prohibits

---

[1]  Effective January 1, 2000, California state law prohibits the manufacture, importation, sale, gift, or loan of magazines capable of holding more than ten rounds. Cal. Penal Code §§ 32310, 32400-50.

[2]  The ordinance exempts from its definition of "large-capacity magazines" any: (1) feeding device that has been permanently altered so that it cannot accommodate more than ten rounds; (2) .22 caliber tube ammunition feeding device; or (3) tubular magazine contained in a lever-action firearm.

[3]  The Ordinance took effect on December 6, 2013, requiring all persons to dispose of their magazines by March 6, 2014.

3

them from continuing to possess those magazines within the City. Fyock Decl. ¶¶ 4-5, 12; Douglas Decl. ¶¶ 4-5, 10; Pearsons Decl. ¶¶ 4-5, 10; Seifers Decl. ¶¶ 4-5, 12; Swanson Decl. ¶¶ 4-5, 11. While each individual plaintiff intends to comply with section 9.44.050 to avoid prosecution, they would each immediately possess these magazines within the City for self-defense and other lawful purposes should the Court enjoin enforcement of the law. Fyock Decl. ¶¶ 13-14; Douglas Decl. ¶¶ 11-12; Pearsons Decl. ¶¶ 11-12; Seifers Decl. ¶¶ 13-14; Swanson Decl. ¶¶ 12-13.

## II. THE BANNED MAGAZINES ARE STANDARD EQUIPMENT FOR COMMON FIREARMS OWNED BY MILLIONS OF LAW-ABIDING CITIZENS

### A. Prevalence of the Prohibited Magazines Among Law-Abiding Citizens

Magazines capable of holding more than ten rounds are standard equipment for many common pistols and rifles purchased by the American public for both self-defense and sport. Helsley Decl. ¶ 3; Monfort Decl. ¶ 5; Ex. B at 455-64 (attached to Monfort Decl.); Ex. C (attached to Monfort Decl.). Conservative estimates set the number of these standard magazines possessed by law-abiding citizens throughout the country in the tens of millions. Curcuruto Decl. ¶ 13. Although exact numbers are difficult to calculate, a large percentage – perhaps a majority – of rifles and pistols manufactured and sold in the United States today have capacities greater than ten rounds. Curcuruto Decl. ¶ 6; NSSF Magazine Report (attached to Curcuruto Decl. as "Exhibit A"); Helsley Decl. ¶ 10; Ex. B. Many of the most popular and predominant models of handguns – the "quintessential" self-defense firearm – typically have capacities ranging from eleven to twenty rounds, with many holding between fifteen and seventeen. Helsley Decl. ¶ 3; Monfort Decl. ¶ 5; Ex. B at 455-64, 497-99; Ex. C.

Firearms with magazine capacities greater than ten rounds are highly effective for in-home self-defense. Ayoob Decl. ¶¶ 11,14, 25, 27. Due to their suitability for this purpose, they are the preferred firearm of choice for millions of law-abiding Americans.[4]

---

[4] As Second Amendment protections turn on common usage, the evidence supporting these points are discussed in greater detail in Part I.B.1.

### B.     The "Large Capacity" Label Is a Misnomer

The City pejoratively refers to the feeding devices it bans as "large-capacity magazines." Proponents of standard-capacity firearm and magazine bans have even started referring to them as "mega-magazines." Cal. Leg. S. 396, 2013-2014 Reg. Sess. (Cal. 2013); Bill Analysis, S. 396, 2013-2014 Reg. Sess., at 5 (Cal. 2013). As used by advocates of such bans, these are terms of opprobrium, applied for public relations purposes to help garner support for legislative proposals. In a similar attempt to vilify these common magazines, the City and County of San Francisco adopted a finding describing the prohibited magazines as "typically associated with machine guns or semi-automatic assault weapons," S.F., Cal., Police Code § 619(a)(4), despite their being standard equipment for tens of millions of *handguns*.

The standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of its capacity. Helsley Decl. ¶ 3.

### ARGUMENT

Plaintiffs seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of relief; (3) the balance of equities tips in his or her favor; and (4) an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Under controlling Ninth Circuit precedent, these factors may operate on a "sliding scale," such that "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the [plaintiff's] favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Plaintiffs, absent relief, will continue to suffer the deprivation of their Second Amendment rights. They are likely to succeed on the merits and have raised serious questions of law regarding their claims. The harm invited upon them is irreparable. And granting this motion will preserve Plaintiffs' constitutional rights and protect the rights of all Sunnyvale residents and persons passing through the City, including active-duty law enforcement officers. The balance of harms and the public interest thus tip sharply in favor of relief.

///

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

**I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM THAT THE ORDINANCE VIOLATES THE SECOND AMENDMENT**

The Supreme Court has described "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" as the Second Amendment interest "surely elevate[d] above all other[s]." *Heller*, 554 U.S. at 635. Because the Ordinance prohibits law-abiding citizens from using commonly possessed arms within the sanctity of their homes, for the core, lawful purpose of self-defense, it is unconstitutional under any test the Court might apply.

**A.    The Second Amendment Protects Arms "Typically Possessed By Law-Abiding Citizens for Lawful Purposes"**

The Supreme Court recently confirmed that the Second Amendment protects a fundamental, individual right to keep and bear arms that, by virtue of the Fourteenth Amendment, state and local governments are bound to respect. *Id.* at 581; *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026, 3036 (2010). It follows that there are certain "instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, that law-abiding citizens have an inviolable right to possess and use. Indeed, as *Heller* made clear, the constitution protects arms "of the kind in common use . . . for lawful purposes like self-defense." *Id.* at 624. Conversely, it "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Put another way, the Second Amendment does not protect arms "that are highly unusual in society at large," *id.*, but it definitively protects those in common use for lawful purposes, *id.* at 624. This distinction is fairly supported by the historical prohibition on carrying "dangerous *and* unusual weapons." *Id.* at 627 (emphasis added).

