1  Roderick M. Thompson (State Bar No. 96192)
   Anthony P. Schoenberg (State Bar No. 203714)
2  Rochelle L. Woods (State Bar No. 282415)
   Farella Braun + Martel LLP
3  235 Montgomery Street, 17th Floor
   San Francisco, CA 94104
4  Telephone: (415) 954-4400
   Facsimile: (415) 954-4480
5  Email: aschoenberg@fbm.com

6  Attorneys for Defendants THE CITY OF
   SUNNYVALE, THE MAYOR OF SUNNYVALE,
7  ANTHONY SPITALERI, in his official capacity,
   and THE CHIEF OF THE SUNNYVALE
8  DEPARTMENT OF PUBLIC SAFETY, FRANK
   GRGURINA, in his official capacity

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13

14  LEONARD FYOCK,                    Case No. 13-cv-05807 RMW
    SCOTT HOCHSTETLER,
15  WILLIAM DOUGLAS, DAVID            **SUNNYVALE'S OPPOSITION TO**
    PEARSON, BRAD SEIFERS, and        **PLAINTIFFS' MOTION FOR**
16  ROD SWANSON,                      **PRELIMINARY INJUNCTION**

17              Plaintiffs,           Date:      February 21, 2014
                                      Time:      9:00 a.m.
18        v.                          Location:  San Jose Courthouse
                                                 Courtroom 6 – 4th Floor
19  THE CITY OF SUNNYVALE, THE                   280 South 1st Street
    MAYOR OF SUNNYVALE,                          San Jose, CA 95113
20  ANTHONY SPITALERI, in his official
    capacity, THE CHIEF OF THE
21  SUNNYVALE DEPARTMENT OF
    PUBLIC SAFETY, FRANK GRGURINA,
22  in his official capacity, and DOES 1-10,

23              Defendants.

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW                    29688\4017162.9

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

I.     STATEMENT OF THE ISSUE TO BE DECIDED .................................................. 1

II.    STATEMENT OF FACTS ........................................................................................ 2

       A.     Large-Capacity Magazines Are Frequently Used In Mass Shootings And
              The Murders of Law Enforcement Officers Nationwide ................................. 2

       B.     The Law In California With Respect To LCMs ............................................... 4

       C.     Voter-Approved Measure C ............................................................................ 6

III.   ARGUMENT ............................................................................................................ 7

       A.     Legal Standards .............................................................................................. 7

       B.     Measure C Does Not Burden Conduct Protected By The Second
              Amendment ..................................................................................................... 8

              1.     Large-Capacity Magazines Are Not "Arms." ...................................... 9

              2.     LCMs Are Dangerous And Unusual .................................................. 10

                     a.     LCMs Are Not In Common Use For Self-Defense...................... 11

                     b.     LCMs Are Dangerous And Unsuitable For Responsible
                            Self-Defense In The Home.......................................................... 15

                     c.     LCMs Are Used Overwhelmingly In Crimes With Multiple
                            Victims And Assaults On Law Enforcement ............................... 16

       C.     Even If Large-Capacity Magazines Do Implicate The Second Amendment,
              Sunnyvale's Statute Banning These Weapons Would Remain
              Constitutional ............................................................................................... 18

              1.     If Heightened Scrutiny Applies, Intermediate Scrutiny Is The
                     Appropriate Level of Review ............................................................. 19

                     a.     Every Court Applying Any Heightened Scrutiny To An
                            LCM Ban Has Applied Intermediate Scrutiny ............................ 19

                     b.     The LCM Ban Does Not Burden Plaintiffs' Ability To
                            Defend Themselves In The Home ............................................... 22

              2.     The LCM Ban Satisfies Intermediate Scrutiny ................................. 23

       D.     The Remaining Preliminary Injunction Factors Favor The City ................... 25

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- i -

29688\4017162.9

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ......................................................................... 7

*Dymo Indus., Inc. v. Tapeprinter, Inc.,*
  326 F.2d 141 (9th Cir. 1964) ........................................................................... 7

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ....................................................................................... 24

*Heller v. District of Columbia,*
  554 U.S. 570 (2008) .............................................................................. passim

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ........................................................... passim

*Hightower v. City of Boston,*
  693 F.3d 61 (1st Cir. 2012) ........................................................................... 15

*Kachalsky v. Cnty. of Westchester,*
  701 F.3d 81 (2d Cir. 2012) ................................................................ 8, 19, 20

*Kampfer v. Cuomo,*
  No. 6:13-cv-82 (GLS/ATB), 2014 WL 49961 (N.D.N.Y. Jan. 7, 2014) ............... 9

*Kelley v. Johnson,*
  425 U.S. 238 (1976) ................................................................................ 19, 24

*Lorrilard Tobacco Co. v. Reilly,*
  533 U.S. 525 (2001) ....................................................................................... 24

*McDonald v. City of Chicago,*
  _ U.S. _, 130 S. Ct. 3020 (2010) ............................................................. 8, 19

*Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco & Firearms,*
  700 F.3d 185 (5th Cir. 2012) ........................................................................... 8

*New York State Rifle and Pistol Ass'n, Inc. v. Cuomo,*
  No. 13-cv-291S, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013) ................... passim

*Olympic Arms v. Buckles,*
  301 F.3d 384 (6th Cir. 2002) ......................................................................... 21

*Osterweil v. Bartlett,*
  706 F.3d 139 (2d Cir. 2013) ........................................................................... 19

*Schall v. Martin,*
  467 U.S. 253 (1984) ....................................................................................... 24

*Turner Broad. Sys., Inc. v. F.C.C.,*
  512 U.S. 622 (1994) ................................................................................ 23, 25

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- ii -

29688\4017162.9

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ............................................................................. 7

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013) ................................................................. 7, 8, 22

*United States v. Marzzarella,*
  595 F. Supp. 2d 596 (W.D. Pa. 2009) ......................................................... 19, 20

*United States v. Marzzarella,*
  614 F.3d 85 (3rd Cir. 2010) ................................................................... passim

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ............................................................. 8, 20, 23

*United States v. Decastro,*
  682 F.3d 160 (2d Cir. 2012) ............................................................................. 11

*United States v. Fincher,*
  538 F.3d 868 (8th Cir. 2008) ........................................................................... 11

*United States v. Lahey,*
  No. 10-CR-765 KMK, 2013 WL 4792852 (S.D.N.Y. Aug. 8, 2013) .................................. 20

*United States v. Masciandaro,*
  638 F.3d 458 (4th Cir. 2011) ..................................................................... 19, 20

*United States v. Miller*,
  307 U.S. 174 (1939) ............................................................................. 10, 11

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) .................................................................... 19-20

*United States v. Salerno,*
  481 U.S. 739 (1987) ....................................................................................... 24

*United States v. Walker,*
  709 F. Supp. 2d 460 (E.D. Va. 2010) ................................................................. 20

*United States v. Williams,*
  616 F.3d 685 (7th Cir. 2010) ..................................................................... 19, 20

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ....................................................................................... 23

*Winter v. Natural Res. Def. Council,*
  555 U.S. 7 (2008) ..................................................................................... 7, 25

*Woollard v. Gallagher,*
  712 F.3d 865 (4th Cir. 2013) ......................................................................... 19

**STATE CASES**

*Arnold v. Cleveland,*
  616 N.E.2d 163 (Ohio 1993) ........................................................................... 21

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- iii -

29688\4017162.9

*Beaver v. City of Dayton,*
   No. 13871, 1993 WL 333641 (Ohio Ct. App. Aug. 30, 1993) ............................................ 21

*Benjamin v. Bailey,*
   662 A.2d 1226 (Conn. 1995) ............................................................................................... 21

*Cincinnati v. Langan,*
   640 N.E.2d 200 (Ohio Ct. App. 1994) ................................................................................ 21

*Kasler v. Lockyer,*
   23 Cal. 4th 472 (2000) ........................................................................................................ 21

*Oregon State Shooting Ass'n v. Multnomah Cnty.,*
   858 P.2d 1315 (Or. Ct. App. 1993) ..................................................................................... 21

*People v. James,*
   174 Cal. App. 4th 662 (2009) ......................................................................................... 9, 11

*People v. Zondorak,*
   220 Cal. App. 4th 829 (2013) ............................................................................................... 9

*Robertson v. City & Cnty. of Denver,*
   874 P.2d 325 (Colo. 1994) ............................................................................................ 21, 25

## FEDERAL STATUTES

18 U.S.C. § 922(g) ......................................................................................................................... 7

18 U.S.C. § 922(w) ........................................................................................................................ 5

103-322, Sept. 13, 1994, 108 Stat. 1796, 1998-2000 .................................................................... 5

## STATE AND LOCAL STATUTES

1785 Va. Acts ch. 1, § 3 ............................................................................................................... 10

2002 Md. Sess. Laws ch. 26, § 2 .................................................................................................... 5

2000 N.Y. Sess. Laws ch. 189, § 11 .............................................................................................. 5