In accord with *Heller*, various circuit courts considering which arms enjoy Second Amendment protection have examined whether types of firearms, ammunition, and firearm accessories are in "common use for lawful purposes." The Fourth and D.C. Circuits have applied this "common use" test in challenges to laws regulating not just firearms, but also necessary components of functional firearms, including ammunition and ammunition feeding devices. *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2011) (magazines holding over ten rounds); *Kodak v. Holder*, 342 F. App'x 907, 908-09 (4th Cir. 2009) (armor-

1    piercing ammunition). And the Ninth Circuit has also applied this analysis to non-essential

2    firearm accessories. *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (finding no

3    Second Amendment right implicated because silencers are not "typically possessed for lawful

4    purposes").

5         *Heller* and its progeny thus instruct that the Second Amendment protects firearms with

6    capacities of more than ten rounds if they are typically possessed or commonly chosen for lawful

7    purposes in American society. If the Court establishes this class of arms is "in common use for

8    lawful purposes," as it should, these arms enjoy constitutional protection and the Court's work is

9    done. Because common usage "for lawful purposes" is the decisive issue under *Heller*, further

10   inquiry into the "necessity" of such arms or the availability of other sufficient arms is improper.

11   *Heller*, 554 U.S. at 624-25, 627.

12        *Heller* categorically invalidated D.C.'s handgun ban without requiring any such showing.

13   The District and its amici specifically argued that handguns may be banned because individuals

14   can defend themselves with rifles and shotguns – items they considered to be superior defensive

15   tools. The *Heller* Court responded unequivocally:

16

17   > It is no answer to say, as [the District does], that it is permissible to ban the
>    possession of handguns so long as the possession of other firearms (i.e., long guns)
>    is allowed. It is enough to note, as we have observed, that the American people
18   > have considered the handgun to be the quintessential self-defense weapon.

19   554 U.S. at 630. Simply put, handguns are protected regardless of whether they are "necessary"

20   for self-defense because the American people commonly choose them for that lawful purpose.

21        In direct conflict with this clear instruction from the Supreme Court, a panel of the D.C.

22   Circuit upheld a ban on magazines capable of holding more than ten rounds. *Heller II*, 670 F.3d at

23   1264. To justify application of lesser scrutiny, the court required not only that the banned items

24   be in common use, but *also* that they be "well-suited to or preferred" for self-defense and sporting

25   purposes. *Id.* at 1261. Controlling Supreme Court precedent provides no support for such a test.

26        Here, any argument that magazines capable of holding more than ten rounds are not

27   *necessary* for individuals to vindicate their right to self-defense is simply irrelevant to whether the

28   law abiding have a right to possess and use them. Even if this argument were rooted in fact, the

7

*American public* dictates what is necessary and suitable for self-defense – not the City. In striking down D.C.'s handgun ban, the *Heller* Court made clear that the Second Amendment protects arms chosen *by the American people* for self-defense. 554 US at 628. It was not for the government to say the banned items are not well-suited to that purpose.

Nor may it be suggested that the chances are low that one would ever "need" firearms loaded with more than ten rounds for self-defense. Plaintiffs may never "need" to discharge a firearm for protection at all, but that does not extinguish their right to do so. The City's belief that firearms holding fewer rounds are sufficient for self-defense in most cases, no matter how sincere, is *not* decisive. Second Amendment protection depends on the purposes for which types of arms are possessed by the law abiding, and it does not evaporate simply because other arms sufficient for those purposes might exist.

The City's ordinance effectively bans firearms with magazine capacities over ten rounds. These arms are routinely, and on a massive scale, chosen and preferred by Americans for self-defense. Their Second Amendment protection cannot be credibly disputed.

## B.    The Ordinance Prohibits Law-Abiding Citizens From Possessing Arms in Common Use for Lawful Purposes – It Is Thus Categorically Invalid

Millions of law-abiding Americans possess firearms with magazine capacities over ten rounds for lawful purposes, including the core lawful purpose of self-defense. Protection for these arms under the Second Amendment is thus secure. Rather than regulate these protected arms, the City has flatly banned all law-abiding citizens from possessing them in their homes. The City's ordinance is irreconcilable with Second Amendment protections under any test, and the Court need not select a level of scrutiny in declaring it invalid.

### 1.    Firearms Equipped With the Prohibited Magazines Are in Common Use for Lawful Purposes

Firearms equipped with magazines prohibited by the Ordinance are "typically possessed by law-abiding citizens for lawful purposes," including self-defense and sporting purposes. *See Heller*, 554 U.S. at 625. In fact, such magazines are *standard equipment* for many popular pistols and the predominant brands of semiautomatic rifles used for both self-defense and recreational

8

purposes. Curcuruto Decl. ¶ 6; Helsley Decl. ¶¶ 3, 10; Monfort Decl. ¶ 5; Ex. B; Ex. C. Standard-issue magazines for very common semiautomatic pistols have capacities ranging from eleven to twenty rounds, with many between fifteen and seventeen. Helsley Decl. ¶¶ 3, 5-9; *see also* Ex. D (attached to Monfort Decl.). Examples of these common handguns include the Browning High Power (13 rounds) c.1954, MAB PA-15 (15 rounds) c.1966, Beretta Models 81/84 (12/13 rounds) c.1977, S&W Model 59 (14 rounds) c.1971, L.E.S P-18 (18 rounds) c.1980 aka Steyr GB, Beretta Model 92 (15 rounds) c.1980s, and Glock 17 (17 rounds) c.1986. Helsley Decl. ¶ 3. And the magazines for tens of millions of rifles are also over ten rounds. Curcuruto Decl. ¶ 8; Ex. A. These are the "standard capacities" for many of the most popular firearms in American society.

Approximately one-third of the semiautomatic handgun models listed in *Gun Digest*, a reference work that includes the specifications of currently available firearms, are normally sold with magazines that hold more than ten rounds of ammunition. Helsley Decl. ¶ 1; Ex. B at 407-39. And approximately two-thirds of the distinct models of semiautomatic, centerfire rifles listed are regularly sold with detachable magazines that hold more than ten rounds. Ex. B at 455-64, 497-99. In both cases, but especially for handguns, these figures underestimate the market share of magazines capable of holding more than ten rounds of ammunition, because they include many of the rarer lower-capacity firearms offered by low-volume manufacturers.

A large percentage of pistols, perhaps a majority, are manufactured with magazines holding more than ten rounds. Helsley ¶¶ 3, 9-11; Ex. A; *see also* Massad Ayoob, *The Complete Book of Handguns* 87, 89-90 (2013). And millions of rifles equipped with such magazines are privately owned throughout the United States. Curcuruto Decl. ¶¶ 8, 11-13; Ex. A.