Cal. Penal Code
   § 32310 ....................................................................................................................... 1, 5, 13
   § 32310(a) ............................................................................................................................. 5
   §32390 ....................................................................................................................... 1, 5, 16

Cal. Stats. 1999, ch. 129, §§ 3, 3.5 ................................................................................................ 5

Chicago, Ill. Muni. Code §§ 8-20-010, 8-20-075 .......................................................................... 5

City of Rochester, N.Y., City Code No. 47-5 ................................................................................ 5

D.C. Code § 7-2506.01 ................................................................................................................... 6

Haw. Rev. Stat. § 134-8(c) ............................................................................................................. 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- iv -

29688\4017162.9

Mass. Gen. Laws Ann. ch. 140, §§ 121, 131M ................................................................. 5

N.J. Stat. Ann. §§ 2C:39-1(y), 39-3(j) ........................................................................ 5

Sunnyvale Municipal Code, § 9.44.050 ........................................................................ 6

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 103-322 ................................................................................................ 17

H.R. Rep. No. 103-489 ................................................................................................ 5

**OTHER AUTHORITIES**

Henigan, Dennis A., *The Heller Paradox*, 56 UCLA L. Rev. 1171 (2009) ................................. 20

Volokh, Eugene, "Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda," 56 UCLA L. Rev. 1443 (2009) ...................... 20

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- v -

29688\4017162.9

## INTRODUCTION

In the wake of recent tragic mass shootings in Newtown and other American cities and towns, where the shooters achieved their carnage by using firearms equipped with detachable large-capacity ammunition magazines ("LCMs"), the citizens of the City of Sunnyvale (the "City") took action. They overwhelmingly voted to pass a city ordinance, which includes a ban on the possession of LCMs within the City (with exceptions, *e.g.*, for law enforcement personnel). The ordinance, Measure C, closes a loophole in California state law, which has banned the manufacture, sale, importation, and transfer of LCMs — but not their possession — for over a decade. Cal. Penal Code § 32310. Indeed, LCMs have been denominated a "nuisance" under California state law because the legislature found them to be a significant threat to public safety. Cal. Penal Code §32390.

The plaintiffs in this case — six individuals located by the National Rifle Association ("NRA") — seek to enjoin enforcement of Measure C, asserting that the ordinance violates their Second Amendment right to bear arms. But, as the Court noted, Plaintiffs do not, and could not, argue that Measure C somehow "deprives them of the ability to keep a firearm for self-dense [sic]." Dkt. 28 at 5. Plaintiffs have access to a plethora of fully adequate alternative firearms not equipped with LCMs. Plaintiffs also concede that to comply with Measure C they need simply to "purchase new compliant magazines," which are readily available in California, to replace their LCMs. Dkt. 31 at 4. Plaintiffs' (and the NRA's) arguments that Measure C violates the Second Amendment fail as a matter of law.

## I. STATEMENT OF THE ISSUE TO BE DECIDED

The issue to be decided is whether that portion of Measure C, a voter-approved ordinance which bans possession of LCMs within the City, is unconstitutional under *Heller v. District of Columbia*, 554 U.S. 570 (2008) and its progeny. The D.C. Circuit Court of Appeals in *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011) addressed this issue and upheld the D.C. assault weapons and LCM bans against a Second Amendment challenge.

This question first requires assessing whether the ordinance burdens conduct protected by the Second Amendment. That is, whether LCMs—a container for ammunition—qualify as

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 1 -

29688\4017162.9

"arms" within the meaning of the Second Amendment, and, if so, whether LCMs, which have frequently been used in mass shootings and the shootings of law enforcement personnel, are "dangerous and unusual" weapons that are not protected by the Second Amendment. Second, even assuming there is a burden on such conduct, whether the ordinance is nevertheless constitutional because there is a reasonable fit between the prohibition and the important governmental objectives of preserving public safety and preventing crimes.

## II.  STATEMENT OF FACTS

### A.  Large-Capacity Magazines Are Frequently Used In Mass Shootings And The Murders of Law Enforcement Officers Nationwide.

Large-capacity magazines are detachable ammunition feeding devices that can hold more than ten rounds of ammunition—in fact, some can hold up to 100 rounds of ammunition—and can be used with semiautomatic weapons. Declaration of Anthony Spitaleri ("Spitaleri Decl.") at ¶ 8, Ex. 1 (Measure C); Declaration of Christopher S. Koper ("Koper Decl.") at ¶ 5. A semiautomatic firearm fires one bullet for each pull of the trigger and, after each round of ammunition is fired, automatically loads the next round and cocks itself for the next shot, thereby permitting a faster rate of fire. Koper Decl. at ¶ 5 n. 5. LCMs allow semiautomatic weapons to fire many rounds without the need for the shooter to reload the weapon. *Id.* at ¶ 5. Because LCMs enable the shooter to fire repeatedly without needing to reload, they significantly increase a shooter's ability to injure and kill large numbers of people quickly. *Id.* at ¶ 7; *see also* Ayoob Decl. (Dkt. 11) ¶ 28 ("[S]imply pulling the trigger again on a pistol that still has more ammunition in it can be accomplished in a fraction of a second.").

Semiautomatic firearms equipped with LCMs have frequently been employed in mass shootings over the past three decades. In instances of mass shootings where the magazine capacity used by a killer could be determined, researchers found that 86% of them involved an LCM. Koper Decl. ¶ 14; *see also* Declaration of Lucy P. Allen ("Allen Decl.") at ¶ 17 (85% correlation). Some of the more notorious of these mass shootings include:

- On July 18, 1984, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California McDonald's restaurant, using an Uzi carbine, a shotgun, and another semiautomatic handgun, and equipped with a 25-round LCM;

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 2 -

29688\4017162.9

- On January 17, 1989, Patrick Purdy used a civilian version of the AK-47 military rifle and a 75-round LCM to open fire in a Stockton, California schoolyard, killing five children and wounding 29 other persons;

- On October 16, 1991, George Hennard, armed with two semiautomatic handguns with LCMs (and reportedly a supply of extra LCMs), killed 22 people and wounded another 23 in Killeen, Texas;

- On July 1, 1993, Gian Luigi Ferri, armed with two Intratec TEC-DC9 assault pistols and 40 to 50 round magazines killed nine and wounded six at the law offices of Pettit & Martin in San Francisco, California;

- On December 7, 1993, Colin Ferguson, armed with a handgun and multiple LCMs, opened fire on commuters on a Long Island Rail Road train, killing 6 and wounding 19;

- Blacksburg, Virginia, April 16, 2007: Seung-Hui Cho killed 33 (including himself) and wounded 17 on the campus of Virginia Tech, armed with a handgun and multiple LCMs;

- Tucson, Arizona, January 8, 2011: Jared Loughner, armed with a handgun and multiple LCMs, killed 6 and wounded 13, including Congresswoman Gabrielle Giffords;

- Aurora, Colorado, July 20, 2012: James Holmes killed 12 and wounded 58 in a movie theater, armed with a Smith & Wesson M&P1 5 assault rifle, 100-round LCMs, and other firearms; and

- Newtown, Connecticut, December 14, 2012: Adam Lanza killed 26 (twenty of whom were young children) and wounded two at Sandy Hook Elementary School, armed with a Bushmaster AR-15-style assault rifle, two handguns, and multiple LCMs.

Koper Decl. at ¶¶ 9-10; *see also* Declaration of Roderick M. Thompson ("Thompson Decl."), Ex. 2, Violence Policy Center, "Mass Shootings in the United States Involving High-Capacity Ammunition Magazines." And the frequency of these shootings has shown no signs of decreasing. Thompson Decl., Ex. 3, Blair *et al.*, "Active Shooter Events from 2000 to 2012," *FBI Law Enforcement Bulletin*, Jan. 2014.

Mass shootings involving LCMs injure and kill more people than other mass shootings. A recent study found that use of LCMs and assault weapons in recent mass shootings was associated with a 151% increase in number of people shot and a 63% increase in deaths. Thompson Decl., Ex. 4, Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings*, Sept. 2013, at 3; *see also* Koper Decl. ¶ 19 (where an LCM was used, an average of about four more people were killed in each shooting and an average of about nine more people were wounded, compared to shootings using standard-capacity magazines). Another recent study found an average of 22 fatalities or injuries per mass shooting with an LCM compared to only nine without. Allen Decl. at ¶ 14.

1   Across all kinds of gun attacks, those committed with semiautomatic weapons, including

2   LCMs, tend to result in more shots fired, more people wounded, and more wounds per victim

3   than attacks with other weapons.  Koper Decl. ¶¶ 20-25.  These results have been confirmed in

4   multiple studies.  *Id.*

5       LCMs are also disproportionately used in the murders of law enforcement officers.  Prior

6   to the federal ban in 2004, LCMs were used in somewhere between 31% to 41% of gun murders

7   of police.  Koper Decl. ¶ 18 & Ex. D at 160, 162.  Facing an offender equipped with an LCM is a

8   particularly dangerous event for a police officer.  When a shooter pauses, even briefly, to reload a

9   weapon, police officers or bystanders have the chance to take tactical action, such as by

10  advancing or taking cover.  A shooter who does not have to reload does not give police that

11  opportunity.  Thompson Decl., Ex. 5 (media accounts where shooters were subdued by police or

12  bystanders during reloading).