At minimum, there are tens of millions of magazines capable of holding more than ten rounds in the hands of the American public. Curcuruto Decl. ¶ 13. A 2004 report funded by the Department of Justice estimated the number of such magazines to be 72 million – a figure that does not include the millions that have been imported or manufactured in the ten years since the

1    federal ban expired in 2004.[5]

2        Far from being "highly unusual in society at large," the evidence establishes that

3    magazines holding more than ten rounds are exceedingly common throughout the nation. The

4    overwhelming majority of states place no restrictions on standard-capacity magazines, let alone

5    force law-abiding citizens to surrender them or face criminal prosecution. It is the City's ban, not

6    these magazines, that is "highly unusual."

7        In considering a challenge to a similar magazine ban, the D.C. Circuit acknowledged the

8    commonality of the banned items: "We think it clear enough in the record that . . . magazines

9    holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend." *Heller II*,

10   670 F.3d at 1261. Despite this finding, the *Heller II* court improperly proceeded to further require

11   that such magazines be "well-suited to or preferred for the purpose of self-defense or sport," a test

12   unsupported by *Heller*. *See* Part I.A., *supra*.

13       In any event, firearms with magazines capable of holding more than ten rounds are both

14   well-suited and preferred for self-defense in the home and for sport. This fact is self evident. The

15   availability of more ammunition in a firearm increases the likelihood of surviving a criminal

16   attack, while limiting the number of rounds available decreases one's chances of survival. A

17   firearm's ammunition capacity is thus directly related to its suitability for self-defense.

18       Evidence of this point is overwhelming. Massad Ayoob, renowned use-of-force expert and

19   a preferred defensive-gun-use trainer among law enforcement, describes the suitability of firearms

20   with increased ammunition capacities for self-defense:

21       [L]imits on magazine capacity are likely to impair the ability of citizens to engage
         in lawful self-defense in those crime incidents necessitating that the victim fire
22       many rounds in order to stop the aggressive actions of offenders.

23   Ayoob Decl. ¶ 4; *see also* Ayoob Decl. at ¶¶ 4-16 (recounting, as examples, some of the many

24   instances where crime victims required more than ten rounds to fight off his or her attacker(s));

25   _____

26       [5]  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons
     Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice,
27   U. S. Dept. of Justice at 65 (2004) (hereafter, "2004 Koper Report") (reporting industry
     estimates that 25 million such magazines were available as of 1995, nearly 4.8 million were
28   imported for sale from 1994-2000, and an additional 42 million may have arrived after 2000).

                                                    10

Kleck Decl. ¶ 20.

The reasons a potential victim benefits from having more than ten rounds immediately available in a self-defense emergency are many. 554 U.S. at 624-25, 627. For instance, the presence of multiple attackers often requires far more defensive discharges to eliminate the threat.[6] Ayoob Decl. ¶¶ 4-16; Kleck Decl. ¶ 21. Second, the stress of a criminal attack greatly reduces the likelihood that shots fired will actually hit a violent intruder.[7] Kleck Decl. ¶¶ 21-23; *see also* Ayoob Decl. ¶ 27. And it is rare that those hits will incapacitate the criminal intruder before he can complete his attack. Ayoob Decl. ¶¶ 5-9, 11-14; Helsley Decl. ¶¶ 12-15 (debunking the myth that a person, once shot, is generally immediately incapacitated).[8]

Given that criminal attacks occur at a moment's notice, taking the victim by surprise, usually at night and in confined spaces, victims rarely have multiple magazines or extra ammunition readily available for reloading. Ayoob Decl. ¶¶ 17-18; Kleck Decl. ¶ 20. Regardless, the victim likely cannot hold a spare magazine as he or she scrambles for cover. Often both hands will be on the firearm. If they are not, one hand is likely holding the phone to call the police. Ayoob Decl. ¶ 17. And certainly most people do not sleep with back-up magazines or firearms strapped to their bodies. Ayoob Decl. ¶ 17. Victims will typically have to make do with a single

---

[6] Far from a rare occurrence, the 2008 National Crime Victimization survey indicates that 17.4% of violent crimes in the U.S. involved two or more offenders. That year, victims of nearly 800,000 violent crimes faced multiple offenders. Kleck Decl. ¶ 22; *see also* U.S. Dept. of Justice, Bureau of Justice Statistics, National Crime Victimization Survey, *Criminal Victimization in the United States, 2008 Statistical Tables*, Table 37 (Mar. 2009), *available at* bjs.gov/content/pub/pdf/cvus08.pdf.

[7] The low hit-rate among trained law enforcement officers underscores this point. Even at close range, officers miss their target far more often than they hit it. Kleck Decl. ¶¶ 22-23. Considering that even law enforcement often struggle to hit a target under stress at close range, it is no surprise that law-abiding citizens overwhelmingly choose standard-capacity magazines holding more than ten rounds for in-home self-defense. This is especially true since civilians rarely have the benefit of a bullet proof vest, a secondary weapon, extra magazines, or a partner for backup. Ayoob Decl. ¶¶ 25-26.

[8] Even assuming a generous 37 percent "hit rate," Kleck Decl. ¶ 23, for a civilian facing three attackers and the ability to incapacitate each aggressor with just two bullets, the victim, limited to ten rounds, would be about seven bullets short – and left defenseless to ward off any remaining attackers while reloading.

11

1   available gun and its ammunition capacity. Ayoob Decl. ¶¶ 17, 23; Kleck Decl. ¶ 20. Limited to

2   just ten rounds by the City's law, victims will be left defenseless against their attackers should

3   they be unable to neutralize their attackers with just ten bullets.

4         Even if additional magazines are available, it is extremely difficult – and potentially

5   deadly – to stop to change magazines under the stress of a criminal attack. As Mr. Ayoob

6   explains:

7       A highly skilled police officer or competitive shooter may be able to accomplish a
        reload in two seconds. Most people take considerably longer; especially someone

8       who is under the mental duress typically experienced during an attack. **Changing
        a magazine is a fine motor skill, the type of skill which degrades severely in**

9       **human beings under stress** due to vasoconstriction (loss of blood flow to the
        extremities) and also due to tremors induced by internally-generated adrenaline

10      (epinephrine).