13      In addition to the immense human toll of gun murders committed using LCMs, every act

14  of gun violence results in high social costs.  The lifetime medical costs per gunshot injury are

15  nearly $30,000, and studies estimate the full societal costs from gun violence to be $1 million per

16  shooting.  Koper Decl. ¶¶ 52-53.  If these estimates are correct, then even a 1% reduction in

17  shootings nationally could result in hundreds of millions of dollars in savings.  *Id.* ¶ 53.

18      **B.      The Law In California With Respect To LCMs.**

19      Because of this devastating role that LCMs have repeatedly played in mass shootings and

20  the shootings of law enforcement personnel, LCMs have been extensively regulated in the United

21  States for decades.  In 1989, the U.S. Department of Treasury, charged with developing

22  guidelines for which firearms could be imported into the United States, determined that the ability

23  to accept an LCM was a signature characteristic of military firearms, and that detachable LCMs

24  did not serve any sporting purpose.  Thompson Decl., Ex. 6, U.S. Dep't of Treasury, *1989 Report*

25  *and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic*

26  *Rifles*, July 6, 1989, at 6; *id.*, Ex. 7, U.S. Dep't of Treasury, *Study on the Sporting Suitability of*

27  *Modified Semiautomatic Assault Rifles*, Apr. 1998.

28      In 1994, in the wake of the 101 California Street massacre at the law firm of Petit &

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW          - 4 -          29688\4017162.9

Martin and numerous other mass shootings during the 1980s and early 1990s, Congress passed the Violent Crime Control and Law Enforcement Act (the federal assault weapons ban). Thompson Decl., Ex. 8, H.R. Rep. 103-489, at 32-33 (1994). The ban prohibited the possession or transfer of all "large-capacity ammunition feeding devices," defined as those with the capacity to accept more than ten rounds, except those lawfully possessed at the time of the bill's enactment. *See* Pub. L. 103-322, Sept. 13, 1994, 108 Stat. 1796, 1998-2000 (formerly codified at 18 U.S.C. § 922(w)). The law, which also prohibited the possession or transfer of assault weapons (except those manufactured before 1994) expired by its own terms in 2004.[1] *Id.*, 108 Stat. at 2000.

But in 2000, before the federal ban expired, California adopted its own legislation prohibiting the manufacture, import, keeping or offering for sale, giving, or lending of LCMs. Thompson Decl., Ex. 1, Cal. Stats. 1999, ch. 129, §§ 3, 3.5, presently codified at Cal. Penal Code § 32310. And more recently, California also enacted a ban on the purchase or receipt of LCMs. *See* Cal. Penal Code § 32310(a). California has also declared LCMs to be a "nuisance." Cal. Penal Code § 32390. Thus, though the federal assault weapons ban expired in 2004, LCMs have remained illegal to buy, sell, or import in California. Taken together, LCMs have been unavailable to the vast majority of Californians for the past twenty years.[2]

---

[1] Professor Koper, a renowned expert on the federal assault weapons ban, explains that the ban contained several important exemptions which blunted its full potential impact, especially in the short term. Koper Decl. at ¶ 35. Assault weapons and LCMs manufactured on or before the effective date of the ban were "grandfathered" in and thus remained legal to own and transfer. *Id.* at ¶ 36. In addition, the ban did not apply to a semiautomatic weapon possessing only one military-style feature listed in the ban's features test provision. *Id.* at ¶ 37. Thus, many civilian rifles patterned after military weapons were legal under the ban with only slight modifications. *Id.* Professor Koper opines that it is likely that the ban may have had a stronger impact on the supply of LCMs to criminal users had it remained in effect. *Id.* at ¶ 50.

[2] Prior to 2013, at least eight other jurisdictions restricted the possession or sale of ammunition magazines on the basis of capacity. *See* Haw. Rev. Stat. § 134-8(c) (prohibiting possession of LCMs capable of use with pistols); Mass. Gen. Laws Ann. ch. 140, §§ 121, 131M (enacted as 1998 Mass. Stats. ch. 180, § 8) (prohibiting sale or possession of LCMs); Thompson Decl., Ex. 24, 2002 Md. Sess. Laws ch. 26, § 2 (prohibiting sale of magazine with capacity of more than 20 rounds); N.J. Stat. Ann. §§ 2C:39-1(y), 39-3(j) (prohibiting possession of magazines with capacity of more than 15 rounds except magazines grandfathered under 1990 law); Thompson Decl., Ex. 25, 2000 N.Y. Sess. Laws ch. 189, § 11 (prohibiting LCMs except those manufactured

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 5 -

29688\4017162.9

## C. <u>Voter-Approved Measure C.</u>

In early 2013, in the wake of another series of mass shootings and violence caused by persons armed with LCMs—including the unspeakably horrific shooting deaths of twenty schoolchildren and six adults in Newtown and a shooting rampage using firearms equipped with LCMs that ended in Sunnyvale[3]—defendant Mayor Spitaleri (now the former mayor) and the other members of Sunnyvale's City Council proposed a ballot initiative, Measure C, in an effort to establish safety regulations related to guns and ammunition that would help stop preventable deaths caused by gun violence. Spitaleri Decl., Ex. 1. The citizens of Sunnyvale recognized that the "violence and harm caused by and resulting from both the intentional and accidental misuse of guns constitutes a clear and present danger to the populace," and found that "sensible gun safety measures" would "provide some relief from that danger and are of benefit to the entire community." *Id.* To meet those goals, Measure C implemented, among other requirements, a prohibition on "the possession of ammunition magazines capable of holding more than 10 rounds, with certain exceptions." *Id.*; Sunnyvale Municipal Code, § 9.44.050.[4] On November 5, 2013, the citizens of Sunnyvale overwhelmingly voted to pass Measure C.[5]

For the reasons explained below, Measure C's LCM ban readily passes constitutional muster, and Plaintiffs are not likely to succeed on the merits of their Second Amendment challenge. The motion should be denied.

---

before September 13, 1994); *id.*, Ex. 26, City of Rochester, N.Y., City Code No. 47-5 (prohibiting possession of pistol magazines containing more than 17 rounds or rifle magazines containing more than five rounds); D.C. Code § 7-2506.01 (prohibiting possession of LCMs); *id.*, Ex. 18, Chicago, Ill. Muni. Code §§ 8-20-010, 8-20-075 (prohibiting possession of magazines with capacity greater than 15 rounds).

[3] In 2011, Shareef Allman killed three co-workers and seriously injured several others in a shooting rampage that began in Cupertino and ended in Sunnyvale, where Allman was confronted by police, in an incident that resulted in an exchange of gunfire. Declaration of Frank Grgurina ("Grgurina Decl.") at ¶ 4. Allman had several weapons that included LCMs. *Id.*

[4] Contrary to Plaintiffs' assertions (Dkt. 10 ("Pl. Br.") at 3), active-duty police officers need not discontinue possession of their non-duty magazines capable of holding more than ten rounds. Grgurina Decl., ¶ 6 & Ex. A.

[5] 66.55% of voters supported Measure C. Thompson Decl., Ex. 9, at 3.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW        - 6 -        29688\4017162.9

1  **III.** **ARGUMENT**

2  **A.** **Legal Standards**

3  "The grant of a preliminary injunction is the exercise of a very far reaching power never

4  to be indulged in except in a case clearly warranting it." *Dymo Indus., Inc. v. Tapeprinter, Inc.*,

5  326 F.2d 141, 143 (9th Cir. 1964). A plaintiff seeking a preliminary injunction must establish

6  that: (1) plaintiff is likely to succeed on the merits; (2) plaintiff is likely to suffer irreparable harm

7  in the absence of preliminary relief; (3) the balance of equities tips in plaintiff's favor; and (4) an

8  injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). A

9  plaintiff who has proved likely irreparable harm and raised serious questions going to the merits

10  may obtain an injunction only if the balance of hardships tips *sharply* in his favor. *Alliance for*

11  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (emphasis added).