11  Ayoob Decl. ¶ 27 (emphasis added); *see also* Kleck Decl. ¶ 27. In sum, forcing law-abiding

12  citizens to change magazines while attempting to defend against a criminal attack could cost them

13  their lives, particularly if they are facing multiple armed assailants.

14        It is undeniable that magazines capable of accepting more than ten rounds are well-suited

15  to and effective for self-defense in the home and elsewhere.[9] Firearms with capacities of more

16  than ten rounds were developed for that very reason. Helsley Decl. ¶¶ 4-11. Manufacturers

17  specifically market them for self-defense. Monfort Decl. ¶ 5; Ex. C. And, as evidenced by the fact

18  that U.S. consumers acquire these firearms specifically developed and marketed for personal

19  defense on a massive scale, Curcuruto Decl. ¶¶ 8, 11-13; Ex. A, they are preferred by millions of

20  Americans for that reason. The entire consumer firearm market has transitioned from revolvers to

21  pistols in large part because semiautomatic pistols allow for more rounds to be immediately

22  available in a self-defense emergency. Helsley Decl. ¶¶ 9-11.

23  ───────────────────

24      [9] The banned magazines are also essential in the most popular competitive shooting
    sports in America. Standard ammunition capacities are required when proceeding through

25  multi-target stages of competitions sponsored by the highly popular International Practical
    Shooting Confederation (which has tens of thousands of members). *See* International Practical

26  Shooting Federation, http://www.ipsc.org.They are also required for the famed "3-Gun

27  Competition," the fastest-growing shooting sport in America, where participants use standard-
    capacity magazines while testing their marksmanship skills using rifles, shotguns, and

28  handguns. *See* Chad Adams, *Complete Guide to 3-Gun Competition* 89 (2012).

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

Civilians overwhelmingly prefer these firearms for the same reason active-duty officers do – to increase their chances of staying alive. Ayoob Decl. ¶ 24; Helsley Decl. ¶ 11; Fyock Decl. ¶¶ 6-11; Douglas Decl. ¶¶ 6-9; Pearsons Decl. ¶¶ 6-9; Seifers Decl. ¶¶ 6-11; Swanson Decl. ¶¶ 7-10. American citizens have thus historically modeled their choice of firearms on what police carry. Ayoob Decl. ¶ 24; Helsley Decl. ¶¶ 9-10. For example, Glock pistols, the most popular handguns among American law enforcement, are "hugely popular" for home and personal defense. Ayoob, *The Complete Book of Handguns* at 90. They come standard with fifteen- to seventeen-round magazines. *Id.*

In short, firearms with magazine capacities over ten rounds are among "the most preferred firearm[s] in the nation to 'keep' and use for protection of one's home and family," *Heller*, 554 U.S. at 628-29; individuals are thus guaranteed the right to possess and use them for those purposes.

### 2. Bans on Arms in Common Use for Lawful Purposes Are Categorically Invalid Without Resort to Means-End Scrutiny

The Ordinance is necessarily invalid because it imposes an outright ban on the possession and use of arms protected by the Second Amendment. It is a fundamental principle of both law and logic that, where the constitution protects the possession or use of an item, a total ban on such possession or use will be an unconstitutional infringement of that right, regardless of the level of judicial scrutiny applied. To this end, the courts may forego adoption of any particular standard of review when striking flat prohibitions on constitutionally protected conduct and items.

This was precisely the approach taken by the Supreme Court in *Heller*. There, the Supreme Court found a ban on handguns, arms the Court found to be in common use for self-defense, necessarily violates the Second Amendment. 554 U.S. at 635. While *Heller* stated the ban would fail "any of the standards of scrutiny that [the courts have] applied to enumerated constitutional rights," *id*. at 628, the Court made a point of *not* applying any of those standards. Instead, *Heller* categorically invalidated the handgun ban because it prohibited a class of arms "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. 554 U.S. at 628-29. That the Court did so without selecting a level of scrutiny is unsurprising. For the

13

Second Amendment would mean little if the application of a particular test would permit the government to ban the very arms the Second Amendment protects.

A categorical approach to bans on protected arms is also consistent with the framework adopted by the Ninth Circuit in *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). In deciding whether arms restrictions for convicted domestic violence misdemeanants violates the Second Amendment, the *Chovan* panel applied a two-step test for Second Amendment challenges. *Id.* at 1136. The approach asks first whether the challenged law burdens protected conduct. *Id.* If it does, the appropriate level of heightened scrutiny is selected based on "how close the law comes to core of the Second Amendment" and "the severity of the law's burden on the right." *Id.* at 1138. *Chovan* does not foreclose the application of *Heller*'s categorical approach to striking down as unconstitutional a law that flatly bans the possession of protected arms by law-abiding citizens. As *Helle*r made clear, such a law is necessarily unconstitutional regardless of the level of scrutiny applied. 554 U.S. at 628-29. In short, there is no need to struggle with selecting a level of scrutiny under *Chovan* when the Supreme Court has already instructed what the outcome will be under any test.

Other circuits have acknowledged this principle. For example, the Seventh Circuit, in striking down the State of Illinois' flat ban on the protected activity of carrying firearms outside the home, eschewed the levels of scrutiny analysis it had applied in other Second Amendment contexts. *Moore v. Madigan*, 702 F.3d 933, 940, 941 (7th Cir. 2012). The Second Circuit similarly recognized, "where a state regulation is entirely inconsistent with the protections afforded by an enumerated right – it is an exercise in futility to apply means-end scrutiny." *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 n.9 (2d Cir. 2012).

This is also consistent with the Supreme Court's approach in other rights contexts, where it has repeatedly found bans on protected activity to be unconstitutional without resort to any level of scrutiny. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557 (1969) (holding that a ban on the private possession of obscene material violated the First and Fourteenth Amendments); *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (declaring a ban on contraceptives unconstitutional); *Lamont v. Postmaster Gen. of the U.S.*, 381 U.S. 301 (1965) (holding that a ban on access to

14

materials deemed "communist political propaganda" violated the First Amendment).[10]

Here, the City's magazine ban is inimical to the Second Amendment's protections for standard-capacity firearms and should be stricken without resort to any level of scrutiny. Like the handguns at issue in *Heller*, firearms with magazines holding more than ten rounds are overwhelmingly chosen by law-abiding citizens for the core lawful purpose of self-defense. And like the District of Columbia, Sunnyvale flatly bans these protected arms, going so far as to force law-abiding citizens, including active-duty law enforcement, to remove their standard magazines from the City or face criminal prosecution.