12  The Ninth Circuit has adopted a two-step inquiry previously outlined by other Circuit

13  Courts, including the Third and Fourth Circuits, to determine whether a statute is constitutional

14  under the Second Amendment. *U.S. v. Chovan*, 735 F.3d 1127, 1136-7 (9th Cir. 2013). The

15  inquiry first asks whether the challenged law is protected at all—*i.e.*, whether the law burdens

16  conduct protected by the Second Amendment. *Id., citing U.S. v. Chester*, 628 F.3d 673, 680 (4th

17  Cir. 2010); *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3rd Cir. 2010)).[6] Only if the challenged law in

18  fact burdens conduct protected by the Second Amendment does the court then select an

19  appropriate level of scrutiny, which "depend[s] on 'the nature of the conduct being regulated and

20  the degree to which the challenged law burdens the right.'" *Id*. at 1138 (*quoting Chester*, 628

21  _____

22  [6] *Chovan* evaluated the constitutionality of a ban on firearms possession for domestic violence
misdemeanants, 18 U.S.C. § 922(g). It is difficult to imagine a more complete abrogation of the

23  right to bear arms for those affected by § 922(g), and *Chovan* made clear that domestic violence
misdemeanants were not completely excluded from claiming Second Amendment protection. 735

24  F.3d at 1137. Because they were not law-abiding citizens, however, their rights were outside the
core of that protection, and *Chovan* applied only intermediate scrutiny to the law disarming them,

25  notwithstanding the "quite substantial" degree of the burden they bore. *Id*. at 1137-38. By
articulating a two-part test—looking both to the degree of the burden, and the burden's proximity

26  to the core of the right—*Chovan* teaches that only where a law *significantly* burdens the Second
Amendment right to keep and bear arms in the home for self-defense will strict scrutiny apply.

27  *Id*. at 1138. Otherwise, *Chovan* would have had no reason to articulate a two-part test, and could

28  have rested on the fact that domestic violence misdemeanants were not law-abiding citizens.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW                   - 7 -                   29688\4017162.9

F.3d at 682). The closer the law comes to the core of the Second Amendment right—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635—and the greater the severity of the law's burden, the greater scrutiny it should draw. *Chovan*, 735 F.3d at 1138. A law that permits armed self-defense in the home and merely regulates some types of arms, leaving a person "free to possess any otherwise lawful firearm," only operates like a "regulation of the manner" in which persons may lawfully exercise their Second Amendment rights, and is therefore subject only to intermediate scrutiny. *Marzzarella*, 614 F.3d at 97 (*cited with approval in Chovan*, 735 F.3d at 1138); *see also Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco & Firearms*, 700 F.3d 185, 205-7 (5th Cir. 2012) (applying intermediate scrutiny to ban on some handgun sales to young adults); *U.S. v. Skoien*, 614 F.3d 638, 641-2 (7th Cir. 2010) (*en banc*).

### B. Measure C Does Not Burden Conduct Protected By The Second Amendment.

The Second Amendment right is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Instead, "[s]tate regulation under the Second Amendment has always been more robust than of other enumerated rights." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 100 (2d Cir. 2012). "[W]hen the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee." *Nat'l Rifle Ass'n*, 700 F.3d at 200. The Supreme Court has emphasized that "incorporation [of the Second Amendment into the Due Process Clause of the Fourteenth Amendment] does not imperil every law regulating firearms," and agreed that "reasonable firearms regulation will continue under the Second Amendment." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3046-7 (2010) (internal citations omitted).

As set forth above, the threshold inquiry at the outset of the two-step analysis set forth by *Chovan* is whether Measure C burdens conduct protected by the Second Amendment. 735 F.3d at 1136. A recent New York federal court decision, addressing a state assault weapons ban that includes an LCM ban similar to Measure C, found that the "burden" placed upon Second Amendment rights by such a ban must be measured by its burden on the right to bear arms generally—*i.e.*, "any burden upon the possession of an 'assault weapon' is relevant only insofar

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW     - 8 -     29688\4017162.9

as it generally impacts one's ability to possess arms." *Kampfer v. Cuomo*, No. 6:13-cv-82 (GLS/ATB), 2014 WL 49961, at *6 n. 10 (N.D.N.Y. Jan. 7, 2014); *see also* Thompson Decl., Ex. 19, Statement of Professors of Constitutional Law: The Second Amendment and the Constitutionality of the Proposed Gun Violence Prevention Legislation (Jan. 30, 2013) (submitted to Congress re: 2013 proposal to prohibit LCMs & assault weapons). The *Kampfer* court went on to hold that the ban did not substantially burden an individual's Second Amendment rights in light of the number of alternative firearms available to an individual to use for self-defense, and thus warranted no heightened scrutiny at all. *Id.* at **5-6.

Similarly, California courts have held that the state ban on assault rifles does not implicate the Second Amendment. *See People v. Zondorak*, 220 Cal. App. 4th 829, 836 (2013) ("the ban on AK series rifles does not impinge on rights protected by the Second Amendment because assault weapons are at least as dangerous and unusual as the short-barreled shotgun . . . an evaluation of the validity of the law under either strict scrutiny or intermediate scrutiny is unnecessary") (internal quotations omitted); *People v. James*, 174 Cal. App. 4th 662, 676 (2009) (holding that ban on semi-automatic assault weapons does not implicate Second Amendment, and noting that an "assault weapon has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.") (internal citations omitted).

Measure C's LCM ban imposes no burden on Plaintiffs' right to keep and bear arms.

## 1. Large-Capacity Magazines Are Not "Arms."

First, only the right to keep and bear "arms" is protected by the Second Amendment, and LCMs by definition do not qualify as "arms." In answering what types of "arms" are protected by the Second Amendment in *Heller*, the Supreme Court observed that the "18th-century meaning" of "arms" "is no different from the meaning today": "weapons of offence, or armour of defence." 554 U.S. at 581 (*quoting* 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). Another late 18th-century legal dictionary relied upon by the Court defined arms as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (*quoting* 1 A New and Complete Law Dictionary). The *Heller* majority opinion

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 9 -

29688\4017162.9

does not mention magazines or devices to hold ammunition at all. Contemporary sources make clear that accoutrements and ammunition often used with firearms are something different from the "arms" themselves: "The Virginia military law, for example, ordered that 'every one of the said officers . . . shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for . . . .'" 554 U.S. at 650 (Stevens, J., dissenting) (*quoting* Act for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § 3, p. 2) (emphasis omitted).

Large-capacity magazines are not "arms" at all. Magazines are containers. They are not "weapons of offence," or things worn for defense or taken "to cast at or strike another." Rather, they are merely devices used for feeding ammunition into firearms. LCMs are not necessary components of firearms, but, by definition, are detachable, allowing them to be easily switched out with other detachable magazines of lower capacity but that can still feed ammunition into a firearm. Although the Plaintiffs state a preference for the use of LCMs, they do not and cannot allege that firearms are rendered inoperable with lower-capacity magazines.[7] Accordingly, because LCMs are neither "arms" nor are they required to operate arms, they fall outside the scope of the Second Amendment's protection.

## 2. LCMs Are Dangerous And Unusual.

Even if LCMs could be construed to be "arms," the Second Amendment would still not protect a right to possess them. The Supreme Court held in *Heller* that "dangerous and unusual weapons" are excluded from the scope of the Second Amendment. 544 U.S. at 627, *aff'g U.S. v. Miller*, 307 U.S. 174, 178 (1939) (holding that short-barreled shotguns are not protected by the Second Amendment, because they are dangerous and unusual).[8] And courts have upheld

---

[7] Most firearms that are capable of accepting LCMs are also capable of accepting magazines with a maximum capacity of ten rounds. Declaration of James E. Yurgealitis ("Yurgealitis Decl.") ¶ 5.

[8] The Supreme Court also identified a non-exhaustive list of "presumptively lawful regulatory measures" (*Heller*, 554 U.S. at 626-7 & n.26), including "longstanding prohibitions" on firearm possession by felons and the mentally ill, as well as laws forbidding firearm possession in sensitive places such as schools and government buildings, and imposing conditions on the commercial sale of firearms. *Id*. at 626-27. In addition, the Court declared that its analysis should not be read to suggest "the invalidity of laws regulating the storage of firearms to prevent accidents." *Id*. at 632.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 10 -

29688\4017162.9

1    prohibitions restricting the possession of "dangerous and unusual" weapons after *Heller*. *See,*

2    *e.g., Heller II*, 670 F.3d at 1263-64 (acknowledging *Heller*'s exception for "dangerous and

3    unusual" weapons, and upholding the D.C. assault weapons and LCM bans against a Second

4    Amendment challenge); *U.S. v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (defendant's

5    possession of machine gun not protected by Second Amendment as those firearms fall "within the

6    category of dangerous and unusual weapons"); *James*, 174 Cal. App. 4th at 676 (upholding

7    California's assault weapon prohibition because assault weapons fall within category of

8    "dangerous and unusual" weapons); *U.S. v. Decastro*, 682 F.3d 160, 165 n. 4 (2d Cir. 2012)

9    ("[T]he Second Amendment right does not encompass all weapons, but only those 'typically

10   possessed by law-abiding citizens for lawful purposes' and thus does not include the right to

11   possess 'dangerous and unusual weapons.'") (*quoting Heller*, 544 U.S. at 625, 627).

         a.    **LCMs Are Not In Common Use For Self-Defense.**

12

13        Plaintiffs' primary argument in support of its request for an injunction appears to be that

14   Measure C is invalid because LCMs are in "common use" and therefore may not be prohibited.

15   Pl. Br. at 4, 6-15.  This relies on a misreading of *Heller*.  *Heller's* "common use" test is merely a

16   test for whether a firearm (not an ammunition container) is subject to *any* Second Amendment