Under *Heller*, the Ordinance is necessarily unconstitutional. The Court need not go any further because the City's ban on protected arms would fail "any of the standards of scrutiny that [the courts have] applied to enumerated constitutional rights." The City's outright ban on the use of standard-capacity firearms that are possessed by millions of law-abiding Americans for in-home self-defense is plainly inconsistent with the Second Amendments's protections for these arms – making the application of means-end scrutiny a futile endeavor.

**C.    If the Court Selects a Level of Means-End Review, Strict Scrutiny Must Apply**

When a law interferes with "fundamental constitutional rights," it generally is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973); *see also, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988). And "a law is subject to strict scrutiny . . . when that law *impacts* a fundamental right, not when it infringes it." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 544 (9th Cir. 2004). In *McDonald*, the Supreme Court confirmed the right to

---

[10]   *See also Lawrence v. Texas*, 539 U.S. 558 (2003) (ban on consensual, intimate conduct in the home); *Butler v. State of Michigan*, 352 U.S. 380, 382-84 (1957) (ban on material "tending to the corruption of the morals of youth"); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 741, 747 (5th Cir. 2008) (ban on sale of sex toys). When courts have applied a standard of review to laws directly contradicting or foreclosing the exercise of a protected activity, such restrictions have been struck down regardless of the test applied. *See, e.g.*, *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738-39 (2011) (ban on sale or rental of "violent video games"); *Planned Parenthood v. Casey*, 505 U.S. 833, 898 (1992) (spousal notice requirements to obtain abortion); *Carey v. Population Servs., Int'l.*, 431 U.S. 678, 689-91 (1977) (ban on contraceptive sales); *Vincenty v. Bloomberg*, 476 F.3d 74, 85 (2d Cir. 2007) (ban on spray paint sales).

keep and bear arms is fundamental and silenced any argument that it should not be afforded the same status as other fundamental rights. *McDonald*, 130 S. Ct. at 3043. In short, strict scrutiny is the "default" standard for fundamental rights – and the right to arms is no exception.

Under the *Chovan* analysis described above, the result is no different. Again, *Chovan* directs courts to select a level of heightened scrutiny according to the law's proximity "to the core of the Second Amendment right" and "the severity of the law's burden on the right." 735 F.3d at 1138. Chovan's claims were held to be outside the Second Amendment's core because his conviction excluded him from the "law abiding." *Id*. And although the ban imposed a "quite substantial" burden, the law's many exceptions "lightened" that burden. *Id*.

In contrast, the conduct burdened here – the possession of protected arms by the law abiding for in-home self-defense – is at the *very center* of the Second Amendment's core. *Id.* at 1133, 1138 (quoting *Heller*, 554 U.S. at 635) (repeatedly referencing the core of the Second Amendment as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). By banning the possession and use of arms widely chosen for in-home self-defense, and by restricting the amount of ammunition residents may load into their firearms well below national norms, the City's ordinance directly restricts conduct at the Second Amendment's core. *See id.* at 1133, 1138; *see also Heller*, 554 U.S. at 635.

Further, the burden imposed is particularly severe. The law does not simply regulate "the manner in which" Plaintiffs' rights may be exercised, *Chovan*, 735 F.3d at 1138, but rather directly bans the possession and use of constitutionally protected items. It forces law-abiding residents to remove commonly possessed magazines from their homes. And it does so without qualification.[11] The fact that the prohibition extends to the home where the need for self-defense is "most acute" exacerbates the problem. *Heller*, 554 U.S. at 628; *see also Kachalsky*, 701 F.3d at

---

[11]  It is no answer to say the laws do not impose a severe burden simply because other arms are sufficient for self-defense. Under that logic, a flat ban on virtually any protected arms could avoid strict scrutiny, so long as the government imposed its ban in small enough increments. This would certainly defy the Supreme Court's instructions as to the protections the Second Amendment affords. *Heller*, 554 U.S. at 624-25, 630; *McDonald*, 130 S. Ct. at 3037.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1    89 ("Second Amendment guarantees are at their zenith within the home.").[12]

2        But even if a blanket ban on the use of protected arms in the home is itself not sufficiently

3    severe to warrant strict review, the impact of the law certainly is. While millions of Americans

4    routinely select firearms capable of accepting more than ten rounds for self-defense, the City

5    dictates that its residents must load significantly less ammunition into their firearms. If such a

6    government-imposed reduction on the ammunition capacity of citizens' commonly used firearms

7    – with potentially deadly consequences in the event of a self-defense emergency – isn't a severe

8    burden triggering strict scrutiny, it is difficult to imagine what is.

9        Application of strict scrutiny here also comports with a number of decisions from other

10   circuits. Just as "any law regulating the content of speech is subject to strict scrutiny, . . . any law

11   that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding

12   citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th

13   Cir. 2011). While many courts have evaluated Second Amendment claims under intermediate

14   scrutiny, they have routinely done so where the interest asserted does *not* involve core Second

15   Amendment conduct. As described above, such is not the case here. The City's flat ban on law-

16   abiding citizens' possession of arms overwhelmingly chosen by American society for self-defense

17   lies at the very heart of the Second Amendment, and strict scrutiny must apply.

18       The lone circuit court opinion to apply intermediate scrutiny to a ban on the possession of

19   common arms by law-abiding citizens itself suggests that strict scrutiny is appropriate here. As

20   noted above, the D.C. Circuit selected intermediate scrutiny to evaluate a ban on standard-

21   capacity magazines after finding there was little evidence they are "well-suited to or preferred for

22   self-defense or sport." *Heller II*, 670F.3d at 1262. Here, given the abundance of evidence

23   presented that firearms equipped with the prohibited magazines are both highly effective and

24

---

25   [12]  To comport with fundamental rights jurisprudence requiring the application of strict
     scrutiny to laws burdening core protected conduct, *see, e.g.*, *Citizens United v. Fed. Election*
26   *Comm'n*, 558 U.S. 310, 340 (2010), consideration of both the "proximity" and "severity"
     prongs of *Chovan* should be done so that burdens on conduct closer to the core trigger strict
27   scrutiny even if the burden is less severe. Thus, even if the Court were to somehow find the
     burden less "severe," it should apply strict scrutiny because the law strikes at the very center of
28   the Second Amendment's core.