17   scrutiny.  554 U.S. at 627.  *Heller* does not, as Plaintiffs contend, say that all "common use"

18   firearms are immune from regulation or that any regulation on such firearms is subject to strict

19   scrutiny.  *Heller* explains that "the right secured by the Second Amendment is not unlimited,"

20   noting that "nothing in our opinion should be taken to cast doubt on" a host of "presumptively

21   lawful regulatory measures," *id.* at 626-27 & n.26, and that the Second Amendment does not

22   protect all arms.  The Court declared, for example,  that the Second Amendment extends no

23   protection at all to arms that are not "'in common use at the time.'"  *Id.* at 627 (*quoting Miller*,

24   307 U.S. at 179).  Such arms can be entirely prohibited without further judicial inquiry.  *Heller*,

25   554 U.S. at 625.  When *Heller* applies these principles to the District of Columbia's handgun ban,

26   it does not say the converse, *i.e.*, that arms in common use cannot be prohibited.  Instead, in

27   striking down the handgun ban "[u]nder any of the standards of scrutiny that [the Court has]

28   applied to enumerated constitutional rights," *Heller* emphasizes both the breadth of D.C.'s ban—

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW          - 11 -                    29688\4017162.9

"a prohibition of an entire class of 'arms'"—and how singularly well-suited handguns are for self-defense purposes. 554 U.S. at 628-29.

Indeed, if the standard advocated by Plaintiffs were the rule, as long as the ownership numbers of a particular firearm (or a firearm accessory, as here) were sufficiently high, the government either could never prohibit the sale of that firearm, no matter what dire harm it is proven to cause, or the government could only prohibit its sale if that prohibition withstands strict scrutiny. That is not the law and would be a perverse test indeed. Such a test would incentivize the government to prohibit any new firearms technology as soon as it is developed, lest it become popular and thus no longer subject to regulation. And it would incentivize firearms manufacturers to boost the sales of new products at any cost—including the militarized novelty products that the industry has focused on selling to committed gun owners as the number of gun-owning households in America has dropped, *see* Thompson Decl., Ex. 10, Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market*, June 2011, at 1, 15, 40; *id.*, Ex. 11, Testimony of Laurence H. Tribe before Senate Judiciary Committee, Feb. 12, 2013, at 14. Such a test would place the constitutionality of firearms prohibitions in the hands of gun manufacturers and firearms enthusiasts who could determine the scope of constitutional protections simply by making more firearms and stockpiling new items.

Moreover, Plaintiffs' contentions that LCMs are popular and widespread are unsupported by empirical evidence. Plaintiffs' "evidence" appears to rely solely on two sources: First, they point to handguns and long guns that are sold standard with LCMs, Monfort Decl. (Dkt. 20) Exs. B-D; and second, they offer the declaration of James Curcuruto, a gun industry trade association representative. This evidence does not establish their point.

Mr. Curcuruto estimates that there are 75 million LCMs in private hands in America. Curcuruto Decl. (Dkt. 13) ¶ 8. But Mr. Curcuruto's estimate draws from an incomplete dataset. While federal data provides an aggregate number of long guns and handguns sold, it does not disaggregate the numbers of each make or model sold, nor does Mr. Curcuruto explain how "[f]irearms industry professionals" then attributed numbers of each magazine to the firearms sold.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 12 -

29688\4017162.9

1   *Id.* at ¶¶ 11-12.[9]  This self-serving estimate deserves little weight.  Nor is it probative that

2   Plaintiffs attach advertisements for guns that are sold standard with LCMs in firearms catalogs to

3   their attorney declaration.  Monfort Decl., Exs. B-D.  None of that establishes the actual number

4   of those guns that are sold, let alone those guns that are sold with LCMs in California, where such

5   sales have been illegal for nearly 15 years.  *See* Cal. Penal Code § 32310.

6            Second, it is highly likely that LCM ownership is not widespread, but instead very

7   concentrated.  Gun ownership in America has been dropping as a percentage of households for

8   decades.  Declaration of John J. Donohue III ("Donohue Decl.") ¶¶ 3-5.  Yet gun sales have risen

9   at the same time.  *Id.* ¶ 7.  One trend driving these sales is the sale of more weapons, and more

10  powerful weapons, to a smaller and smaller group of gun enthusiasts.  *See generally* Thompson

11  Decl., Ex. 10; Donohue Decl. ¶¶ 6-8.  And studies directly show that gun ownership itself is very

12  concentrated: 20% of gun owners possess 65% of the nation's guns.  Donohue Decl. ¶ 6.  Thus, it

13  is likely that LCMs are similarly collected by a small number of enthusiasts; there is no evidence

14  to indicate that they are widely popular—especially in a small city like Sunnyvale.  *Id.* ¶¶ 9-10.

15           Even if such magazines are arguably in "common use" nationally, plaintiffs have not even

16  attempted to show that this is the case in California.  Even before the passage of Measure C,

17  federal law in conjunction with California law has banned the sale, purchase, and transfer of such

18  LCMs in this State since 1994.  *See supra* at II(B).  As a result, with few statutory exceptions, no

19  individuals have legally transferred or sold LCMs in California for nearly twenty years.  Since the

20  state ban on the sale and manufacture of LCMs was enacted in 1999, gun manufacturers have

21  been producing and promoting specific models of firearms with lower-capacity magazines that

22  comply with California law.  Yurgealitis Decl. ¶ 6.  Presumably only a small number of

23  individuals legally acquired their LCMs before 2000 (when the state ban went into effect), have

24  possessed those LCMs during the last 14 years, and continue to possess them in California, let

25  alone Sunnyvale.  There is no evidence of "common use" in California.

26           In any event, regardless of whether LCMs are in widespread use in California or

27  _____

28  [9] Mr. Curcuruto also excludes the iconic revolver from his "survey" – revolvers do not use
    magazines and typically hold fewer bullets than LCMs.  Curcuruto Decl., Ex. A.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW          - 13 -                    29688\4017162.9

nationally, that still would not establish that LCMs are widely used for *self-defense* in the home, the purpose of the Second Amendment right. *See Heller*, 554 U.S. at 599; *see also* Thompson Decl., Ex. 11, 2013 Tribe Testimony, at 14 (noting that, "in the case of high-capacity magazines, significant market presence does not necessarily translate into heavy reliance by American gun owners on those magazines for self-defense"). Plaintiffs offer no evidence directly establishing that LCMs are used for self-defense, and Plaintiffs' indirect evidence about the utility of LCMs for self-defense is dubious. An analysis of the NRA's own reports "over a five-year period" of firearm use in self-defense, both within the home and elsewhere, "demonstrated that in 50% of all cases, two or fewer shots were fired, and the average number of shots fired across the entire data sample was also about two." Thompson Decl., Ex. 11 at 16-17.[10] And although Plaintiffs posit fantastical scenarios involving multiple home invaders who can be stopped only by a homeowner's immediate access to firearms containing more than ten rounds of ammunition (*see* Pl. Br. at 10-11; Ayoob Decl.), the evidence does not provide any reasonable grounds for these sorts of speculative fears. Similarly, the "overwhelming" "evidence" that Plaintiffs point to regarding the suitability of firearms with LCMs for home defense merely consists of a few

---

[10] Even Dr. Kleck has admitted elsewhere that most criminal uses of guns, and most defensive uses of guns, result in few if any shots fired. Thompson Decl., Ex. 12, Kleck, *Point Blank: Guns & Violence in America* (1991) (2d ed. 2009), at 111 ("Only a tiny fraction of criminal gun assaults involves anyone actually being wounded, even nonfatally, and one would expect the same to be true of defensive gun uses"). Gun-rights supporters maintain databases of "self-defense stories" to illustrate the need for firearms in the home, but these stories only illustrate that rarely are more than a few shots fired. Allen Decl. ¶ 7. Dr. Allen's analysis of this database for the last three years showed an average of 2.1 bullets fired by defenders, and there were no incidents where the defender reporting firing more than 10 bullets. *Id.* ¶ 9. And an analysis of earlier "self-defense stories" printed on a pro-gun website reported that "the average and median number of shots fired was 2," and that "[r]eloading was required in only 3 incidents," one of which involved an escaped lion. Thompson Decl., Ex. 13, Werner, *The Armed Citizen: A Five-Year Analysis*, at 3-4. Even where a defender faced multiple offenders, only a few shots were needed. In fact, "[t]he most common responses of criminals upon being shot were to flee immediately or expire. With few exceptions, criminals ceased their advances immediately upon being shot. Even small caliber handguns displayed a significant degree of instant lethality (30 per cent immediate one shot kills) when employed at close range." *Id.* at 4. Plaintiffs' witness Massad Ayoob has said much the same thing. Although the declaration he filed in this case insists that LCMs are needed for self-defense, in his 2012 book, the *Gun Digest Book of Concealed Carry*, Ayoob writes, "The bottom line is, it's not about 'what gun you have,' so much as it's about 'did you have a gun?'" Thompson Decl., Ex. 14, at 64.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 14 -

29688\4017162.9

anecdotal, unverified stories—some of which are decades-old, and most of which involve law enforcement officers or business owners, not private citizens defending their homes. Pl. Br. at 4, 10.[11] For example, Plaintiffs' sole citations in support of its sweeping statement that firearms with LCMs "are highly effective for in-home self-defense" are to several third-hand accounts that do not relate to in-home self-defense at all. Pl. Br. at 4, *citing* Ayoob Decl. ¶¶ 11, 14, 25, 27.