1    hugely popular for self-defense and sport, strict scrutiny is appropriate even under the novel

2    requirement imposed by the *Heller II* panel. Part I.B.1, *supra*.

3    While bans on the possession of protected arms are categorically invalid under *Heller*, if

4    the Court opts to apply a level of scrutiny, it should keep Kipling's six honest serving-men in

5    mind.[13] Here, they each point directly to strict scrutiny. For, at all times ("when"), the law flatly

6    bans ("how") the exercise of the core right of law-abiding citizens ("who") to possess and use

7    protected arms ("what") for the purpose of self-defense ("why") in the sanctity of their homes

8    ("where") – the Second Amendment interest that is "surely elevate[d] above all other[s]." *Heller*,

9    554 U.S. at 635.

10       **D.    The Ordinance Is Unconstitutional Under Any Heightened Level of Review**

11   Under heightened scrutiny, whether intermediate or strict, a challenged law is *presumed*

12   unconstitutional, and the government bears the burden of justifying it. *See R.A.V. v. City of St.*

13   *Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are presumptively invalid); *see*

14   *also United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("unless the conduct is not

15   protected by the Second Amendment at all, the government bears the burden of justifying the

16   constitutional validity of the law"). Strict scrutiny requires that the City prove that its magazine

17   ban is "narrowly tailored" to serve a "compelling government interest." *United States v. Playboy*

18   *Entm't Grp., Inc.*, 529 U.S. 803, 804 (2000). Even under intermediate scrutiny, the City must

19   establish a "reasonable fit" or a "substantial relationship" between the ban and an important

20   government objective. *Chovan*, 735 F.3d at 1139. Such a fit requires that the law is "not more

21   extensive than necessary" to serve its interest. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 825

22   (9th Cir. 2013) (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serve Comm'n of N.Y.*, 447

23   U.S. 557, 566 (1980)). The Ordinance fails under either test.

24   The City seems to have enacted the Ordinance to reduce injuries resulting from the

25   criminal misuse of firearms. Sunnyvale, Ca., Measure C (2013) at 1 (attached to Compl. as

26

27       [13] "I keep six honest serving-men (They taught me all I knew); Their names are What
     and Why and When and How and Where and Who." Rudyard Kipling, *The Elephant's Child*, in
28   *Just So Stories* 31 (Acra Found. 2013).

18

"Exhibit A"). While the government has a compelling interest in promoting public safety and preventing crime, *see, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994), to satisfy even intermediate scrutiny the City must demonstrate the law is likely to advance that interest to some "material degree," *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). It cannot.

First, the City's policy has already proven ineffective. The 1994 federal ban on standard-capacity magazines capable of holding more than ten rounds was so ineffective in reducing violent crime that it was allowed to expire in 2004. *See* H.R. 3355, 103rd Cong. § 110106. The Clinton-Reno Department of Justice selected researchers to study the impact of the nationwide ban.[14] "There was no evidence that lives were saved [and] no evidence that criminals fired fewer shots during gun fights. . . ." Kopel Testimony, *supra* n. 14, at 11; *see also* Kleck Decl. ¶ 33. It was thus not surprising that Congress chose not to renew the 1994 ban. Kopel Testimony, *supra* n. 14, at 11.

Since 2004, *millions* of standard-capacity firearms have been purchased throughout the United States. 2004 Koper Report, n. 5, at 65; *see also* Ex. A. Violent crime has not increased in that period; in fact, it has steadily and significantly declined.[15] And there is no evidence to suggest that criminals have fired more shots per incident in the years since the federal ban expired.

Empirical evidence demonstrates why restrictions on firearms with magazine capacities over ten rounds will not further public safety. Such a limit has no bearing on the overwhelming majority of gun crimes, as criminals rarely fire more than ten shots – and typically they fire fewer than four. Kleck Decl. ¶¶ 7-8; *see also* 2004 Koper Report, *supra* n. 5, at 90. Moreover, it is

---

[14] *What Should America Do About Gun Violence?* Full Comm. Hr'g Before U.S. Sen. Jud. Comm., 113th Cong. at 11 (2013), available at http://www.judiciary.senate.gov/pdf/1-30-13KopelTestimony.pdf (hereafter, "Kopel Testimony"); 2004 Koper Report, *supra* n. 5, at 1.

[15] Federal Bureau of Investigation, *Crime in the United States 2012*, Department of Justice (2012), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s .-2012/violent-crime/violent-crime; *id.* at Table 1, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/tables/1tabledatadecoverviewpdf/table_1_crime_in_the_ united_states_by_volume_and_rate_per_100000_inhabitants_1993-2012.xls.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

unlikely that a ten-round limit would have any impact even in those rare instances that they do. A study of "mass shootings" from 1984 to 1993 found that for those incidents where both the number of rounds fired and the duration of the shooting were reported, the rate of fire was almost never faster than about one round every two seconds. Kleck Decl. ¶¶ 18-19. And it was usually much slower. Kleck Decl. ¶¶ 18-19, *see also* Kleck Decl. table 1. Thus, none of the mass shooters maintained a sustained rate of fire that could not also have been maintained – even when considering reloading time – with either multiple guns or with an ordinary six-shot revolver and common speedloader. Gary Kleck, *Targeting Guns: Firearms and Their Control* 125 (Aldine De Gruyter 1997).