Measure C neither creates new standards for prohibited LCMs in California, nor creates new restrictions on citizens' ability to obtain them. Rather, Measure C merely closes one modest loophole in California law by bringing to an end the special dispensation of LCMs owned prior to the effective date of the 10-round statewide standard in January, 2000.

b.      **LCMs Are Dangerous And Unsuitable For Responsible Self-Defense In The Home.**

Regardless of their claimed popularity, LCMs are an inappropriate choice for responsible self-defense in the home. *See, e.g., Hightower v. City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012) (noting that "large capacity weapons" – in that case, those able to carry "more than ten rounds" – are not "of the type characteristically used to protect the home"); Thompson Decl., Ex. 15, 2011 ATF Study, at 10-11 (determining that "magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for *military and law enforcement applications*") (emphasis added); *id.* at Ex. 16, 1998 ATF report, at 3, 37 ("firearms with the ability to expel large amounts of ammunition quickly. . . . have *military purposes* and are a crime problem") (emphasis added).

For example, a former Baltimore Police Colonel testified before Congress that "[t]he typical self-defense scenario in a home does not require more ammunition than is available in a standard 6-shot revolver or 6-10 round semiautomatic pistol. In fact, because of potential harm to

---

[11] The City objects to the "self-defense" stories presented in Mr. Ayoob's declaration (¶¶ 5-16) because Mr. Ayoob lacks personal knowledge regarding any of the stories. Fed .R. Evid. 602. The City further objects to the remainder of Mr. Ayoob's declaration (¶¶ 17-34) as speculative and lacking foundation. For example, Mr. Ayoob does not even attempt to cite to any evidence to support his conclusory statements (*e.g.*, "[Mass shooters] simply could have drawn a second (or third) gun that they had on their persons and shot whoever attempted to grab the empty one" (¶ 22); "The loss of time for a magazine change is generally of little consequence for the attacker" (¶ 28)).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 15 -

29688\4017162.9

others in the household, passersby, and bystanders, too much firepower is a hazard." Thompson Decl., Ex. 17, Brian J. Siebel, Brady Center to Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem*, at 16 (2008). Furthermore, LCMs exacerbate concerns about stray bullets, because "the tendency for defenders [is] to keep firing until all bullets have been expended." *Id*. As discussed above, California state law has long recognized these dangers of LCMs, declaring them to be a "nuisance." Cal. Penal Code §32390.

Plaintiffs themselves confirm the additional danger that LCMs create, and their inappropriateness for responsible self-defense in the home, by acknowledging that many of the shots fired do not actually hit their intended targets. Pl. Br. at 11-12 (*e.g.*, "[T]he stress of a criminal attack greatly reduces the likelihood that shots fired will actually hit" their intended target); *see also* Helsley Decl. (Dkt. 12) ¶ 11 ("Gunfights frequently involve a lot of 'missing.' This can be the result of improper aim . . ."). Responsible self-defense does not mean the capacity to spray dozens of additional bullets in the home when the first ten have not been fired accurately. *See, e.g.*, *Heller II*, 670 F.3d at 1263-64 ("[H]igh-capacity magazines are dangerous in self-defense situations because 'the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.'").

Plaintiffs simplistically assert that LCMs should be protected essentially because more bullets equal more effective self-defense in the home. *See, e.g.*, Pl. Br. at 10 ("A firearm's ammunition capacity is thus directly related to its suitability for self-defense"). Under that reasoning, fully automatic machine guns—which could be for obvious reasons quite effective at repelling and disabling attackers—should also be protected. *Cf. New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, No. 13-cv-291S, 2013 WL 6909955, at **14 (W.D.N.Y. Dec. 31, 2013) ("There . . . can be no serious dispute that the very features that increase a weapon's utility for self-defense also increase its dangerousness to the public at large."). It is precisely because LCMs are so effective at inflicting great damage in a short time that they should be banned.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

29688\4017162.9

Criminals disproportionately use LCMs in two categories of crimes: those with multiple victims and those that target law enforcement.  As described in detail above, *see supra* at II(A), LCMs have played a devastating role in numerous mass shootings nationwide.  As the D.C. Circuit has noted, "studies . . . suggest that attacks with semiautomatics –including [assault weapons] or other semiautomatics with [magazines holding more than ten rounds] – result in more shots fired, persons wounded, and wounds per victim than do other gun attacks."  *Heller II*, 670 F.3d at 1263 (internal quotations omitted); *see* Koper Decl. ¶¶ 8-10, 19, 21, Ex. C at 97, Ex. D at 166-67.  And LCMs are also disproportionately used in the murders of law enforcement officers.  *See supra* at II(A); *see also Heller II*, 670 F.3d at 1263-64 (concluding that "the evidence demonstrates that large-capacity magazines tend to pose a danger to innocent people and particularly to police officers"); Koper Decl. ¶¶ 11-12, 18.

Because shooters limited to ten-round magazines must reload more frequently, the prohibition on LCMs will protect both ordinary people and law enforcement officers.  In dangerous shootout situations, the "2 or 3 second pause during which a criminal reloads his firearm can be of critical benefit to law enforcement."  *Heller II*, 670 F.3d at 1264 (internal quotations omitted).   For example, the shooter who wounded Gabrielle Giffords and killed six others, including a federal judge, was tackled by bystanders while he was reloading, according to first-hand accounts of the incident.  Thompson Decl., Ex. 20, Dolak & Weaver, "Woman Wrestled Fresh Ammo Clip from Tucson Shooter as He Tried to Reload," *ABC News*, Jan. 9, 2011.  In addition to the 1998 Oregon mass shooting where Plaintiff's expert Dr. Kleck acknowledges the shooter was subdued while reloading, Kleck Decl. (Dkt. 19) ¶ 15, the 1993 Long Island Railroad commuter train shooter was tackled as he attempted to load a fresh 15-round LCM in his pistol.  *See* H.R. Rep. No. 103-322, *supra*, at 5; Thompson Decl., Ex. 27, Clines, "Death on the L.I.R.R.," New York Times, Dec. 9, 1993.  And law enforcement sources have stated that a half-dozen children may have been able to escape from Sandy Hook Elementary School while the shooter was switching magazines.  Thompson Decl., Ex. 21,

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW          - 17 -          29688\4017162.9

Mahoney *et al*., "Sandy Hook Shooter's Pause May Have Aided Students' Escape," *Hartford Courant*, Decl. 23, 2012, at 1, 9; *see also* Donohue Decl. ¶ 11 & n. 4 (families estimate 11 children saved during shooter's reloading). Imagine how many more children could have escaped from Sandy Hook alive if the shooter had been limited to ten round magazines and forced to spend more time reloading.

In an attempt to distract from the fact that LCMs are more dangerous than standard-capacity magazines, Plaintiffs offer the declaration of criminologist Dr. Gary Kleck. As discussed in detail in the brief filed by San Francisco in a suit challenging a similar ordinance, where Dr. Kleck filed a substantively identical declaration, Dr. Kleck's claims regarding the frequency of use of LCMs in mass shootings, as well as the impact of LCMs on the rate-of-fire and lethality in mass shootings, are flawed and misleading. *See* Thompson Decl., Ex. 22, San Francisco's Opposition to Plaintiffs' Motion for Preliminary Injunction, Case No. 5:13-cv-05351-WHA, Dkt. 34, at 5-9 (Jan. 16, 2014). For example, Kleck states that, of the 57 mass shootings between 1994 and July 2014 that he studied, "no LCM was used in . . . 35 incidents (or about 61%)." Kleck Decl. ¶ 14. The appendix to Dr. Kleck's declaration reveals that his dataset of mass shootings included only *three* incidents where a standard-capacity magazine was used, 30 incidents where magazine capacity was *unknown*, and 22 incident where an LCM was known to be used, *id*. at 18-46. When Dr. Kleck tells the Court that LCMs were not used in 35 incidents, he actually means that *either* LCMs were not used *or* (in many more cases) magazine capacity was not reported (in 30 incidents). It is not surprising that Dr. Kleck's work on guns and gun violence has been widely discredited. *See* Thompson Decl., Ex. 22, at 5-9.

For all these reasons, Measure C's LCM ban regulates conduct that is not within the scope of the Second Amendment right. Thus, Plaintiffs' challenge of the ban fails as a matter of law.