As more recent incidents demonstrate, a mass shooter controlling the circumstances under which he carries out his attack can easily change magazines each time one is spent. Ayoob Decl. ¶ 28; Kleck Decl. ¶¶ 10-14. For instance, "[a]t Newtown, the murderer changed magazines many times, firing only a portion of the rounds in each magazine." Kopel Testimony, *supra* n. 14, at 19. And, in the Virginia Tech murders, the perpetrator likewise changed magazines numerous times. Ayoob Decl. ¶ 28. A criminal with multiple guns can avoid the need to reload altogether by simply changing guns when the first runs out of ammunition. Ayoob Decl. ¶¶ 19-22; Kleck Decl. ¶ 10-11. The perpetrators of the majority of mass shootings between 1984 and 1993 carried multiple firearms and did just that. Kleck Decl. ¶11; Kleck, *Targeting Guns* at 125, 144 (table 4.2). The same is true of such attacks since that time. Ayoob Decl. ¶ 20; Kleck Decl. ¶¶ 12-14.

So, even if we seriously believe that the law would deter a criminal from obtaining the banned magazines, the Ordinance is unlikely to serve the City's public-safety objectives to any "material degree."

Instead, the City's ban decreases public safety by restricting the self-defense capabilities of the law abiding – as the time it takes to change magazines is much more likely to negatively affect crime victims than criminal attackers. Ayoob Decl. ¶ 4, 23, 28-29, 31-34; Kleck Decl. ¶ 34. Unlike violent criminals, victims do not choose when or where an attack will take place. Ayoob Decl. ¶ 28. And they will often face multiple armed attackers at a moment's notice. The burden of changing or reloading a magazine (if extra magazines are even accessible) is far greater for a

20

victim under the emotional and physiological stress of an unannounced attack, especially in the middle of the night. Ayoob Decl. ¶¶ 27-28, 34; Kleck Decl. ¶¶ 20-21, 27, 29, 34. Compare this with violent criminals and mass murderers who can plan out their attacks and often carry multiple firearms and magazines into settings where their victims are unarmed. Ayoob Decl. ¶¶ 28; Kleck Decl. ¶¶ 10-11, 14, 19-20.

In light of these realities, it comes as no surprise that a 2013 poll of 15,000 law enforcement professionals showed that an overwhelming majority of respondents (95.7%) did not believe a federal ban on standard-capacity magazines would increase public safety.[16]

But even if restricting these magazines would promote public safety, the City's chosen means to accomplish its safety objectives are "substantially broader than necessary." *Fantasyland Video, Inc. v. Cnty. of San Diego*, 505 F.3d 996, 1004 (9th Cir. 2007) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989)). Rather than develop policies to prevent access by criminals, the City has opted to strip protected arms from the homes of *law-abiding* citizens. The City attempts to accomplish its objective of reducing injuries from the criminal misuse of firearms by banning the use of arms by the law abiding – not based on the harm they themselves may cause, but based on the violence that may come from criminals *who might steal those firearms from gun owners*.

But to ban certain arms because criminals might misuse them is to tell law-abiding citizens that their liberties depend not on their own conduct, but on the conduct of the lawless. Surely this cannot be. Courts have already rejected the notion that the government may ban constitutionally protected activity on the grounds that the activity could lead to abuses. *See*, *e.g.*,

---

[16] *Gun Policy & Law Enforcement: Where Police Stand on America's Hottest Issue*, PoliceOne.com, http://ddq74coujkv1i.cloudfront.net/p1_gunsurveysummary_2013.pdf (accessed Dec. 19, 2013). With over 1.5 million unique visitors per month and more than 450,000 registered members, PoliceOne is becoming the leading destination for Law Enforcement professionals. PoliceOne.com, About Us, http://www.policeone.com/about/ (accessed Dec. 19, 2013).

1  *New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 560 (7th Cir. 2009).[17]

2       Ultimately, the City's ban represents a policy choice as to the types of arms it desires its

3  residents to use. But *Heller* is clear that such policy choices are off the table when considering

4  commonly used, constitutionally protected arms. 554 U.S. at 636. There, D.C. sought to ban

5  handguns for the same reasons the City wishes to ban its residents from having standard-capacity

6  firearms and magazines – to decrease criminal misuse and prevent injuries through decreased

7  availability. *Id.* at 682, 694 (Breyer, J., dissenting). Despite these interests, the Supreme Court

8  explicitly stated that D.C.'s handgun ban would "fail constitutional muster" under "any of the

9  standards of scrutiny the Court has applied" to fundamental rights. *Id.* at 628-29.

10       If the D.C. handgun ban could not pass intermediate scrutiny (i.e., it was not "substantially

11  related" to public safety), it follows that the City's ban on standard-capacity arms cannot survive

12  such scrutiny either.[18] For if stopping law-abiding citizens from possessing protected items were a

13  valid method of reducing criminal access and violent crime, *Heller* would have been decided

14  differently. Certainly, the justifications for a ban on *handguns* are substantially *more* related to

15  the government's public safety objectives than a ban on firearms with magazines holding over ten

16  rounds. While criminals might sometimes misuse these standard-capacity firearms, misuse of

17  handguns is off the charts. *Id.* at 697-99 (Breyer, J., dissenting) (from 1993 to 1997, a whopping

18  81% of firearm-homicide victims were killed by handguns). Indeed, handguns are

19  overwhelmingly preferred by criminals in nearly all violent gun crimes. But despite the

20  government's clear interest in keeping concealable firearms out of the hands of criminals and

21

22       [17]  Just as the First Amendment "knows no heckler's veto," the Second Amendment
23  cannot tolerate restrictions on law-abiding citizens' right to keep and bear protected arms based
    on the threat to public safety posed not by those citizens but by criminals who may obtain such
24  firearms illegally. *See Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004).

25       [18]  *Heller II*'s holding that D.C.'s magazine ban could survive intermediate scrutiny is in
26  direct conflict with *Heller*'s holding that banning law-abiding citizens from possessing and
    using protected arms is not a valid means of promoting the government's interest. *Heller*'s
27  approach and analysis is controlling – *Heller II*'s, whose analysis was poisoned by the court's
    mistaken assumption that standard-capacity firearms are not well-suited to or preferred for self-
28  defense or sport, is not.

1   unauthorized users, a ban on the possession of protected arms by the law abiding lacks the

2   required fit under any level of scrutiny. *Id.* at 628-29.

3       Here too, the City's ban on the possession and use of protected arms is necessarily

4   unconstitutional no matter which test the Court may apply.