## C. Even If Large-Capacity Magazines Do Implicate The Second Amendment, Sunnyvale's Statute Banning These Weapons Would Remain Constitutional.

Plaintiffs' failure to establish a Second Amendment right to possess LCMs should end this Court's inquiry. But even if this Court were to expansively read the limited holdings of *Heller* and *McDonald* and conclude that Measure C implicates the Second Amendment right to possess a

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

29688\4017162.9

handgun in the home for self-defense, Measure C would still pass constitutional muster.

**1.    If Heightened Scrutiny Applies, Intermediate Scrutiny Is The Appropriate Level of Review.**

**a.    Every Court Applying Any Heightened Scrutiny To An LCM Ban Has Applied Intermediate Scrutiny.**

Plaintiffs argue that Measure C must be subject to either no means-end scrutiny, or at least a strict scrutiny standard, because the enumerated right the Second Amendment protects is "fundamental." Pl. Br. at 13-18. Plaintiffs' argument is without merit. Contrary to Plaintiffs' assertions (*id.* at 17), every court that has addressed the constitutionality of an LCM possession ban that has not concluded that LCMs are completely outside the scope of the Second Amendment has applied an intermediate scrutiny standard. *See, e.g., Cuomo*, 2013 WL 6909955, at \*\*17-18; *Heller II*, 670 F.3d at 1262. And with good reason. Protecting public safety is the bedrock function of government, and guns have an obvious and "unique potential to facilitate death and destruction and thereby to destabilize ordered liberty." *McDonald*, 130 S. Ct. at 3108 (Stevens, J., dissenting). Accordingly, state and local governments have a profound interest in safeguarding the public and law enforcement personnel from gun violence. *See Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("promotion of safety of persons and property is unquestionably at the core of the State's police power"); *Osterweil v. Bartlett*, 706 F.3d 139, 143 (2d Cir. 2013), *certified question accepted*, 20 N.Y.3d 1058 (2013) (O'Connor, Sup. Ct. Justice (Ret.) sitting by designation) ("[t]he regulation of firearms is a paramount issue of public safety, and recent events in this circuit are a sad reminder that firearms are dangerous in the wrong hands"); *Kachalsky*, 701 F.3d at 96 ("As Plaintiffs admitted at oral argument, 'the state enjoys a fair degree of latitude' to regulate the use and possession of firearms in public."). The level of scrutiny applied to firearms regulations must not deprive legislatures of the flexibility to safeguard the populace. *See Heller*, 554 U.S. at 636 (Constitution permits legislatures "a variety of tools for combating that problem").

Most courts throughout the country have applied some form of intermediate scrutiny in the Second Amendment context generally. *See, e.g., Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *U.S. v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011); *Marzzarella*, 614 F.3d at

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 19 -

29688\4017162.9

96; *U.S. v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *U.S. v. Reese*, 627 F.3d 792, 802-3 (10th Cir. 2010); *Kachalsky*, 701 F.3d at 96; *Skoien*, 614 F.3d at 641-2; *U.S. v. Walker*, 709 F. Supp. 2d 460, 466 (E.D. Va. 2010); *U.S. v. Lahey*, No. 10-CR-765 KMK, 2013 WL 4792852, at *15 (S.D.N.Y. Aug. 8, 2013).[12]

In the leading case on LCM laws, the D.C. Circuit applied intermediate scrutiny to uphold the constitutionality of the District of Columbia's ban on assault weapons and LCMs substantially similar to Measure C. *Heller II*, 670 F.3d at 1261-2. "[R]estrictions that impose severe burdens (because they don't leave open ample alternative channels) must be judged under strict scrutiny, but restrictions that impose only modest burdens (because they do leave open ample alternative channels) are judged under a mild form of intermediate scrutiny." *Id.* at 1262 *quoting* Eugene Volokh, "Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda," 56 UCLA L. Rev. 1443, 1471 (2009). The Court stated that the prohibition of assault weapons and LCMs was "more accurately characterized as a regulation of the ***manner*** in which persons may lawfully exercise their Second Amendment rights," since the prohibition did not "prevent a person from keeping a suitable and commonly used weapon for protection in the home." *Id.* at 1262, *quoting Marzzarella*, 614 F.3d at 97 (emphasis added). The Court also highlighted a fundamental distinction between the absolute handgun ban in *Heller* and bans on assault weapons and LCMs: "Unlike the law held unconstitutional in *Heller*, [bans on assault weapons and LCMs] do not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun." *Id.* at 1261-62, *quoting Heller*, 544 U.S. at 629.

Similarly, in *Cuomo*, the Western District of New York granted summary judgment in

---

[12] Likewise, nearly all courts that have chosen a level of scrutiny for evaluating Second Amendment claims have rejected strict scrutiny. *See, e.g., Kachalsky*, 701 F.3d at 96; *Heller II*, 670 F.3d at 1257; *Masciandaro*, 638 F.3d at 471; *Reese*, 627 F.3d at 802; *Williams*, 616 F.3d at 691-93; *Marzzarella*, 614 F.3d at 96-97; *Walker*, 709 F. Supp. 2d at 466. And although *Heller* did not articulate a level of review, the decision implicitly rejected the use of strict scrutiny in the Second Amendment context. *See also U.S. v. Marzzarella*, 595 F. Supp. 2d 596, 604 (W.D. Pa. 2009) (observing that "the Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review"); Thompson Decl., Ex. 28, Dennis A. Henigan, *The Heller Paradox*, 56 UCLA L. Rev. 1171, 1197-98 (2009) (stating "the *Heller* majority. . . . implicitly rejected strict scrutiny")).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 20 -

29688\4017162.9

favor of the state on its LCM and assault weapons ban.  2013 WL 6909955, at *17-18.  It held that intermediate scrutiny should apply to the ban because prohibiting assault weapons and LCMs was akin to a time, place and manner restriction on the use of firearms, leaving open ample alternative channels for self defense.  *Id*. at *13.  And it concluded that the assault weapon and LCM ban was ultimately constitutional under intermediate scrutiny.  *Id*. at **14-19. [13]

In addition, many state courts have held that assault weapons bans and LCM bans are consistent with state constitutional guarantees (similar to the Second Amendment) of an individual right to keep and bear arms.  *See Robertson v. City & Cnty. of Denver*, 874 P.2d 325, 332-33 & n.16 (Colo. 1994) (local assault weapons ban was a reasonable safety regulation in part in light of "the ability [of assault weapons] to fire many rounds without reloading"); *Benjamin v. Bailey*, 662 A.2d 1226, 1232-35 (Conn. 1995) (state assault weapons ban was "reasonable regulation" of right to bear arms); *Arnold v. Cleveland*, 616 N.E.2d 163, 164 n.1, 171-73 (Ohio 1993) (local assault weapons ban, where assault weapons were defined in terms of their ability to accept 20+ round magazines, was constitutional); *Beaver v. City of Dayton*, No. 13871, 1993 WL 333641 (Ohio Ct. App. Aug. 30, 1993) (upholding municipal assault weapons regulation against state constitutional challenge); *Cincinnati v. Langan*, 640 N.E.2d 200, 206 (Ohio Ct. App. 1994) (upholding local ban on LCMs and semiautomatic weapons); *Oregon State Shooting Ass'n v. Multnomah Cnty.*, 858 P.2d 1315, 1324 (Or. Ct. App. 1993) (rejecting state constitutional challenge to regulation on sale of assault weapons).  *Cf. Olympic Arms v. Buckles*, 301 F.3d 384, 390 (6th Cir. 2002) (on equal protection challenge, finding federal assault weapons ban to serve rational basis; noting that ability to accept LCMs "makes a weapon potentially more dangerous"); *Kasler v. Lockyer*, 23 Cal. 4th 472, 490-91 (2000) (rejecting equal protection challenge to California's assault weapons ban in light of dangerousness of assault weapons).[14]

---

[13] The court did strike down a separate part of the law—unique to New York—that limited the amount of bullets that could be loaded into a magazine to seven at a time.  *Id.*

[14] Long before the current controversy over LCM and assault weapons restrictions, states frequently prohibited entire classes of weapons, such as pistols or other concealable firearms, on the basis of their particular dangerousness.  These regulations were upheld as reasonable even under state constitutional guarantees of an individual right to bear arms.  *See generally* Thompson

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 21 -

29688\4017162.9

1    Plaintiffs have cited no precedent (and the City is aware of none) where a court has

2    applied any standard stricter than intermediate scrutiny to an LCM possession ban.  If this Court

3    decides to apply some form of heightened scrutiny, it should similarly apply intermediate scrutiny

4    to the City's ban on LCMs.

5              **b.    The LCM Ban Does Not Burden Plaintiffs' Ability to Defend
                        Themselves In The Home.**

6

7         The degree of burden, if any, that the LCM ban imposes on Plaintiffs' ability to defend

8    themselves in the home with firearms is so modest that intermediate scrutiny must apply here.