5   **II.   THE REMAINING PRELIMINARY INJUNCTION FACTORS WARRANT RELIEF**

6       **A.   Irreparable Harm Should Be Presumed Because the Ordinance Violates
7   Plaintiffs' Second Amendment Rights**

8       Generally, once a plaintiff shows a likelihood of success on the merits of a constitutional

9   claim, irreparable harm is presumed. 11A Charles Alan Wright et al., *Federal Practice and*

10  *Procedure* § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is

11  involved, most courts hold that no further showing of irreparable injury is necessary."). The Ninth

12  Circuit has often imported the First Amendment's "irreparable-if- only-for-a-minute" concept to

13  cases involving other rights and, in doing so, has held a deprivation of these rights constitutes

14  irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). The

15  Second Amendment should be treated no differently. *See McDonald*, 130 S. Ct. at 3043, 3044;

16  *Ezell v. Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (a deprivation of the right to arms is

17  "irreparable and having no adequate remedy at law").

18      Here, because Plaintiffs are likely to succeed on the merits of their Second Amendment

19  claim, irreparable harm is presumed. The harm is the denial of the exercise of Plaintiffs'

20  constitutional rights – namely, the right to use and possess protected arms for lawful purposes,

21  including self-defense within their homes, and the potentially *deadly* consequences that can arise

22  when one's ability to use such arms in self-defense is restricted.

23      Plaintiffs have established a likelihood of success on the merits of their constitutional

24  claim; they have necessarily established irreparable harm warranting preliminary relief.

25      **B.   Harms to Plaintiffs and to the Public Far Outweigh Any Harm to the City**

26      When plaintiffs challenge government action that affects the exercise of constitutional

27  rights, "[t]he balance of equities and the public interest . . . tip *sharply* in favor of enjoining the

28  ordinance." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (emphasis added).

1    And, the City "cannot reasonably assert that [it] is harmed in any legally cognizable sense by

2    being enjoined from constitutional violations." *Haynes v. Office of the Att'y Gen. Phill Kline*, 298

3    F. Supp. 2d 1154, 1160 (D. Kan. Oct. 26, 2004) (citing *Zepeda v. U.S. Immigration.*, 753 F.2d

4    719, 727 (9th Cir. 1983)).

5         Here, Plaintiffs seek to vindicate their fundamental Second Amendment rights. As the

6    Ninth Circuit has made clear, "all citizens have a stake in upholding the Constitution" and have

7    "concerns [that] are implicated when a constitutional right has been violated." *Preminger v.*

8    *Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Accordingly, not only Plaintiffs' rights are at stake,

9    but so are the rights of all residents seeking to engage in Second Amendment conduct that is

10   prohibited by the City's law. This is especially true for those residents unable to store their

11   magazines outside of the City. These residents will be dispossessed of their magazines with no

12   way to replace them because state law prohibits the purchase and sale of these magazines. Cal.

13   Penal Code §§ 32310, 32400-50. The balance of equities and the public interest thus tip *sharply* in

14   Plaintiffs' favor. *See Klein*, 584 F.3d at 1208.

15        Even absent the constitutional dimension of this lawsuit, the balance of harms tips in

16   Plaintiffs' favor. The City can establish no harm to its interests as the law does not actually serve

17   the public interest or increase public safety. *See* Part I.D., *supra*. To the contrary, the City's laws

18   make the public *less* secure. The Ordinance prevents residents from possessing and using

19   standard-capacity firearms, putting residents at *greater* risk when faced with a self-defense

20   emergency. The Ordinance limits residents to using roughly half the ammunition that law-abiding

21   Americans typically prefer to have in their self-defense firearms.

22        Granting the injunction will maintain the status quo while the case is decided on the

23   merits. The sale of standard-capacity magazines is already unlawful in California, so the City will

24   not be flooded with additional standard-capacity firearms if an injunction is granted. On the other

25   hand, granting an injunction will end the ongoing violation of Plaintiffs' rights, allowing them the

26   freedom to exercise them without fear of prosecution and allowing residents to continue

27   possessing their lawfully acquired, common magazines in their homes.

28

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

**CONCLUSION**

The Second Amendment extends protections to arms commonly used by responsible citizens. Magazines that hold over ten rounds are the standard for many firearms commonly owned in modern American society. Accounting for millions of annual firearm purchases by the law abiding, their Second Amendment protection is hardly debatable.

Fearing that certain members of society may misuse these arms, the City has prohibited all law-abiding citizens from possessing or using them for self-defense in their homes. The courts have often described the impropriety of this approach with the phrase *abusus non tollit usum* – as abuse is not a valid argument against proper use.

Just as the government may not strip "smart phones" from the law abiding on the basis that drug dealers frequently use them to move their product or that terrorists can use them to detonate explosives in a mass killing, the City cannot deny law-abiding citizens the right to keep and use protected arms simply because they might be misused by some. While the Supreme Court has not yet ruled that the constitution guarantees protections for common tools of communication, like smart phones, it is self evident that the First Amendment would not tolerate such government action. In the Second Amendment context, it is even more clear, as the Court *has expressly announced* protection for common arms.

The Court should grant Plaintiffs' motion to preserve the status quo and prevent the removal of these protected arms from the homes of Sunnyvale residents while the Court considers the merits of this case.

Dated: December 23, 2013                    MICHEL & ASSOCIATES, P.C.


                                                  /s/ C. D. Michel
                                                  C.D. Michel
                                                  Attorney for Plaintiffs

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| LEONARD FYOCK, SCOTT HOCHSTETLER, WILLIAM DOUGLAS, DAVID PEARSON, BRAD SEIFERS, and ROD SWANSON,<br><br>Plaintiffs<br><br>vs.<br><br>THE CITY OF SUNNYVALE, THE MAYOR OF SUNNYVALE, ANTHONY SPITALERI, in his official capacity, THE CHIEF OF THE SUNNYVALE DEPARTMENT OF PUBLIC SAFETY, FRANK GRGURINA, in his official capacity, and DOES 1-10,<br><br>Defendants. | **CASE NO: CV13-05807 RMW**<br><br>**CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

I am not a party to the above-entitled action. I have caused service of

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; AND SUPPORTING DECLARATIONS**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Roderick M. Thompson
rthompson@fbm.com
Anthony P. Schoenberg
aschoenberg@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 23, 2013.

/s/ C. D. Michel
C. D. Michel
Attorney for Plaintiffs

26