9    Although Plaintiffs claim that the City's ban is "at the extreme end of the gun control

10   continuum," a footnote on the next page of their brief acknowledges the reality that California —

11   like many other states (*see supra* at 6 n. 4)— has prohibited the manufacture or sale of LCMs for

12   nearly fifteen years.  Pl. Br. at 2-3 & n.1.  Far from being an extreme example of gun control, the

13   City's ordinance merely closes a loophole in, and compliments, a longstanding state law.

14        In *Marzzarella*, 614 F.3d 85 (which was cited extensively by *Chovan*, 735 F.3d at 1136-

15   38), the Court held that the federal law criminalizing possession of firearms with obliterated serial

16   numbers did not "severely limit the possession of firearms" and left the defendant free to possess

17   any otherwise lawful firearm for self-defense.  614 F.3d at 97.  It was subject only to intermediate

18   scrutiny because it was not a prohibition on the exercise of Second Amendment rights but instead

19   regulated merely "the form in which that conduct occurs."  *Id*.  Here, too, the City's LCM ban

20   does not prohibit the use of any class of firearm but only limits the kind of magazine, and thus the

21   number of bullets, that may be loaded in any otherwise lawful firearm at one time.  It is a

22   regulation that controls not whether someone can use a firearm in self-defense or not but instead

23   how he may equip it.  Under this reasoning, it is subject only to intermediate scrutiny.

24        Measure C has no impact on the citizens of Sunnyvale's abilities to defend themselves in

25   their homes with any gun of their choosing.  *See, in contrast, Heller*, 554 U.S. at 635 (addressing

26   ban on all handgun possession in the home).  Plaintiffs concede that they "do not assert that the

27

28   Decl., Ex. 23, Brief for Professional Historians and Law Professors as Amici Curiae, *Heller v.
     District of Columbia*, D.C. Cir. No. 10-7036, at 18-24.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW          - 22 -                    29688\4017162.9

1  Ordinance deprives them of the ability to keep a firearm for self-[defense]." Dkt. 28 at 5; *see also*

2  Monfort Decl., Dkt. 20, Ex. B (gun catalog containing numerous handgun and rifle models with

3  magazines capable of holding ten or fewer rounds of ammunition). Rather, Measure C only limits

4  the type of magazine that can be used with these guns. Most firearms that accept a detachable

5  magazine can be equipped either an LCM or with a standard-capacity magazine containing ten

6  rounds or fewer (Yurgealitis Decl. ¶ 5)—Measure C prohibits only the possession of the former.

7  Individuals are free to possess numerous magazines that can hold up to ten rounds of ammunition.

8        Even though the vast majority of Californians have not had ready access to LCMs for self-

9  defense purposes since the implementation of the federal ban in 1994, Plaintiffs do not contend,

10  and have presented no evidence, that Californians have been unable to effectively defend

11  themselves using guns without LCMs. Indeed, Sunnyvale's Police Chief is unaware of any

12  instance where a citizen in Sunnyvale was unable to defend himself or herself as a result of not

13  having an LCM. Grgurina Decl. ¶ 3. Accordingly, because the prohibition on LCMs does not

14  affect an individual's ability to possess an operable handgun for in-home self-defense, Measure C

15  imposes no burden on an individual's ability to exercise his Second Amendment right.

16        Moreover, as previously discussed (*see supra* at III(B)(2)(a)-(b)), there is no credible

17  evidence whatsoever that having a magazine with more than 10 rounds makes a home defender

18  any safer. To the contrary, oversized magazines can make home defense less safe by increasing

19  the likelihood that a defender will discharge more errant rounds and harm the innocent. Simply

20  because Plaintiffs can imagine a hyperbolic, Hollywood film-type scenario where they may need

21  LCMs to defend themselves does not mean that these magazines are useful or necessary for self-

22  defense. Because all empirical evidence indicates that Plaintiffs can fully vindicate their right to

23  self-defense in the home using standard-capacity magazines in the vast array of circumstances

24  they may encounter, any burden here is so minor that only intermediate scrutiny is warranted,

25  assuming any heightened scrutiny is required at all.

26          **2.**      **The LCM Ban Satisfies Intermediate Scrutiny.**

27        Intermediate scrutiny requires a showing that the asserted governmental end is

28  "significant," "substantial," or "important." *See, e.g., Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 23 -

29688\4017162.9

622, 662 (1994); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Skoien*, 614 F.3d at 641-42. In addition, it requires that the "fit" between the challenged regulation and the stated objective be "reasonable"—not perfect—and does not require that the regulation be the least restrictive means of serving the interest. *Lorrilard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001); *Marzzarella*, 614 F.3d at 98.

Measure C easily satisfies this standard. In enacting Measure C, the Sunnyvale City Council was concerned by the threat to public safety posed by LCMs. *See* Spitaleri Decl. ¶¶ 4, 10-11, 13. It is beyond dispute that public safety and the prevention of crime are substantial and compelling governmental interests. *See, e.g., U.S. v. Salerno*, 481 U.S. 739, 748-50 (1987) (noting that "the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and holding that the government's interest in preventing crime is compelling); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted"); *Kelley*, 425 U.S. at 247 ("promotion of safety of persons and property is unquestionably at the core of the State's police power"); *see also Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (states are generally afforded "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons. . . ." (internal quotations and citation omitted)); *see also Cuomo*, 2013 WL 6909955, at **17-18 ("Evidence also suggests that, quite simply, more people die when a shooter has a large-capacity magazine. . . . [I]n passing these provisions New York has made a public policy judgment that draws reasonable inferences from substantial evidence. . .").

Given the real and immediate threats to the safety of the public and law enforcement personnel caused by LCMs, the City has made the reasonable choice to reduce these threats by prohibiting access to these dangerous instruments of mass mayhem, while preserving access to handguns and other firearms. Since the most effective way to eliminate the threat of death, injury, and destruction caused by LCMs is to prohibit their use and possession, a substantial relationship clearly exists between Measure C and the government's significant interests.

Professor Koper, author of a seminal report on the federal assault weapons ban, has

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 24 -

29688\4017162.9

1  opined that the LCM possession ban has the potential to (1) reduce the number of crimes

2  committed with LCMs; (2) reduce the number of shots fired in gun crimes; (3) reduce the number

3  of gunshot victims in such crimes; (4) reduce the number of wounds per gunshot victim; (5)

4  reduce the lethality of gunshot injuries when they do occur; and (6) reduce the substantial societal

5  costs that flow from shootings. Koper Decl. ¶ 57. Professor Koper further opines that Measure C

6  "has the potential to help prevent the use and spread of particularly dangerous magazines, and is a

7  reasonable and well-constructed measure that is likely to advance Sunnyvale's interest in

8  protecting its citizens and its police force." *Id*. at ¶ 58.

9  　　　Measure C is a sufficiently narrowly-tailored means of serving vital government interests

10  that is neither overly broad nor arbitrary. *See, e.g., Turner Broad. Sys.*, 512 U.S. at 662; *Heller II*,

11  670 F.3d at 1262; *Marzzarella*, 614 F.3d at 98. It should be upheld as constitutional.

12  ## D.　The Remaining Preliminary Injunction Factors Favor The City.

13  　　　Plaintiffs contend that irreparable injury flows from the denial of their Second

14  Amendment rights. But in view of the speculative nature of their claims that LCMs are necessary

15  for self-defense, they cannot show that they are likely to suffer irreparable harm if they must

16  surrender their LCMs or store them outside of Sunnyvale while this lawsuit is pending. Indeed,

17  Plaintiffs concede that Measure C does not "deprive[] them of the ability to keep a firearm for

18  self-dense [sic]," Dkt. 30 at 2, and that they can merely "purchase new compliant magazines" to

19  replace their LCMs, Dkt. 31 at 4. Such a speculative showing of harm is insufficient to obtain

20  injunctive relief. *Winter*, 555 U.S. at 20.

21  　　　For the same reasons, Plaintiffs have failed to establish that "the balance of equities tips in

22  [their] favor, and that an injunction is in the public interest." *Id*. Like a host of other

23  jurisdictions, including the State of California, Sunnyvale restricts the possession of LCMs in

24  order to prevent their criminal use. The compelling public safety interest underlying Measure

25  C—which was approved of by two-thirds of Sunnyvale citizens—tips the equities decisively

26  away from Plaintiffs. This Court should deny Plaintiffs' motion.

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION – 13-cv-5807 RMW

- 25 -

29688\4017162.9

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

1

2
Dated: January 29, 2014                    Farella Braun + Martel LLP

3
                                           By: _/s/ Roderick M. Thompson_
4                                              Roderick M. Thompson

5                                          Attorney for Defendants THE CITY OF
                                           SUNNYVALE, THE MAYOR OF
6                                          SUNNYVALE, ANTHONY SPITALERI, in
                                           his official capacity, and THE CHIEF OF THE
7                                          SUNNYVALE DEPARTMENT OF PUBLIC
                                           SAFETY, FRANK GRGURINA, in his official
8                                          capacity

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28