C. D. Michel - S.B.N. 144258
Clinton B. Monfort - S.B.N. 255609
Sean A. Brady - S.B.N. 262007
Anna M. Barvir - S.B.N. 268728
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| LEONARD FYOCK, SCOTT HOCHSTETLER, WILLIAM DOUGLAS, DAVID PEARSON, BRAD SEIFERS, and ROD SWANSON,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CITY OF SUNNYVALE, THE MAYOR OF SUNNYVALE, ANTHONY SPITALERI, in his official capacity, THE CHIEF OF THE SUNNYVALE DEPARTMENT OF PUBLIC SAFETY, FRANK GRGURINA, in his official capacity, and DOES 1-10,<br><br>Defendants. | **CASE NO: CV 13-05807 RMW**<br><br>**PLAINTIFFS' STATEMENT OF RECENT DECISION**<br><br>**Civ. L.R. 7-3(d)(2)**<br><br>Hearing Date: February 21, 2014<br>Time: 9:00 a.m.<br>Location: Courtroom 6 – 4th Floor<br>280 South 1st Street<br>San Jose, CA 95113 |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Pursuant to Northern District of California Civil Local Rule 7-3(d)(2), Plaintiffs Leonard Fyock, Scott Hochstetler, William Douglas, David Pearson, Brad Seifers, and Rod Swanson, by and through their attorneys of record, hereby submit the recent decision by the Ninth Circuit Court of Appeals in *Peruta v. County of San Diego*, Case No. 10-56971. This decision was issued on February 13, 2014, three days after Plaintiffs submitted their Reply to Defendants' Opposition to Motion for Preliminary Injunction. A copy of the *Peruta* decision is attached to this filing for the Court's convenience.

Plaintiffs would like to direct the Court's attention to pages 48-57, where the panel, citing the Supreme Court decision in *District of Columbia v. Heller* which struck a flat ban on certain protected arms, discusses the categorical invalidation of laws inimical to the Second Amendment right at issue without resort to means-end review. Plaintiffs wish to further highlight pages 69-75, which discuss how to properly apply intermediate scrutiny when such scrutiny is appropriate.

Date: February 18, 2014

**MICHEL & ASSOCIATES, P.C.**

/s/ C. D. Michel
C. D. Michel
Attorney for Plaintiffs

***EDWARD PERUTA et al.***

***v.***

***COUNTY OF SAN DIEGO et al.***

**Case No. 10-56971**

FILED

FEB 13 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| EDWARD PERUTA; MICHELLE LAXSON; JAMES DODD; LESLIE BUNCHER, Dr.; MARK CLEARY; CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION,<br><br>Plaintiffs - Appellants,<br><br>v.<br><br>COUNTY OF SAN DIEGO; WILLIAM D. GORE, individually and in his capacity as Sheriff,<br><br>Defendants - Appellees. | No. 10-56971<br><br>D.C. No. 3:09-cv-02371-IEG-BGS<br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Chief District Judge, Presiding

Argued and Submitted December 6, 2012
San Francisco, California

Before: O'SCANNLAIN, THOMAS, and CALLAHAN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We are called upon to decide whether a responsible, law-abiding citizen has a right under the Second Amendment to carry a firearm in public for self-defense.

# I

## A

California generally prohibits the open or concealed carriage of a handgun, whether loaded or unloaded, in public locations.[1] *See* Cal. Penal Code § 25400 (prohibiting concealed carry of a firearm); *id.* § 25850 (prohibiting carry of a loaded firearm); *id.* § 26350 (prohibiting open carry of an unloaded firearm); *see also id.* § 25605 (exempting the gun owner's residence, other private property, and place of business from section 25400 and section 26350).

Nonetheless, one may apply for a license in California to carry a concealed weapon in the city or county in which he or she works or resides. *Id.* §§ 26150, 26155. To obtain such a license, the applicant must meet several requirements. For example, one must demonstrate "good moral character," complete a specified training course, and establish "good cause." *Id.* §§ 26150, 26155.

[1] There are a few narrow exceptions to this rule. Armored vehicle guards and retired federal officers may carry a loaded firearm in public without meeting stringent permitting requirements. *See* Cal. Penal Code § 26015 (armored vehicle guards); *id.* § 26020 (retired federal officers). And a citizen may carry a loaded firearm in public if: (1) he is engaged in the act of attempting to make a lawful arrest; (2) he is hunting in locations where it is lawful to hunt; or (3) he faces immediate, grave danger provided that the weapon is only carried in "the brief interval" between the time law enforcement officials are notified of the danger and the time they arrive on the scene (where the fleeing victim would obtain a gun during that interval is apparently left to Providence). *Id.* § 26040 (hunting); *id.* § 26045 (immediate, grave danger); *id.* § 26050 (attempting to make a lawful arrest).

California law delegates to each city and county the power to issue a written policy setting forth the procedures for obtaining a concealed-carry license. *Id.* § 26160. San Diego County has issued such a policy. At issue in this appeal is that policy's interpretation of the "good cause" requirement found in sections 26150 and 26155: "[A] set of circumstances that distinguish the applicant from the mainstream and causes him or her to be placed in harm's way." Good cause is "evaluated on an individual basis" and may arise in "situations related to personal protection as well as those related to individual businesses or occupations." But—important here—concern for "one's personal safety alone is not considered good cause."

The power to grant concealed-carry licenses in San Diego County is vested in the county sheriff's department. Since 1999, the sheriff's department has required all applicants to "provide supporting documentation" in order "to demonstrate and elaborate good cause." This "required documentation, such as restraining orders, letters from law enforcement agencies or the [district attorney] familiar with the case, is discussed with each applicant" to determine whether he or she can show a sufficiently pressing need for self-protection. If the applicant cannot demonstrate "circumstances that distinguish [him] from the mainstream," then he will not qualify for a concealed-carry permit.

B

Wishing to carry handguns for self-defense but unable to document specific threats against them, plaintiffs Edward Peruta, Michelle Laxson, James Dodd, Leslie Buncher, and Mark Cleary (collectively "the applicants"), all residents of San Diego County, were either denied concealed-carry licenses because they could not establish "good cause" or decided not to apply, confident that their mere desire to carry for self-defense would fall short of establishing "good cause" as the County defines it. An additional plaintiff, the California Rifle and Pistol Association Foundation, comprises many San Diego Country residents "in the same predicament as the individual Plaintiffs." No plaintiff is otherwise barred under federal or state law from possessing firearms.

C

On October 23, 2009, after the County denied his application for a concealed-carry license, Peruta sued the County of San Diego and its sheriff, William Gore (collectively "the County"), under 42 U.S.C. § 1983, requesting injunctive and declaratory relief from the enforcement of the County policy's interpretation of "good cause." Peruta's lead argument was that, by denying him the ability to carry a loaded handgun for self-defense, the County infringed his right to bear arms under the Second Amendment.

About a year later, the applicants and the County filed dueling motions for summary judgment. The district court denied the applicants' motion and granted the County's. Assuming without deciding that the Second Amendment "encompasses Plaintiffs' asserted right to carry a loaded handgun in public," the district court upheld the County policy under intermediate scrutiny. As the court reasoned, California's "important and substantial interest in public safety"—particularly in "reduc[ing] the risks to other members of the public" posed by concealed handguns' "disproportionate involvement in life-threatening crimes of violence"—trumped the applicants' allegedly burdened Second Amendment interest. The district court rejected all of the other claims, and the applicants timely appealed.

II

As in the district court, on appeal the applicants place one argument at center stage: they assert that by defining "good cause" in San Diego County's permitting scheme to exclude a general desire to carry for self-defense, the County impermissibly burdens their Second Amendment right to bear arms.

The Supreme Court's opinions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), direct our analysis of this claim. In *Heller*, the Court confronted a Second Amendment

challenge to a District of Columbia law that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock." 554 U.S. at 603, 628–29. The validity of the measures depended, in the first place, on whether the Second Amendment codified an individual right, as plaintiff Dick Heller maintained, or a collective right, as the government insisted. *Id.* at 577.

Consulting the text's original public meaning, the Court sided with Heller, concluding that the Second Amendment codified a pre-existing, individual right to keep and bear arms and that the "central component of the right" is self-defense. *Id.* at 592, 599. It further held that, because "the need for defense of self, family, and property is most acute in the home," the D.C. ban on the home use of handguns—"the most preferred firearm in the nation"—failed "constitutional muster" under any standard of heightened scrutiny. *Id.* at 628–29 & n.27 (rejecting rational-basis review). The same went for the trigger-lock requirement. *Id.* at 635. The Court had no need to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" to dispose of Heller's suit. *Id.* at 626–27. Nor had it reason to specify, for future cases, which burdens on the Second Amendment right triggered which standards of review, or whether a tiered-scrutiny

approach was even appropriate in the first place. *Id.* at 628–29. By any measure, the District of Columbia law had overreached.

Two years later, the Court evaluated a similar handgun ban enacted by the City of Chicago. The question presented in *McDonald*, however, was not whether the ban infringed the city residents' Second Amendment rights, but whether a state government could even be subject to the strictures of the Second Amendment. That depended on whether the right could be said to be "deeply rooted in this Nation's history and tradition" and "fundamental to our scheme of ordered liberty." 130 S. Ct. at 3036. To these questions, the *McDonald* Court declared, "[o]ur decision in *Heller* points unmistakably to the answer." *Id.* After all, self-defense, recognized since ancient times as a "basic right," is the "central component" of the Second Amendment guarantee. *Id.* Consequently, that right restricted not only the federal government but, under the Fourteenth Amendment, also the states. *Id.* at 3026. Having so concluded, the Court remanded the case to the Seventh Circuit for an analysis of whether, in light of *Heller*, the Chicago handgun ban infringed the Second Amendment right. *Id.* at 3050.

It doesn't take a lawyer to see that straightforward application of the rule in *Heller* will not dispose of this case. It should be equally obvious that neither *Heller* nor *McDonald* speaks explicitly or precisely to the scope of the Second

Amendment right outside the home or to what it takes to "infringe" it. Yet, it is just as apparent that neither opinion is silent on these matters, for, at the very least, "the Supreme Court's approach . . . points in a general direction." *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (noting that *Heller* does not leave us "without a framework for how to proceed"). To resolve the challenge to the D.C. restrictions, the *Heller* majority described and applied a certain methodology: it addressed, first, whether having operable handguns in the home amounted to "keep[ing] and bear[ing] Arms" within the meaning of the Second Amendment and, next, whether the challenged laws, if they indeed did burden constitutionally protected conduct, "infringed" the right. We apply that approach here, as we have done in the past, *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013), and as many of our sister circuits have done in similar cases. *See, e.g.*, *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) ("A two-step inquiry has emerged as the prevailing approach."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1252 (D.C. Cir. 2011); *Ezell,* 651 F.3d at 701–04; *United States v. Chester,* 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese,* 627 F.3d 792, 800–01 (10th Cir. 2010); *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010).

A

The first question goes to the scope of the guarantee: Does the restricted activity—here, a restriction on a responsible, law-abiding citizen's[2] ability to carry a gun outside the home for self-defense—fall within the Second Amendment right to keep and bear arms for the purpose of self-defense? *Ezell*, 651 F.3d at 701; *see also Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012). Concerning the precise methods by which that right's scope is discerned, the *Heller* and *McDonald* Courts were hardly shy: we must consult "both text and history." *Heller*, 554 U.S. at 595; *see also McDonald*, 130 S. Ct. at 3047 (reiterating that "the scope of the Second Amendment right" is determined by historical analysis and not interest balancing).

The analysis begins—as any interpretive endeavor must—with the text. "Constitutional rights are enshrined with the scope they were understood to have

---

[2] In this case, as in *Heller*, we consider the scope of the right only with respect to responsible, law-abiding citizens. *See Heller*, 554 U.S. at 635 ("And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."). With respect to irresponsible or non-law-abiding citizens, a different analysis—which we decline to undertake here—applies. *Chovan*, 735 F.3d at 1138 (holding that a statute "does not implicate this core Second Amendment right [if] it regulates firearm possession for individuals with criminal convictions"); *see also Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . .").

when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35. To arrive at the original understanding of the right, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning," unless evidence suggests that the language was used idiomatically. *Id.* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).

Since the goal is to arrive at a *fair*, not a hyper-literal, reading of the Constitution's language, *Heller*'s analysis is necessarily a contextual—and therefore a historical—one. *See Chester*, 628 F.3d at 680 ("This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right . . . ."). It begins with the pre-ratification "historical background of the Second Amendment," since "the Second Amendment . . . codified a pre-existing right." *Heller*, 554 U.S. at 592 (emphasis omitted). Next, it turns to whatever sources shed light on the "public understanding [of the Second Amendment] in the period after its enactment or ratification," *see id.* at 605–10, such as nineteenth-century judicial interpretations and legal commentary. *See id.* at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."); *id.* at

610–19 (surveying "Pre–Civil War Case Law," "Post–Civil War Legislation," and "Post–Civil War Commentators").

Of course, the necessity of this historical analysis presupposes what *Heller* makes explicit: the Second Amendment right is "not unlimited." *Id.* at 595. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Rather, it is a right subject to "traditional restrictions," which themselves—and this is a critical point—tend "to show the scope of the right." *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring); *see also Kachalsky*, 701 F.3d at 96; *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196 ("For now, we state that a longstanding presumptively lawful regulatory measure . . . would likely [burden conduct] outside the ambit of the Second Amendment."); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) ("That *some* categorical limits are proper is part of the original meaning.").

In short, the meaning of the Second Amendment is a matter not merely of abstract dictionary definitions but also of historical practice. As "[n]othing but conventions and contexts cause [language] to convey a particular idea," we begin our analysis of the scope of the Second Amendment right by examining the text of the amendment in its historical context. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* xxvii (2012).

The Second Amendment secures the right not only to "keep" arms but also to "*bear*" them—the verb whose original meaning is key in this case. Saving us the trouble of pulling the eighteenth-century dictionaries ourselves, the Court already has supplied the word's plain meaning: "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584.[3] Yet, not "carry" in the ordinary sense of "convey[ing] or transport[ing]" an object, as one might carry groceries to the check-out counter or garments to the laundromat, but "carry for a particular purpose—confrontation." *Id.* The "natural meaning of 'bear arms,'" according to the *Heller* majority, was best articulated by Justice Ginsburg in her dissenting opinion in *Muscarello v. United States*, 524 U.S. 125 (1998): to "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Heller*, 554 U.S. at 584 (quoting *Muscarello*, 524 U.S. at 143 (Ginsburg, J., dissenting) (quoting *Black's Law Dictionary* 214 (6th ed.

[3] Although we are dealing with the Second Amendment right as incorporated against the states through the Fourteenth Amendment, we—consistent with the Court's analysis in *McDonald*—assume that the right had the same scope at the time of incorporation as it did at the time of the founding. *See, e.g.*, 130 S. Ct. at 3036 (using the definition of the Second Amendment right espoused in *Heller* when analyzing incorporation against the states).

1998)); *see also id.* at 592 (concluding that the Second Amendment "guarantee[s] the individual right to . . . carry weapons in case of confrontation").

Speakers of the English language will all agree: "bearing a weapon inside the home" does not exhaust this definition of "carry." For one thing, the very risk occasioning such carriage, "confrontation," is "not limited to the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). One needn't point to statistics to recognize that the prospect of conflict—at least, the sort of conflict for which one would wish to be "armed and ready"—is just as menacing (and likely more so) beyond the front porch as it is in the living room. For that reason, "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage." *Id.* To be sure, the idea of carrying a gun "in the clothing or in a pocket, for the purpose . . . of being armed and ready," does not exactly conjure up images of father stuffing a six-shooter in his pajama's pocket before heading downstairs to start the morning's coffee, or mother concealing a handgun in her coat before stepping outside to retrieve the mail. Instead, it brings to mind scenes such as a woman toting a small handgun in her purse as she walks through a dangerous neighborhood, or a night-shift worker carrying a handgun in his coat as he travels to and from his job site.

More importantly, at the time of the Second Amendment's enactment, the familiar image that "bear arms" would have painted is one of an eighteenth-century frontiersman, who "from time to time [would] leave [his] home to obtain supplies from the nearest trading post, and en route one would be as much (probably more) at risk if unarmed as one would be in one's home unarmed." *Id.* at 936. Indeed, it was this spirit of the arms-bearing settler that Senator Charles Sumner invoked (and the *Heller* Court cited as instructive of the scope of the right) in the (in)famous "Crime against Kansas" speech in 1856: "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." 4 *The Works of Charles Sumner* 211–12 (1875); *see also Heller*, 554 U.S. at 609.

Other passages in *Heller* and *McDonald* suggest that the Court shares Sumner's view of the scope of the right. The Second Amendment, *Heller* tells us, secures "the right to 'protect[] [oneself] against both *public* and private violence,' thus extending the right in some form to wherever a person could become exposed to public or private violence." *United States v. Masciandaro,* 638 F.3d 458, 467

(4th Cir. 2011) (Niemeyer, J., specially concurring) (quoting *Heller*, 554 U.S. at 594 (emphasis added)). The Court reinforced this view by clarifying that the need for the right is "most acute" in the home, *Heller*, 554 U.S. at 628, thus implying that the right exists outside the home, though the need is not always as "acute." *See also McDonald*, 130 S. Ct. at 3044 (2010) ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."). In a similar vein, *Heller* identifies "laws forbidding the carrying of firearms in sensitive places such as school and government buildings" as presumptively lawful. 554 U.S. at 626. Were the right restricted to the home, the constitutional invincibility of such restrictions would go without saying. Finally, both *Heller* and *McDonald* identify the "core component" of the right as self-defense, which necessarily "take[s] place wherever [a] person happens to be," whether in a back alley or on the back deck. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1515 (2009); *see also Moore*, 702 F.3d at 937 ("To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*.").

These passages alone, though short of dispositive, strongly suggest that the Second Amendment secures a right to carry a firearm in some fashion outside the home. Reading those lines in light of the plain-meaning definition of "bear Arms" elucidated above makes matters even clearer: the Second Amendment right "could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. Though people may "keep Arms" (or, per *Heller*'s definition, "have weapons," 554 U.S. at 582) in the home for defense of self, family, and property, they are more sensibly said to "bear Arms" (or, *Heller*'s gloss: "carry [weapons] . . . upon the person or in the clothing or in a pocket," *id.* at 584) in *nondomestic* settings.[4] *Kachalsky*, 701 F.3d at 89 n.10 ("The plain text of the Second Amendment does not limit the right to bear arms to the home."); *see also Drake v. Filko*, 724 F.3d 426, 444 (3d Cir. 2013) (Hardiman, J., dissenting) ("To speak of 'bearing' arms solely within one's home not only would conflate 'bearing' with 'keeping,' in derogation of the Court's holding that the verbs codified distinct rights, but also would be awkward usage given the meaning assigned the terms by the Supreme Court.").

---

[4]*Heller* and *McDonald* focus on the Second Amendment right to keep and bear arms *for self-defense*—the core component of the right, which this case implicates. We need not consider, therefore, whether the right has other ends. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1448 (2009) (suggesting that the right "may have other components," such as the right to keep and bear arms for recreation, hunting, or resisting government tyranny).

In addition to a textual analysis of the phrase "bear Arms," we, like the Court in *Heller*, look to the original public understanding of the Second Amendment right as evidence of its scope and meaning, relying on the "important founding-era legal scholars." *See Heller*, 554 U.S. at 600–03, 605–10 (examining the public understanding of the Second Amendment in the period after its ratification because "[t]hat sort of inquiry is a critical tool of constitutional interpretation").

The commonsense reading of "bear Arms" previously discussed finds support in several important constitutional treatises in circulation at the time of the Second Amendment's ratification. *See id.* at 582–83, 592–93 (treating such sources as instructive of the clause's original meaning). Writing on the English right to arms, William Blackstone noted in his *Commentaries on the Laws of England* that the "the right of having and using arms for self-preservation and defence" had its roots in "the natural right of resistance and self-preservation." *Heller*, 554 U.S. at 594 (internal citations and quotations omitted). It was this inherited right of armed self-defense, according to *Heller*, that "by the time of the founding [was] understood to be an individual right protecting against both *public* and private violence." *Id.* (emphasis added). Although Blackstone elsewhere

described a fourteenth-century English statute that forbad the "riding or going armed with dangerous or unusual weapons," that prohibition was understood to cover carriage of uncommon, frightening weapons only. Indeed, Justice James Wilson, an early American legal commentator and framer, confirmed this narrower reading, *see* 2 James Wilson, *The Works of James Wilson* 654 (Robert McCloskey ed. 1967), citing an English commentator for the proposition that wearing ordinary weapons in ordinary circumstances posed no problem. *See* Eugene Volokh, *The First and Second Amendments*, 109 Colum. L. Rev. Sidebar 97, 101 (2009) ("American benchbooks for justices of the peace echoed [Wilson's observation]."); Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 105 (1994) (quoting an English case recognizing "a general Connivance to Gentlemen to ride armed for their security," notwithstanding the statute); *see also* William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) (observing that the Second Amendment would not forbid the prohibition of the "carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them"). It is likely for this reason that *Heller* cites Blackstone's commentary on the statute as evidence *not* of the scope of the "keep and bear" language but of what weapons qualify as a Second Amendment "arms." *See Heller*, 554 U.S. at 627.

Writing over thirty years later in what *Heller* calls the "most important" American edition of Blackstone's *Commentaries*, *id.* at 594, St. George Tucker, a law professor and former Antifederalist, affirmed Blackstone's comments on the British right and commented further on its American dimensions. The right to armed self-defense, Tucker insisted, is the "first law of nature," and any law "prohibiting any person from bearing arms" crossed the constitutional line. St. George Tucker, *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States; and of the Commonwealth of Virginia* 289 (1803). Tucker went on to note that, though English law presumed that any gathering of armed men indicated that treasonous plotting was afoot, it would have made little sense to apply such an assumption in the colonies, "where the right to bear arms is recognized and secured in the constitution itself." Tucker, *supra*, vol. 5, app., n.B, at 19. After all, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." *Id.*; *see also* Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 Am. U. L. Rev. 585, 637–38 (2012). Likewise, Edward Christian—another Blackstone commentator from that

period—maintained that this inherited right allowed "everyone . . . to keep or carry a gun, if he does not use it for the [unlawful] destruction of game." *See* Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 Geo. J.L. & Pub. Pol'y 511, 517 (2008) (quoting 2 William Blackstone, *Commentaries* 441 (Edward Christian ed., 1795)).

3

In keeping with the views of the important late-eighteenth-century commentaries, the great weight of nineteenth-century precedent on the Second Amendment or its state-law analogues confirms the *Heller*-endorsed understanding of "bear Arms."[5] In fact, as we will show, many of the same cases that the *Heller* majority invoked as proof that the Second Amendment secures an individual right may just as easily be cited for the proposition that the right to carry in case of

---

[5] Following *Heller*, we credit nineteenth-century judicial interpretations of the right to bear arms as probative of the Second Amendment's meaning. *Heller*, 554 U.S. at 586; *id.* at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century.").

We decline, however, to undertake an exhaustive analysis of twentieth-century interpretations of the right for the same reason that the *Heller* Court presumably did: coming over a hundred years after the Amendment's ratification, they seem poor sources of the text's *original* public meaning. *Cf. id.* at 614 ("Since discussions [in Congress and elsewhere after the Civil War] took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.").

confrontation means nothing if not the general right to carry a common weapon outside the home for self-defense.

a

But before turning to the cases themselves, we offer a word on methodology. We set out to review the bulk of precedents from this period.[6] All are, in a broad sense, equally relevant, for every historical gloss on the phrase "bear arms" furnishes a clue of that phrase's original or customary meaning. Still, some cases are more equal than others.[7] That's because, with *Heller* on the books, the Second Amendment's original meaning is now settled in at least two relevant respects. First, *Heller* clarifies that the keeping and bearing of arms is, *and has always been*, an individual right. *See, e.g.*, 554 U.S. at 616. Second, the right is, *and has always been*, oriented to the end of self-defense. *See, e.g.*, *id.* Any contrary interpretation of the right, whether propounded in 1791 or just last week, is error. What that means for our review is that historical interpretations of the right's scope are of varying probative worth, falling generally into one of three categories ranked here in descending order: (1) authorities that understand bearing arms for self-defense to

[6] We will inevitably miss some. The briefs filed in this appeal were able to address only so many before running up against word limits.

[7] With apologies to George Orwell. *See* George Orwell, *Animal Farm* 118 (2009) (1945) (distilling Manor Farm's Seven Commandments of Animalism to a single rule: "All animals are equal, but some animals are more equal than others").

be an individual right, (2) authorities that understand bearing arms for a purpose *other than* self-defense to be an individual right, and (3) authorities that understand bearing arms not to be an individual right at all.

To illustrate, a precedent in the first category that declared a general right to carry guns in public would be a great case for Peruta, while a decision in the same group that confined exercise of the right to the home would do his position much damage. By contrast, those cases in the third category—which, like the dissenting opinions in *Heller,* espouse the view that one has a right to bear arms only collectively in connection with militia service and *not* for self-defense within or outside the home—are of no help. The second category, consisting mostly of cases that embrace the premise that the right's purpose is deterring tyranny, is only marginally useful. Since one needn't exactly tote a pistol on his way to the grocery store in order to keep his government in check, it is no surprise (and, thus, of limited significance for purposes of our analysis) when these courts suggest that the right is mostly confined to the home. Likewise, a second-category case asserting that the goal of tyranny prevention does indeed call for public weapon bearing lends only indirect support for the proposition that bearing arms in case of confrontation includes carrying weapons in public for self-defense.

b

Having set forth the methodology to be employed, we turn to the nineteenth-century case law interpreting the Second Amendment, beginning with the cases that the Court itself relied upon in *Heller*.

The first case is *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822), *cited in Heller*, 554 U.S. at 585 n.9, a decision "especially significant both because it is nearest in time to the founding era and because the state court assumed (just as [*Heller*] does) that the constitutional provision . . . codified a preexisting right." Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1360 (2009). There, Kentucky's highest court interpreted that state's Second Amendment analogue ("the right of the citizens to bear arms in defense of themselves and the state, shall not be questioned") as invalidating a ban on "wearing concealed arms." *Bliss*, 12 Ky. (2 Litt.) at 90. The Commonwealth's lead argument to the contrary had been that, though Kentucky's constitution forbad prohibitions on the exercise of the right, it permitted laws "merely regulating the manner of exercising that right." *Id.* at 91. Although the court agreed with the Commonwealth's argument in principle, it disagreed with the conclusion that the ban on "wearing concealed arms" was merely a means of "regulating the manner of exercising" the right. *Id.* An act needn't amount to a "complete destruction" of the right to be "forbidden by the explicit language of the constitution," since any

statute that "diminsh[ed] or impair[ed the right] as it existed when the constitution was formed" would also be "void." *Id.* at 92. Thus, had the statute purported to prohibit both the concealed and open carriage of weapons, effecting an "*entire destruction of the right*," it would have been an obvious nullity; but even as a ban on concealed carry alone there could be "entertained [no] reasonable doubt but [that] the provisions of the act import a restraint on the right of the citizens to bear arms." *Id.* at 91–92 (emphasis added). Striking down the law, the court explained that the preexisting right to bear arms had "no limits short of the moral power of the citizens to exercise it, and it in fact consisted in nothing else but in the liberty of the citizens to bear arms. Diminish that liberty, therefore, and you necessarily restrain the right." *Id.* at 92.

In *Simpson v. State*, the Tennessee Supreme Court read that state's Second Amendment analogue just as the *Bliss* court read Kentucky's. 13 Tenn. (5 Yer.) 356 (1833), *cited in Heller*, 554 U.S. at 585 n.9. Convicted of the crime of affray for appearing in public "arrayed in a warlike manner" (i.e., armed), Simpson argued that the state should have had to prove that he had committed acts of physical violence to convict him. *Id.* at 361–62. The court agreed, concluding in part that even if the common law did not require proof of actual violence to punish persons for merely walking around with weapons, the state constitution's

protection of the "right to keep and to bear arms" would trump: "[I]t would be going much too far, to impair by construction or abridgment a constitutional privilege which is so declared." *Id.* at 360; *cf. State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843) (rejecting a "right to bear arms" defense and upholding an affray conviction of a defendant who, threatening to kill off a certain family, was caught carrying an unusual weapon in public). It went without saying, evidently—for the court offered little in the way of analysis—that whatever else the constitution meant by "bear arms," it certainly implied the right to carry operable weapons in public. The court confirmed as much in 1871, holding that an act that proscribed openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances" went too far, even though the statute exempted from its prohibitions the carrying of long guns. *Andrews v. State*, 50 Tenn. 165, 187 (1871), *cited in Heller*, 554 U.S. at 608, 629.

Though the Tennessee Supreme Court announced a slightly different view of the right to bear arms in *Aymette v. State*, that case is plainly consistent with—and indeed affirms—the principle that the right to bear arms extends out of doors. 21 Tenn. 154 (1840), *cited in Heller*, 554 U.S. at 613–14. Commenting on the "manifest distinction" between a restriction on "wearing concealed weapons" (which the court upheld) and a prohibition on open carry, the court observed with

little fanfare that "[i]n the nature of things, if [persons] were not allowed to bear arms openly, they could not bear them in their defense of the State at all." *Id.* at 160. The court marshaled this point in support of the second-category position "whereby citizens were permitted to carry arms openly, unconnected with any service in a formal militia, but were given the right to use them only for the military purpose of banding together to oppose tyranny"—a view of the right's end that *Heller* explicitly rejects. *Heller*, 554 U.S. at 613 ("[*Aymette*'s] odd reading of the right is, to be sure, not the one we adopt."). Nonetheless, what remains of *Aymette* is its observation that the right to bear arms, even if not in the service of personal self-defense, must include the right to carry guns outside the home.

The Alabama Supreme Court weighed in that same year. *See State v. Reid*, 1 Ala.612 (1840), *cited in Heller*, 554 U.S. at 629. Taking a view of the right narrower than that of the *Simpson* court, it nonetheless declared that the constitutional guarantee of "a right to bear arms, in defense of []self and the State," meant that an Alabamian must be permitted to carry a weapon in public in some fashion. *Id.* at 615. Reid, found guilty of the "evil practice of carrying weapons secretly," challenged the constitutionality of the statute of conviction. *Id.* at 614. Rejecting this challenge, the court held that the state constitution's enumeration of the right did not strip the legislature of the power "to enact laws in regard to the

manner in which arms shall be borne . . . as may be dictated by the safety of the people and the advancement of public morals." *Id.* at 616. And, departing to some degree from the approach in *Bliss*, the court concluded that Alabama's concealed-carry law was just such a regulation, going no further than forbidding that means of arms bearing thought "to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others." *Id.* at 617. The act's narrowness ensured its validity:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.

*Id.* at 616–17. Read in light of the court's earlier statement that a restriction on arms bearing would stand so long as it simply proscribed the "manner in which arms shall be borne," this passage suggests that to forbid nearly all forms of public arms bearing would be to destroy the right to bear arms entirely.[8]

---

[8] The Indiana Supreme Court appeared to take the same view. *Compare State v. Mitchell*, 3 Blackf. 229 (Ind. 1833) (publishing a one-sentence opinion that reads, "It was held in this case, that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional.") *with Walls v. State*, 7 Blackf. 572, 573 (Ind. 1845) (implying that a citizen could avoid legal trouble under the concealed weapons law if "he exhibited his pistol so frequently that it could not be said to be concealed").

(continued...)

Embracing precisely that position, the Georgia Supreme Court's decision in *Nunn v. State* six years later—praised in *Heller* as "perfectly captur[ing]" the relationship between the Second Amendment's two clauses, 554 U.S. at 612—made explicit what *Reid* intimated. 1 Ga. 243 (1846), *cited in Heller*, 554 U.S. at 612, 626, 629. Convicted of keeping a pistol on his person—a statutory misdemeanor (whether the pistol was carried openly or "secretly")—Nunn attacked the statute of conviction as an unconstitutional infringement of his right to bear arms under the Second Amendment. *Id.* at 246. The court began with a statement of the constitutional standard: "The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree." *Id.* at 251. Turning to the statute, the court reasoned that had it merely limited the manner of the exercise of the right to carry, it would have withstood scrutiny. As written, however, it went too far:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*; and that, as the defendant has

[8](...continued)

> been indicted and convicted for carrying a pistol, without charging that it was done in a concealed manner, under that portion of the statute which entirely forbids its use, the judgment of the court below must be reversed, and the proceeding quashed.

*Id.* In other words, as the same court explained in a later case involving a defendant charged with illicit open carriage, to ban *both* the open and concealed carriage of pistols "would be to prohibit the bearing of those arms" altogether. *Stockdale v. State*, 32 Ga. 225, 227 (1861) (adding that such a set of restrictions "would . . . bring the Act within the decision in Nunn's case").

Although the Arkansas Supreme Court in *State v. Buzzard* appeared at first to take the contrary position, viewing restrictions on carrying weapons for self-defense as permissible police-power regulations, *see* 4 Ark. 18 (1842); *see also Fife v. State*, 31 Ark. 455 (1876) (relying on *Buzzard* to uphold a prohibition on concealed carry); *Carroll v. State*, 28 Ark. 99 (1872) (same), the court staked its position on two interpretations of the Second Amendment right that the *Heller* Court repudiated—and from which the Arkansas court itself later retreated. According to one judge in the splintered majority, the Second Amendment secured a right to bear arms for use in militia service but *not* a right to bear arms for personal self-defense. *Id.* at 22 (opinion of Ringo, C.J.). Writing separately, the other judge in the majority went further, asserting that the Second Amendment secured *no individual right*. *Id.* at 32 (opinion of Dickinson, J.); *compare id.* at 43

(Lacy, J., dissenting) (arguing that the court should have embraced the *Bliss* view). Neither interpretation survives *Heller*—which is also to say that neither opinion elucidates the right's originally understood scope.[9] Yet it didn't take *Heller* to convince the Arkansas Supreme Court that *Buzzard* could use some shearing. Writing in 1878, the court clarified that while "the Legislature might, in the exercise of the police power of the State, regulate the mode of wearing arms," banning "the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey . . . or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms." *Wilson v. State*, 33 Ark. 557, 560 (1878).

*State v. Chandler*, an 1850 decision of the Louisiana Supreme Court, proceeds along the lines drawn in *Nunn*. 5 La. Ann. 489 (1850), *cited in Heller*, 554 U.S. at 613, 626. Rejecting the argument that Louisiana's ban on carrying concealed weapons infringed the Second Amendment right, the court explained that the prohibition was "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent

---

[9] By assuming that the right to bear arms is an individual one focused on militia service rather than self-defense, the Chief Judge Ringo's opinion in *Buzzard* falls into the second-category; Judge Dickinson's opinion for the majority is consistent with the third-category position in concluding that the Second Amendment does not secure an individual right at all.

bloodshed and assassinations committed upon unsuspecting persons." *Id.* at 489–90. A ban on the open carriage of weapons, by contrast, would enjoy no such justification. Echoing *Reid*, the court said:

> [The Act] interfered with no man's right to carry arms (to use its words) "in full open view," which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.

*Id.* at 490; *see also Heller*, 554 U.S. at 613 (citing favorably *Chandler*'s holding that "citizens had a right to carry arms openly"); *State v. Jumel*, 13 La. Ann. 399, 400 (1858) (invoking *Chandler* for the proposition that "prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society" does not infringe the right).

Nine years later, the Texas Supreme Court declared that "[t]he right of a citizen to bear arms, in the lawful defense of himself or the state, is absolute," permitting even the wielding of a Bowie knife, "the most deadly of all weapons in common use." *Cockrum v. State*, 24 Tex. 394, 403 (1859). Though the state legislature was free to discourage the carriage of such an "exceeding[ly] destructive weapon," it could not adopt measures effectively prohibiting its use as a defensive arm: "[A]dmonitory regulation of the abuse [of the right] must not be carried too far. It certainly has a limit. For if the legislature were to affix a

punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a *prohibition of the right*." *Id.*[10]

Thus, the majority of nineteenth century courts agreed that the Second Amendment right extended outside the home and included, at minimum, the right to carry an operable weapon in public for the purpose of lawful self-defense. Although some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public.

Indeed, we know of only four cases from that period rejecting the presumptive-carry view. Three of the four, however, are not category-one cases. *See Haile v. State*, 38 Ark. 564 (1882) (espousing a militia-based reading of the right); *Hill v. State*, 53 Ga. 472 (1874) (same); *English v. State*, 35 Tex. 473 (1872)

---

[10] The court rested this holding on the Texas constitution's guarantee of the right to bear arms, not that of the Second Amendment, which it read as a strictly tyranny-deterring measure "based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed." *Cockrum*, 24 Tex. at 410. Though *Heller*, of course, rejects such a reading as contrary to the Amendment's original meaning, *Cockrum* retains probative value for purposes of our analysis, as it "illustrates the thesis that, when an antebellum court concluded that a constitutional right to bear arms had a self-defense component, then this normally entailed presumptive carry rights, even as applied to a very potent and dangerous weapon such as the Bowie knife." O'Shea, *supra*, at 632.

(same). Consequently, they shed no light on the question whether, *if* the right to bear arms is an individual right directed to the end of self-defense, it sanctions the public carriage of common weapons. In the fourth case, *State v. Duke*, the court does begin with the *Heller*-endorsed understanding of the right but nonetheless concludes that, while the right contemplates weapon carrying in certain places outside the home (e.g., one's business) and in circumstances reasonably giving rise to fear of attack, the right is otherwise subject to heavy-handed regulation. 42 Tex. 455, 459 (1875). Yet, *Duke* is distinguishable: it construed the guarantee of the right to bear arms as it appeared in the Texas Constitution of 1869, which permitted "such regulations [of the right] as the legislature may prescribe." *Id.* at 458. The Second Amendment's text contains no such open-ended clause restricting its application, and we ought not to go looking for an unwritten one.

4

As the Court did in *Heller*, we turn next to the post–Civil War legislative scene. Although consulting post–Civil War discussions may seem to be an unusual means for discerning the original public meaning of the right—particularly given that these discussions postdate the Second Amendment's ratification by three-quarters of a century—we hew to the Supreme Court's conclusion that they retain some significance, albeit less than earlier interpretations of the right. *See*

*Heller*, 554 U.S. at 614–18; *see also McDonald*, 130 S. Ct. at 3038–42. After the Civil War, "there was an outpouring of discussion of Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly freed slaves." *Heller*, 554 U.S. at 614. As this discussion was led by "those born and educated in the early 19th century" near the time of the Second Amendment's enactment, "their understanding of the origins and continuing significance of the Amendment is instructive." *Id.*

Perhaps unsurprisingly, our review suggests that their understanding comports with that of most nineteenth-century courts: then, as at the time of the founding, "[t]he right of the people . . . to bear arms meant to carry arms on one's person." Stephen P. Halbrook, *Securing Civil Rights, Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* 50 (1998).

Our examination of the Civil War legislative scene begins with the Supreme Court's infamous decision in *Dred Scott v. Sanford*, 60 U.S. 393 (1856). According to the Supreme Court in *Dred Scott*, black slaves and their descendants "had no rights which the white man was bound to respect"— pouring fuel on the flames of the nation's already-blazing sectional crisis just four years before the firing on Fort Sumter. *Id.* at 407. At the heart of this holding was the Court's conclusion that at no point had blacks ever been members of the sovereign

"people" of the United States. It apparently followed from this premise that, as constitutional non-citizens, blacks lacked not only the right to "full liberty of speech in public and private" and "to hold meetings upon political affairs" but also the constitutional right "to keep and *carry arms wherever they went*." *Id.* at 417 (emphasis added). It was in large part in reaction to *Dred Scott*'s logic, on which the Black Codes of the post-war South plainly rested, that the Reconstruction Congress sprung into action. *Heller*, 554 U.S. at 614. It was, of course, no coincidence that the codes, designed to deny the privileges of constitutional citizenship to the freedmen, took aim at that most fundamental right of keeping and bearing arms. Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 Kan. J.L. & Pub. Pol'y 17, 20 (Winter 1995) ("The various Black Codes adopted after the Civil War required blacks to obtain a license before carrying or possessing firearms or bowie knives. . . . These restrictive gun laws played a part in provoking Republican efforts to get the Fourteenth Amendment passed."); *see also* Stephen P. Halbrook, *Personal Security, Personal Liberty, and "The Constitutional Right to Bear Arms": Visions of the Framers of the Fourteenth Amendment*, 5 Seton Hall Const. L.J. 341, 348 (1995) ("One did not have to look hard to discover state 'statutes relating to the carrying of arms by negroes' and to an 'act to prevent free people of color from carrying firearms.'" (citations omitted)). As *Heller* notes,

"[t]hose who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms." *Heller*, 554 U.S. at 614.

By all accounts, the model of such codes was Mississippi's 1865 "Act to Regulate the Relation of Master and Apprentice Relative to Freedman, Free Negroes, and Mulattoes," which provided in part that "no freedman, free negro or mulatto . . . shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife" and that "any freedman, free negro or mulatto found with any such arms or ammunition" was subject to arrest. 1866 Miss. Laws ch. 23, §1, 165 (1865). The act, rigorously enforced, led to a thorough confiscation of black-owned guns, whether found at home or on the person: "The militia of this country have seized every gun and pistol found in the hands of the (so called) freedmen. . . . They claim that the statute laws of Mississippi do not recognize the negro as having any right to carry arms. They commenced seizing arms in town," as well as, later, "the plantations." *Harper's Weekly*, Jan. 13, 1866, at 19, col. 2. A similar law enacted by a city in Louisiana, which a special report "had brought to Congress' attention," forbad freedmen from carrying firearms or any other kind of weapon within the limits of town without special permission from the government and one's employer. Halbrook, *supra*, at 5; *see also* "The Freedmen's Bureau

Bill," *New York Evening Post*, May 30, 1866, at 2, col. 1 ("In South Carolina and Florida the freedmen are forbidden to wear or keep arms.").

Among the proposed legislative solutions to the problem of the Black Codes was a bill to add to the powers of the Freedmen's Bureau, a federal agency dispatched to the South to aid the former slaves. One senator, a Democrat from Indiana, seemed to fear that the bill's section securing civil rights to blacks would cast doubt on the legitimacy of his state's laws securing only whites' right to carry weapons openly. *See* Halbrook, *supra*, at 8. Another senator, though he opposed the bill, knew well the nature of the fundamental rights it sought to secure: They included "the subordination of the military to the civil power in peace, in a war, and always," "the writ of *habeas corpus*," and "trial by jury," he declared. They *also* included the right "for every man bearing his arms about him *and* keeping them in his house, his castle, for his own defense." Cong. Globe, 39th Cong., 1st Sess. 340, 371 (Jan. 23, 1866) (Sen. Henry Winter Davis) (emphasis added), *cited in Heller*, 554 U.S. at 616. Meanwhile, in the House, T. D. Eliot, the chairman of the Committee on Freedman's Affairs, quoted from the Louisiana city ordinance mentioned above, citing its prohibition on "carrying firearms" within the town as an example of the sort of black code that federal legislation securing fundamental rights would undo. Cong. Globe, 39th Cong., 1st Sess. 517 (Jan. 29, 1866).

Underscoring the danger that the Southern states' abridgement of the right portended for blacks, he quoted a letter from a teacher at a black school in Maryland, which told of violence prompting "both the mayor and sheriff [to] warn[] the colored people to go armed to school, (which they do)." She apparently added: "The superintendent of schools came down and brought me a revolver." Cong. Globe, 39th Cong., 1st Sess. 658 (Feb. 5, 1866). Concerned by such peril, Massachusetts Congressman Nathaniel P. Banks proposed making the language of the act more specific by explicitly listing "the constitutional right to bear arms" among the civil rights protected. Cong. Globe, 39th Cong., 1st Sess. 585 (Feb. 1, 1866). The language made it into both the first bill, which President Johnson vetoed (though he did not object to its arms-bearing provision), as well as the final version, passed by a veto-proof supermajority. Cong. Globe, 39th Cong., 1st Sess. 915–17 (Feb. 19, 1866); Cong. Globe, 39th Cong., 1st Sess. 3842 (July 16, 1866).

Orders of Union commanders charged with managing Reconstruction in the South lend further support to the notion that citizens in the post–Civil War era conceived of the right to bear arms as extending to self-defense outside the home. The Union commanders, who were given authority over various "departments" of the defeated South, issued orders that were just as important to the task of securing the constitutional rights of liberated slaves as Congressional legislation. "To the

end that civil rights and immunities may be enjoyed," General Daniel Sickles issued General Order No. 1 for the Department of South Carolina, stating in part that "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms, will not be infringed," though such a guarantee neither foreclosed bans on "the unlawful practice of carrying concealed weapons" nor authorized "any person to enter with arms on the premises of another against his consent." Cong. Globe, 39th Cong., 1st Sess. 908 (Feb. 17, 1866) (Rep. William Lawrence) (quoting Sickles' order on the floor of the House). Congressman William Lawrence of Ohio lauded Sickles' order as just the right medicine. *Id.* The *Loyal Georgian*, a known black journal, applauded its issuance, editorializing that blacks "certainly . . . have the same right to own and carry arms that other citizens have." The Loyal Georgian (Augusta), Feb. 3, 1866, 3, col. 4, *cited in Heller*, 554 U.S. at 615.

Just as it was "plainly the understanding in the post–Civil War Congress that the Second Amendment protected an individual right to use arms for self-defense," *Heller*, 554 U.S. at 616, it appears that the right was also understood to encompass carrying weapons in public in case of confrontation.

5

We consider next the major "[p]ost–Civil War [c]ommentators['']" understanding of the right. *Id.*; *see also* David B. Kopel, *The Second Amendment*

*in the Nineteenth Century*, 1998 B.Y.U. L. Rev 1359, 1461–1503 (1998) (collecting relevant commentary from the period). The first and most influential was Thomas Cooley, judge, professor, and author of two leading treatises on constitutional law. Quoted at length in *Heller* solely for his view that the right is an individual one, Cooley's works say little on the self-defense component of the right. Nonetheless, his treatment of the Second Amendment in his more popular treatise supports a self-defense view of the right. There, he notes that "happily" there has been "little occasion" for consideration by courts of the extent to which the right may be regulated, citing only—and without disapproval—the pro-carriage decisions in *Bliss*, *Nunn*, and a third case on "the right of self-defence." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 350 & n.1 (1868), *cited in Heller*, 554 U.S. at 616–17.[11] Also of note, Cooley observes elsewhere in the book

[11] The editors of an 1875 edition of Blackstone also highlighted these three cases in their discussion of "[t]he right of carrying arms for self-protection." 1 William Blackstone, *Commentaries on the Laws of England* 121 n.64 (Herbert Broom & Edward A. Hadley eds., 1875). William Draper Lewis, a later editor, wrote "[t]hat the right of carrying arms as secured by the U.S. Constitution, and generally by State constitutions, does not include the habitual carrying of concealed deadly weapons by private individuals." 1 William Blackstone, *Commentaries on the Laws of England* 144 n.91 (William Draper Lewis ed., 1897). Both these readings, like Cooley's, presume that some arms bearing for self-defense outside the home is encompassed in the right.

that state constitutions typically secure (among others) the right of each citizen to "bear arms for the *defence of himself*." *Id.* at 35–36 (emphasis added). Cooley's view of the right is thus at least compatible with the mainstream self-defense view and did not preclude certain kinds of defensive weapons bearing.[12] *See also* Cooley, *The General Principles*, *supra*, at 270 (observing that the right was adopted in its inherited English form, "with some modification and enlargement").

A second constitutional commentator from the era, also cited in *Heller*, seemed to concur in Cooley's account. *See* John Pomeroy, *An Introduction to the*

---

[12] In Cooley's other treatise, he often described the right to bear arms as oriented toward the goal of citizenry-wide military readiness. To this end, "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880), *cited in Heller*, 554 U.S. at 617–18.

Although one might be tempted to read this passage, and the section in which it appears, as suggesting that Cooley believed the right to be devoted *solely* to the defense of the community, two of his later comments suggest otherwise. First, a later line in the same treatise clarifies: "[T]he secret carrying of those [arms] suited merely to deadly individual encounters may be prohibited." *Id.* at 272. If Cooley understood the right to allow weapons bearing only for training in "discipline in arms" and the like, this later clarification would not have been necessary: *of course* the Amendment would not foreclose restrictions on concealed carrying, just as it would not foreclose restrictions on open carrying—or carrying altogether. And second, as previously noted, Cooley's more popular treatise referenced and contemplated a self-defense component to the right. Cooley, *A Treatise on the Constitutional Limitations*, *supra*, at 350 & n.1.

*Constitutional Law of the United States* (8th ed. 1885), *cited in Heller*, 554 U.S. at 618. Though Pomeroy associated the right with the "object" of "secur[ing] a well-regulated militia," he suggested that, while restrictions on the frowned-upon method of "secret" carrying would not violate the right, restrictions on open carry likely would. Consistent with the majority of nineteenth century courts, Pomeroy did not see "laws forbidding persons to carry dangerous or concealed weapons" alone as incompatible with the Amendment's "intent and design," (in contrast with laws barring carry altogether) for the right is not absolute: "Freedom, not license, is secured." *Id.* at 152–53.

The observations of Oliver Wendell Holmes Jr. in his annotations to James Kent's canonical *Commentaries on American Law*, are in accord. "As the Constitution of the United States . . . declare[s] the right of the people to keep and bear arms," he wrote, "it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons, when not on a journey, or as travellers, from *wearing or carrying concealed weapons,* be constitutional. There has been a great difference of opinion on the question." 2 J. Kent, *Commentaries on American Law* *340 n.2 (Holmes ed., 12th ed. 1873), *cited in Heller*, 554 U.S. at 618. Reviewing a handful of cases "in favor of" concealed-carry restrictions and others wholly against it, Holmes tellingly ends with an analysis of *Nunn v. State*, in

which a statutory prohibition on carrying was "adjudged to be valid so far as it goes to suppress the wearing of arms *secretly*, but unconstitutional so far as it prohibits the bearing or carrying arms *openly*." *Id.* For his own part, Holmes thought a state acting pursuant to its general police power may (and should) prohibit the "atrociously abused" practice of concealed carry. *Id.* Notably, though, he stops short of suggesting that bans on arms bearing altogether would be appropriate, though he was obviously aware that some courts had adopted a more aggressive regulatory posture toward the right.

The account of George Chase, yet another nineteenth-century editor of Blackstone, also reflects the mainstream view of the right—and quite explicitly so. Though the right may not be infringed, he wrote, "it is generally held that statutes prohibiting the carrying of concealed weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms *in a particular manner*, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence." *The American Students' Blackstone: Commentaries on the Laws of England* 84 n.11 (George Chase ed., 3d ed. 1890) [hereinafter "Chase"], *cited in* Heller, 554 U.S. at 626.

Legal commentator John Odronaux, also cited in *Heller*, understood the right clearly to include arms bearing outside the home. Predating the Constitution, "[t]he right to bear arms has always been the distinctive privilege of freemen," rooted in part in the "necessity of self-protection to the person." John Ordronaux, *Constitutional Legislation in the United States: Its Origin, and Application to the Relative Powers of Congress, and of State Legislatures* 241 (1891), *cited in Heller*, 554 U.S. at 619. He described the special province of the privilege in American history: "Exposed as our early colonists were to the attacks of savages, the possession of arms became an indispensable adjunct to the agricultural implements employed in the cultivation of the soil. Men went armed into the field, and went armed to church. There was always public danger." *Id.* at 242. Still, for all its robustness, the Amendment has never prevented "a State from enacting laws regulating the manner in which arms may be carried. Thus, the carrying of concealed weapons may be absolutely prohibited without the infringement of any constitutional right, while a statute forbidding the bearing of arms openly would be such an infringement." *Id.* at 243 (adding that a state may require a private citizen to "obtain a license in order to be permitted to carry a concealed weapon"). Thus, Ordronaux squarely comes down on the side of *Nunn* and like authorities, affirming in no uncertain terms the right's viability outside the home.

That position also prevailed, to a greater or lesser extent, in some of the minor late-nineteenth-century commentaries. Henry Campbell Black, *Handbook of American Constitutional Law* 463 (1895) (noting that, though the arms-bearing privilege belongs to individuals and is a "natural right," restrictions on carrying concealed weapons are not unconstitutional); James Schouler, *Constitutional Studies: State and Federal* 226 (1897) ("To the time-honored right of free people to bear arms was now [in the mid-nineteenth-century] annexed, . . . the qualification that carrying concealed weapons was not to be included."); *see also*, *supra*, n.12 (late-nineteenth-century editors of Blackstone).

That is not to say that this period was without proponents of a dissenting view. Indeed, there were several. *See* Joel Prentiss Bishop, *Commentaries on the Law of Statutory Crimes* 497–98 (1873) (disagreeing that the right permits the carrying of weapons for personal self-defense); J.C. Bancroft Davis, "Appendix," *in* Samuel Freeman Miller, *Lectures on the Constitution of the United States* 645 (1893) [hereinafter "Davis"] (understanding the right to secure the characteristic activities of "military bodies and associations"); George Boutwell, *The Constitution of the United States at the End of the First Century* 358 (1895) (same); 2 John Randolph Tucker, *The Constitution of the United States* 671–72

(Henry St. George Tucker ed., 1899) (same).[13] Yet, we must accord these commentaries little weight, and for the same reason we discounted the state cases finding no individual or self-defense-based right to keep and bear arms: *Heller* tells us that they are—and always have been—incorrect interpretations of the nature and scope of the right.

The weight of authority suggests that the right to bear arms, as understood in the post–Civil War legal commentary, included the right to carry weapons outside the home for self-defense, which, as shown, is consistent with the understanding of the right articulated in most eighteenth-century commentary, nineteenth-century court opinions, and by many post–Civil War political actors.

---

[13] Some of these authorities took their cues from the Supreme Court's decision in *Presser v. Illinois*, 116 U.S. 252 (1886), which they understood as tying the right exclusively to militia service. *See, e.g.*, Davis, *supra*, at 645. Justice Stevens, dissenting in *Heller*, read it similarly. *Heller*, 554 U.S. at 673 (Stevens, J., dissenting). The majority called that view "simply wrong," concluding that "*Presser* said nothing about the Second Amendment's meaning or scope, beyond the fact that it does not prevent the prohibition of private paramilitary organizations." *Id.* at 621 (majority opinion).

One other nineteenth-century author cited in *Heller* registers disapproval of public arms bearing but offers no legal assessment of whether such bearing is within the scope of the right. *See* Benjamin Vaughan Abbott, *Judge and Jury: A Popular Explanation of Leading Topics in the Law of the Land* 333–34 (1880) ("Carrying them for defence, in the more settled parts of the land, savors of cowardice rather than of prudence; a well-behaved man has less to fear from violence than from the blunders of himself and friends in managing the pistol he might carry as a protection."), *cited in Heller*, 554 U.S. at 619.

So concludes our analysis of text and history: the carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes "bear[ing] Arms" within the meaning of the Second Amendment.

6

Our conclusion that the right to bear arms includes the right to carry an operable firearm outside the home for the lawful purpose of self-defense is perhaps unsurprising—other circuits faced with this question have expressly held, or at the very least have assumed, that this is so. *Moore*, 702 F.3d at 936 ("A right to bear arms thus implies a right to carry a loaded gun outside the home."); *see also, e.g.*, *Drake*, 724 F.3d at 431 (recognizing that the Second Amendment right "*may* have some application beyond the home"); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) ("We . . . assume that the *Heller* right exists outside the home . . . ."); *Kachalsky*, 701 F.3d at 89 (assuming that the Second Amendment "must have *some* application in the very different context of the public possession of firearms").

Given this consensus, one might consider it odd that we have gone to such lengths to trace the historical scope of the Second Amendment right. But we have good reason to do so: we must fully understand the historical scope of the right

before we can determine whether and to what extent the San Diego County policy burdens the right or whether it goes even further and "amounts to a destruction of the right" altogether. *See Heller*, 554 U.S. at 629 (quoting *Reid*, 1 Ala. at 616–17). *Heller* instructs that text and history are our primary guides in that inquiry.

One of *Heller*'s most important lessons is that the Second Amendment "codif[ies] a pre-existing right" whose contours can be understood principally through an evaluation of contemporaneous accounts by courts, legislators, legal commentators, and the like. *Heller*, 554 U.S. at 603, 605; *see also McDonald*, 130 S. Ct. at 3056–57 (Scalia, J., concurring) ("The traditional restrictions [on the keeping and bearing of arms] go to show the scope of the right."). Tracing the scope of the right is a necessary first step in the constitutionality analysis—and sometimes it is the dispositive one. *See Heller*, 554 U.S. at 628–35. "[C]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them. . . ." *Id.* at 634–35. A law that "under the pretence of regulating, amounts to a destruction of the right" would not pass constitutional muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628–29. Put simply, a law that destroys (rather than merely burdens) a right central to the Second Amendment must be struck down. *Id.*

We thus disagree with those courts—including the district court in this case—that have taken the view that it is not necessary (and, thus, necessary *not*) to decide whether carrying a gun in public for the lawful purpose of self-defense is a constitutionally protected activity. *See, e.g.*, *Drake*, 724 F.3d at 431; *Woollard*, 712 F.3d at 876; *Kachalsky*, 701 F.3d at 89; *cf. Masciandaro*, 638 F.3d at 475. Understanding the scope of the right is not just necessary, it is key to our analysis. For if self-defense outside the home is part of the core right to "bear arms" and the California regulatory scheme prohibits the exercise of that right, no amount of interest-balancing under a heightened form of means-ends scrutiny can justify San Diego County's policy. *See Heller*, 554 U.S. at 634 ("The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.").

B

Having concluded that carrying a gun outside the home for self-defense comes within the meaning of "bear[ing] Arms," we ask whether San Diego County's "good cause" permitting requirement "infringe[s]" the right.

1

a

To determine what constitutes an infringement, our sister circuits have grappled with varying sliding-scale and tiered-scrutiny approaches, agreeing as a general matter that "the level of scrutiny applied to gun control regulations depends on the regulation's burden on the Second Amendment right to keep and bear arms." *Nordkye v. King*, 681 F.3d 1041, 1045–46 (9th Cir. 2012) (en banc) (O'Scannlain, J., concurring) (collecting cases); *see Heller II*, 670 F.3d at 1257 (requiring a "strong justification" for regulations imposing a "substantial burden upon the core right of self-defense"); *Ezell*, 651 F.3d at 706, 708 (applying more demanding scrutiny to "severe burden[s] on the core Second Amendment right"); *Masciandaro*, 638 F.3d at 469–70 (requiring "strong justification[s]" for "severe burden[s] on the core Second Amendment right" (quoting *Chester*, 628 F.3d at 682–83)); *Marzzarella*, 614 F.3d at 97 (calibrating the level of scrutiny to the "severity" of the burden imposed). Under this general approach, severe restrictions on the "core" right have been thought to trigger a kind of strict scrutiny, while less severe burdens have been reviewed under some lesser form of heightened scrutiny. *See, e.g.*, *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012); *Heller II*, 670 F.3d at 1257; *Masciandaro*, 638 F.3d at 470; *Chester*, 628 F.3d at 682. Confronting challenges to curtailments of the right to carry, one court has applied "some form of heightened scrutiny . . . less than strict scrutiny." *Kachalsky*, 701

F.3d at 93–94. Another, eschewing a tiered approach, required the state to "justif[y]" the burden. *Moore*, 702 F.3d at 941 ("Our analysis is not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states."). Still another has applied intermediate scrutiny. *See Woollard*, 712 F.3d at 876.

And there is, of course, an alternative approach for the most severe cases—the approach used in *Heller* itself. In *Heller*, applying heightened scrutiny was unnecessary. No matter what standard of review to which the Court might have held the D.C. restrictions,[14] "banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id.* at 628–29 (internal quotation marks and citation omitted). A law effecting a "*destruction* of the right" rather than merely *burdening* it is, after all, an infringement under any light. *Heller*, 554 U.S. at 629 (emphasis added) (quoting *Reid*, 1 Ala. at 616–17); *see also Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and

[14] Excluding, of course, rational basis review. *See Heller*, 554 U.S. at 628 n.27.

tradition, not by a balancing test such as strict or intermediate scrutiny.”).[15]

b

Our first task, therefore, is to assess the nature of the infringement that the San Diego County policy purportedly effects on the right to bear arms—namely, does it burden the right or, like in *Heller*, does it destroy the right altogether?

California’s regulatory scheme addresses two types of arms-bearing: open and concealed carry. Under California law, open carry is prohibited in San Diego County[16] regardless of whether the weapon is loaded or unloaded. *See* Cal. Penal Code §§ 25850, 26350. Because California law has no permitting provision for open carry, *cf. id.* §§ 26150, 26155 (providing licensing only for concealed carry), it is illegal in virtually all circumstances.

California law also severely restricts concealed carry, although not to the same extent as open carry. As a general rule, concealed carry is not allowed regardless of whether the weapon is loaded. *See id.* § 25400. But there are certain

---

[15] In *Chovan*, we applied intermediate scrutiny to a Second Amendment claim that involved “a substantial burden on” a right outside the core of the Second Amendment. 735 F.3d at 1138. Intermediate scrutiny is not appropriate, however, for cases involving the destruction of a right at the core of the Second Amendment.

[16] San Diego, like most of the populous cities and counties in California, is incorporated. *See* California State Association of Counties, *available at* http://www.csac.counties.org/cities-within-each-county (last visited Feb. 4, 2014).

exceptions. Concealed carry is acceptable with a proper permit. *Id.* §§ 26150, 26155. And even without a permit, it is sanctioned for particular groups, *see, e.g.*, *id.* § 25450 (peace officers); *id.* § 25455 (retired peace officers); *id.* § 25620 (military personnel); *id.* § 25650 (retired federal officers), in particular locations, *see, e.g.*, *id.* § 26035 (private property or place of business); *id.* § 26040 (where hunting is allowed), and at particular times, *see, e.g.*, *id.* § 26045 (when faced with "immediate, grave danger" in the "brief interval before and after the local law enforcement agency . . . has been notified of the danger and before the arrival of its assistance); *id.* § 26050 (making or attempting to make a lawful arrest).

Clearly, the California scheme does not prevent every person from bearing arms outside the home in every circumstance. But the fact that a small group of people have the ability to exercise their right to bear arms does not end our inquiry. Because the Second Amendment "confer[s] an individual right to keep and bear arms," we must assess whether the California scheme deprives any individual of his constitutional rights. *Heller*, 554 U.S. at 595. Thus, the question is not whether the California scheme (in light of San Diego County's policy) allows *some* people to bear arms outside the home in *some* places at *some* times; instead, the question is whether it allows the typical responsible, law-abiding citizen to bear arms in public for the lawful purpose of self-defense. The answer to the latter

question is a resounding "no."[17]

In California, the only way that the typical responsible, law-abiding citizen can carry a weapon in public for the lawful purpose of self-defense is with a concealed-carry permit. And, in San Diego County, that option has been taken off the table. The San Diego County policy specifies that concern for "one's personal safety alone" does not satisfy the "good cause" requirement for issuance of a permit. Instead, an applicant must demonstrate that he suffers a unique risk of harm: he must show "a set of circumstances that distinguish [him] from the mainstream and cause[] him . . . to be placed in harm's way." Given this requirement, the "typical" responsible, law-abiding citizen in San Diego County cannot bear arms in public for self-defense; a *typical* citizen fearing for his "personal safety"—by definition—cannot "*distinguish* [*himself*] *from the mainstream*."

Although California law provides other specified exceptions from the general prohibition against public carry, these do little to protect an individual's right to bear arms in public for the lawful purpose of self-defense. The exemptions

---

[17] It is worth noting that California has one of the most restrictive gun regulatory regimes in the nation. Indeed, it is one of only eight states with a "may-issue" permitting regime, meaning that a general desire to carry in self-defense is not sufficient to justify obtaining a permit. *See Drake*, 724 F.3d at 442 (Hardiman, J., dissenting).

for particular groups of law enforcement officers and military personnel do not protect the typical responsible, law-abiding citizen. Excluding private property and places of business does not protect the right to bear arms for *public* confrontation. And the exceptions for "making or attempting to make a lawful arrest" or for situations of "immediate, grave danger" (to the extent that they are not entirely illusory—for how would one obtain a gun for use in public when suddenly faced with such a circumstance?) do not cover the scope of the right, which includes the right to carry *in case of public confrontation*, not just after a confrontation has occurred. *Heller*, 554 U.S. at 584 (defining bear arms to mean carrying a weapon "for the purpose . . . of being *armed and ready* for offensive or defensive action *in a case of conflict* with another person." (emphasis added) (quoting *Muscarello*, 524 U.S. at 143 (Ginsburg, J., dissenting)). To reason by analogy, it is as though San Diego County banned all political speech, but exempted from this restriction particular people (like current or former political figures), particular places (like private property), and particular situations (like the week before an election). Although these exceptions might preserve small pockets of freedom, they would do little to prevent destruction of the right to free speech as a whole. As the Court has said: "The Second Amendment is no different." *Heller*, 554 U.S. at 635. It too is, in effect, destroyed when exercise of the right is limited

to a few people, in a few places, at a few times.

c

It is the rare law that "destroys" the right, requiring *Heller*-style per se invalidation, but the Court has made perfectly clear that a ban on handguns in the home is not the only act of its kind. We quote the relevant paragraph in full, telling case citations included:

> Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. *And some of those few have been struck down*. In *Nunn v. State,* the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). See 1 Ga., at 251. In *Andrews v. State,* the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," 50 Tenn., at 187, violated the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns. *Ibid.* See also *State v. Reid,* 1 Ala. 612, 616–617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional").

*Id.* at 629. In other words, D.C.'s complete ban on handguns in the home amounted to a destruction of the right precisely because it matched in severity the kinds of complete carry prohibitions confronted (and struck down) in *Nunn* and *Andrews*. These, in turn, resemble the severe restrictions in effect in San Diego County, where the open or concealed carriage of a gun, loaded or not, is forbidden.

*Heller* teaches that a near-total prohibition on keeping arms (*Heller*) is hardly better than a near-total prohibition on bearing them (this case), and vice versa. Both go too far.

2

The County presents one further argument in support of the constitutionality of its "good cause" policy, which it perceives as its ace in the hole: the *Heller* Court's description of concealed-carry restrictions as "presumptively lawful regulatory measures." *Id.* at 627 n.26. "The right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller* says. *Id.* at 626. "For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment and state analogues." *Id.* According to the County, this means that their concealed-carry policy (which stops just short of an all-out ban) must also be lawful. Ergo, this suit must fail.

But the County's argument has two flaws. First, it misapprehends Peruta's challenge. This is not a case where a plaintiff who is permitted to openly carry a loaded weapon attacks the validity of a state's concealed-carry rule because he would rather carry secretly. Rather, Peruta and his fellow plaintiffs argue that the San Diego County policy in light of the California licensing scheme *as a whole*

violates the Second Amendment because it precludes a responsible, law-abiding citizen from carrying a weapon in public for the purpose of lawful self-defense in *any* manner. True, Peruta focuses his challenge on the licensing scheme for concealed carry, but for good reason: acquiring such a license is the only practical avenue by which he may come lawfully to carry a gun for self-defense in San Diego County. *See* Cal. Penal Code §§ 26150, 26155 (creating a licensing scheme for concealed carry only). As we have explained, open carry is prohibited in San Diego County, and elsewhere in California, without exception. *See id.* §§ 25850, 26350. It is against this backdrop of the California carry regime at large, Peruta argues, that the unconstitutionality of the County's restrictive interpretation of "good cause" becomes apparent. His is not an attack trained on a restriction against concealed carry as such, or viewed in isolation. Rather, he targets the constitutionality of the entire scheme and requests the least intrusive remedy: that the County of San Diego, in line with many of the other counties in the State of California, should be made to issue carry licenses to citizens whose only "good cause" is the *Heller*-approved desire for self-defense.

The second, somewhat-related mistake in the County's argument is that it reads too much into *Heller*'s ostensible blessing of concealed-carry restrictions. A flat-out ban on concealed carry in a jurisdiction permitting open carry may or may

not infringe the Second Amendment right—the passage from *Heller* clearly bears on that issue, which we need not decide. But whether a state restriction on *both* concealed *and* open carry overreaches is a different matter. To that question, *Heller* itself furnishes no explicit answer. But the three authorities it cites for its statement on concealed-carry laws do. *See Heller*, 554 U.S. at 626. We have analyzed all three already. The first, *State v. Chandler*, stands for the principle that laws prohibiting the carry of concealed weapons are valid only so long as they do not destroy the right to carry arms in public altogether. *See* 5 La. Ann. at 489–90 ("[The Act] interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality."); *see also Jumel*, 13 La. Ann. at 400 (citing *Chandler* for the principle that "prohibiting only *a particular mode* of bearing arms . . . found dangerous" does not infringe the right). The second, *Nunn v. State*, was even more explicit: "A law which merely inhibits the wearing of certain weapons in a *concealed manner* is *valid*. But so far as it cuts off the exercise of the right of the citizen altogether to *bear arms*, *or*, under the color of prescribing the *mode*, renders the right itself useless—it is in conflict with the Constitution, and *void*." 1 Ga. at 243. *Heller*'s third and final source, Chase's *American Students' Blackstone*, takes a similar stance, concluding that, though the Constitution forbids the infringement of the right to bear arms, "statutes

prohibiting the carrying of *concealed* weapons are not in conflict with [it or its state analogues], since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence." Chase, *supra*, at 84 n.11.

Of course, these three sources are not the only exponents of this view. As we have shown, dozens of other cases and authorities from the same period—many of which *Heller* cites as probative of the right's original meaning—contend likewise. *See, e.g.*, *Reid*, 1 Ala. at 616–17 (striking down a concealed carry law because "the Legislature[ has] the right to enact laws in regard to the manner in which arms shall be borne," but noting that a statute that destroys the right altogether under the "pretence of regulating" the manner of carry "would be clearly unconstitutional"); *Bliss*, 12 Ky. (2 Litt.) at 91 (holding that a ban on concealed carry, which "restrain[ed] the full and complete exercise of [the] right," was unconstitutional and void). As Judge Hardiman aptly summarized "courts have long h[eld] that although a State may prohibit the open *or* concealed carry of firearms, it may not ban *both* because a complete prohibition on public carry violates the Second Amendment and analogous state constitutional provisions." *Drake*, 724 F.3d at 449 (Hardiman, J., dissenting).

To be clear, we are not holding that the Second Amendment requires the states to permit concealed carry. But the Second Amendment does require that the states permit *some form* of carry for self-defense outside the home. Historically, the preferred form of carry has depended upon social convention: concealed carry was frowned upon because it was seen as "evil practice" that endangered "the safety of the people" and "public morals" by "exert[ing] an unhappy influence upon the moral feelings of the wearer[ and] making him less regardful of the personal security of others." *Reid*, 1 Ala. at 616–17. States thus often passed laws banning concealed carry and state courts often allowed prohibitions on concealed carry *so long as* open carry was still permitted. *Id.*; *see also Nunn*, 1 Ga. at 251 ("[S]o far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, th[en] it is valid. . . . But [to the extent it] contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.").

California, through its legislative scheme, has taken a different course than most nineteenth-century state legislatures, expressing a preference for concealed rather than open carry.[18] *See* Cal. Penal Code § 26350 (prohibiting open carry of an unloaded firearm); *see also id.* §§ 26150, 26155 (establishing a licensing

[18] This is likely the result of a changing social convention in favor of concealed rather than open carry. *See* Volokh, *Implementing the Right*, *supra*, at 1521 ("In many places, carrying openly is likely to frighten many people, and to lead to social ostracism as well as confrontations with the police.").

procedure only for concealed carry). And it has the power to do so: as the historical sources have repeatedly noted, the state has a right to prescribe a particular manner of carry, provided that it does not "cut[] off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, render[] the right itself useless." *Nunn*, 1 Ga. at 243 (emphasis omitted). California's favoring concealed carry over open carry does not offend the Constitution, so long as it allows one of the two.

To put it simply, concealed carry *per se* does not fall outside the scope of the right to bear arms; but insistence upon a particular mode of carry does. As we have explained previously, this is not the latter type of case. Peruta seeks a concealed carry permit because that is the only type of permit available in the state. As the California legislature has limited its permitting scheme to concealed carry—and has thus expressed a preference for that manner of arms-bearing—a narrow challenge to the San Diego County regulations on concealed carry, rather than a broad challenge to the state-wide ban on open carry, is permissible.[19]

For these reasons, *Heller*'s favorable mention of concealed-carry restrictions is not the silver bullet the County had hoped it was, at least not in this case.

---

[19] The dissent curiously misinterprets our opinion as ruling on the constitutionality of California statutes. We decline to respond to its straw-man arguments.

3

Our opinion is not the first to address the question of whether the Second Amendment protects a responsible, law-abiding citizen's right to bear arms outside the home for the lawful purpose of self-defense. Indeed, we are the fifth circuit court to opine expressly on the issue, joining an existent circuit split. *Compare Moore*, 702 F.3d at 936–42 (holding that "[a] right to bear arms . . . implies a right to carry a loaded gun outside the home" and striking down the open-and-concealed-carry regulatory regime in Illinois because the state failed to justify "so substantial a curtailment of the right of armed self-defense"), *with Drake*, 724 F.3d at 431–35 (recognizing that the right to bear arms may have some application outside the home, but concluding that New Jersey's "justifiable need" permitting requirement was a presumptively lawful longstanding regulation or, alternatively, that the New Jersey regulatory scheme survived intermediate scrutiny); *Woollard*, 712 F.3d at 876, 879–82 (presuming that Second Amendment protections exist outside the home and upholding Maryland's regulatory scheme because it could not "substitute [a different] view[] for the considered judgment of the General Assembly," which "appropriate[ly] balance[d]" the interests involved), *and Kachalsky*, 701 F.3d at 89, 97–99 (proceeding on the "assumption" that the right to bear arms extends outside the home, but affording "substantial deference to the

predictive judgments of [the legislature]" and thus upholding the gun regulations under intermediate scrutiny). Our reading of the Second Amendment is akin to the Seventh Circuit's interpretation in *Moore*, 702 F.3d at 936–42,[20] and at odds with the approach of the Second, Third, and Fourth Circuits in *Drake*, 724 F.3d at 431–35, *Woollard*, 712 F.3d at 876, and *Kachalsky*, 701 F.3d at 89, 97–99.

a

We are unpersuaded by the decisions of the Second, Third, and Fourth Circuits for several reasons. First, contrary to the approach in *Heller*, all three courts declined to undertake a complete historical analysis of the scope and nature of the Second Amendment right outside the home. *Compare Heller*, 554 U.S. at 605 (examining the post-ratification interpretations of the Second Amendment because "the public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (emphasis omitted)), *with Drake*, 724 F.3d at 431 (noting that the court was "not inclined to address [text, history, tradition and precedent] by engaging in a round of full-blown historical analysis" and relying on the Second Circuit's conclusion that "[h]istory and tradition do not speak with one voice" (quoting *Kachalsky*, 701 F.3d

[20] The Supreme Court of Illinois has also found *Moore* persuasive. *See People v. Aguilar*, 2013 IL 122116, at *5–6 (Sept. 12, 2013) (ruling "that the second amendment protects the right to possess and use a firearm for self-defense outside the home").

at 91)); *Woollard*, 712 F.3d at 874–76 (declining to "impart a definitive ruling" regarding the scope of the Second Amendment right), *and Kachalsky*, 701 F.3d at 91 (refusing to look at "highly ambiguous history and tradition to determine the meaning of the Amendment"). As a result, they misapprehend both the nature of the Second Amendment right and the implications of state laws that prevent the vast majority of responsible, law-abiding citizens from carrying in public for lawful self-defense purposes.

For example, in *Kachalsky*, the Second Circuit's perfunctory glance at the plaintiffs' historical argument misunderstood the historical consensus regarding the right to bear arms outside the home. Relying on three cases, the court concluded that "history and tradition [did] not speak with one voice" regarding the ability to restrict public carry because at least three states "read restrictions on the public carrying of weapons as entirely consistent with constitutional protections." *Kachalsky*, 701 F.3d at 90–91 (citing *Fife v. State*, 31 Ark. 455 (1876), *English*, 35 Tex. at 473, and *Andrews v. State*, 50 Tenn. 165 (1871)). But in its brief historical analysis, the court missed a critical factor: the cases it cites in favor of broad public carry restrictions adhere to a view of the Second Amendment that is and always has been incorrect. *Cf. Moore*, 702 F.3d at 941 (referencing "disagreement . . . with some of the historical analysis in [*Kachalsky* because] we regard the historical

issues as settled in *Heller*"). All three cases interpret the Second Amendment as a militia-based (rather than a self-defense-centered) right; they uphold regulations on carrying pistols in public because pistols are not the type of weapons that would be used by militia men. *See Fife*, 31 Ark. at 461 (upholding a prohibition against carrying pistols in public because such weapons are "used in private quarrels and brawls" and are not "effective as a weapon of war, and useful and necessary for 'the common defense'"); *English*, 35 Tex. at 475 ("[W]e shall be led to the conclusion that the [Second Amendment] protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals . . . ."); *Andrews*, 50 Tenn. at 186–87 (affirming the constitutionality of a law regulating public carry of certain weapons which were not the "usual equipment of the soldier" but remanding for consideration of whether a revolver was the "character of weapon" used in warfare).

Because the Second Amendment has always been an individual right to defend oneself, cases that—like these—uphold gun regulations because they do not offend the militia-based nature of the right are inapposite and should not factor into a historical analysis of the right's scope. *See, e.g.*, *Heller*, 554 U.S. at 605. And with these cases off the table, the remaining cases speak with one voice: states may

not destroy the right to bear arms in public under the guise of regulating it. *See, e.g.*, *Kachalsky*, 701 F.3d at 90 (recognizing that some state courts "offered interpretations of the Second Amendment" consistent with the plaintiffs' position that "though a state may regulate open or concealed carrying of handguns, it cannot ban *both*"); *see also Drake*, 724 F.3d at 449 (Hardiman, J., dissenting) (noting that the "crux of the[] historical precedents[] endorsed by the Supreme Court, is that a prohibition against both open and concealed carry without a permit is different in kind, not merely in degree, from a prohibition covering only one type of carry"). In light of *Heller*, the Second Circuit erred in outright rejecting history and tradition as unhelpful and ambiguous, and the Third and Fourth Circuits erred in following suit.[21] *See Kachalsky*, 701 F.3d at 91; *see also Drake*, 724 F.3d at 431;

[21] Indeed, the Third Circuit went even further than that. It not only rejected history and tradition, but specifically relied on more recent mid-twentieth century developments to justify New Jersey's permitting scheme. *See Drake*, 724 F.3d at 432–34; *see also id.* at 447–52 (Hardiman, J., dissenting) (criticizing the majority's reliance on mid-twentieth-century New Jersey law to justify narrowing the scope of the Second Amendment right). The Third Circuit majority concluded that even if the Second Amendment right extended outside the home, permitting restrictions that required individuals to show a "justifiable need to carry a handgun" in the form of "specific threats or previous attacks which demonstrate a special danger to the applicant's life" were analogous to the type of "longstanding" regulations that the Supreme Court had identified as "presumptively lawful" in *Heller*. *Id.* at 428–29 (majority opinion). To reach this conclusion, the Third Circuit relied upon New Jersey law, which had incorporated some version of the "justifiable need" requirement into its permitting scheme since 1924. *Id.* at 432. We reject this analysis because it goes against the analysis of the Second Amendment's scope

(continued...)

*Woollard*, 712 F.3d at 875–76.

By evading an in-depth analysis of history and tradition, the Second, Third, and Fourth Circuits missed a crucial piece of the Second Amendment analysis. They failed to comprehend that carrying weapons in public for the lawful purpose of self defense is a central component of the right to bear arms. *See Moore*, 702 F.3d at 941 (criticizing the court in *Kachalsky* for "suggest[ing] that the Second Amendment should have a much greater scope inside the home than outside" and noting that the "interest in self-protection [and thus in the Second Amendment right] is as great outside as inside the home"). And further, they failed to comprehend that regulations on the right, although permissible to an extent, could not go so far as to enjoin completely a responsible, law-abiding citizen's right to carry in public for self-defense. Such regulations affecting a destruction of the right to *bear arms*, just like regulations that affect a destruction of the right to *keep arms*, cannot be sustained under any standard of scrutiny. *See Heller*, 554 U.S. at

---

[21](...continued)
employed in *Heller* and *McDonald*: those cases made clear that the scope of the Second Amendment right depends not on post-twentieth century developments, but instead on the understanding of the right that predominated from the time of ratification through the nineteenth century. *See, e.g.*, *Heller*, 554 U.S. at 605; *see also Drake*, 724 F.3d at 452 (Hardiman, J., dissenting) ("[R]egardless of whether New Jersey's justifiable need requirement dates to 1924 or 1966 for purposes of the inquiry, there is not a sufficiently longstanding tradition of regulations that condition the issuance of permits on a showing of special need for self-defense to uphold New Jersey's law on that basis.").

629.

Because the Second, Third, and Fourth Circuits eschewed history and tradition in their analysis of the constitutionality of these regulations, despite the Supreme Court's admonition that "the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation," we find their approaches unpersuasive. *See Heller*, 554 U.S. at 605. Our independent analysis of history and tradition leads us to take a different course.

b

Because our analysis paralleled the analysis in *Heller* itself, we did not apply a particular standard of heightened scrutiny. *See also Moore*, 702 F.3d at 941 (declining to subject the "most restrictive gun law of any of the 50 states" to an "analysis . . . based on degrees of scrutiny"). Thus, the Second, Third, and Fourth Circuits' extensive discussions regarding the application of intermediate scrutiny to similar regulations in other states is not particularly instructive to our view of the issues in this case.

Nonetheless, to the extent those opinions suggest that the type of regulation at issue here can withstand some form of heightened scrutiny, it is worth noting our disagreement with their reasoning.

When analyzing whether a "substantial relationship" existed between the challenged gun regulations and the goal of "public safety and crime prevention" the Second Circuit concluded that it owed "substantial deference to the predictive judgments of [the legislature]" regarding the degree of fit between the regulations and the public interest they aimed to serve. *Kachalsky*, 701 F.3d at 97. Relying on New York's historical regulation of handguns from 1911 to the present, the court deferred to the state legislature's "belief" that regulation of handgun possession would have "an appreciable impact on public safety and crime prevention." *Id.* at 97–98. It thus upheld New York's regulatory scheme, emphasizing that there was "general reticence to invalidate the acts of [our] elected leaders." *Id.* at 100 (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012)). Taking a similar approach, the Third Circuit deferred to the legislature's judgment that the permitting regulations would serve its interest in ensuring public safety even though "New Jersey [could not] present[] [the court] with much evidence to show how or why its legislators arrived at this predictive judgment." *Drake*, 724 F.3d at 437; *see also id.* at 454 (Hardiman, J., dissenting) (clarifying that in actuality "New Jersey . . . provided *no evidence at all* to support its proffered justification . . ."). And the Fourth Circuit, in a familiar vein, relied on the legislature's judgment that "reduc[ing] the number of handguns carried in public" would increase public

safety and prevent crime, despite conflicting evidence on the issue. *Woollard*, 712 F.3d at 879–82.

This is not an appropriate application of intermediate scrutiny in at least two respects. First, the analysis in the Second, Third, and Fourth Circuit decisions is near-identical to the freestanding "interest-balancing inquiry" that Justice Breyer proposed—and that the majority explicitly rejected—in *Heller*. *See Heller*, 554 U.S. at 689–90 (Breyer, J., dissenting) (proposing that in Second Amendment cases the court should "ask[] whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests"); *see also id.* at 634–35 (majority opinion) (rejecting a "judge-empowering 'interest-balancing inquiry'" as a test for the constitutionality of Second Amendment regulations because "no other enumerated constitutional right [had its] core protection . . . subjected to [such] a freestanding" inquiry). All three courts referenced, and ultimately relied upon, the state legislatures' determinations weighing the government's interest in public safety against an individual's interest in his Second Amendment right to bear arms. *See Kachalsky*, 701 F.3d at 100 (deferring to the state legislature's determination "that limiting handgun possession to persons who have an articulable basis for believing they will need the weapon for self-defense is in the best interest of public safety

and *outweighs* the need to have a handgun for an unexpected confrontation" (emphasis added)); *see also Drake*, 724 F.3d at 439 (noting that "New Jersey has decided that this somewhat heightened risk to the public may be *outweighed* by the potential safety benefit to an individual with a justifiable need to carry a handgun" (emphasis added) (internal quotation marks omitted)); *Woollard*, 712 F.3d at 880 (relying on the state's determination that "the good-and-substantial-reason requirement '*strikes a proper balance* between ensuring access to handgun permits for those who need them while preventing a greater-than-necessary proliferation of handguns in public places that . . . increases risks to public safety.'" (emphasis added)). As we previously explained, such an approach ignores the *Heller* court's admonition that "the very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634; *see also Drake*, 724 F.3d at 457 (Hardiman, J., dissenting) (recognizing that the *Heller* court "rejected this sort of balancing inquiry as inconsistent with the very idea of constitutional rights").

Our second disagreement with our sister circuits' application of intermediate scrutiny relates to the high degree of deference they afforded the state legislatures' assessments of the fit between the challenged regulations and the asserted government interest they served. Although all three cite *Turner Broadcasting*

*System, Inc. v. FCC* (*Turner II*), 520 U.S. 180 (1997), for the proposition that courts must afford deference to legislative findings, they apply this premise in the wrong context. *See Drake*, 724 F.3d at 436–37; *Woollard*, 712 F.3d at 881; *Kachalsky*, 701 F.3d at 97. In Part II.A. of *Turner*, the Court applied deference to the legislature's judgment regarding the first portion of the intermediate scrutiny analysis: whether there was a "real harm" amounting to an important government interest and "whether [the statutory provisions at issue] will alleviate it in a material way." *Turner*, 520 U.S. at 195. But in Part II.B, when assessing "the fit between the asserted interests and the means chosen to advance them," the Court applied no such deference. *Id.* at 213. Instead, it required the government to prove that the statute did not burden the right "'substantially more . . . than is necessary to further' [the government's legitimate] interests." *Id.* at 214 (quoting *Turner Broadcasting System, Inc. v. FCC* (*Turner I*), 512 U.S. 622, 662 (1994)).

In *Drake*, *Woollard*, and *Kachalsky*, the government failed to show that the gun regulations did not burden "substantially more" of the Second Amendment right than was necessary to advance its aim of public safety. Indeed, as the district court noted in *Woollard*, the government could not show that the challenged regulation served its needs any better than a random rationing system, wherein gun permits were limited to every tenth applicant. *See also Drake*, 724 F.3d at 455

(Hardiman, J., dissenting) ("[I]t is obvious that the justifiable need requirement [in New Jersey] functions as a rationing system designed to limit the number of handguns carried in [the state]."). As that court so aptly put it:

> The Maryland statute's failure lies in the overly broad means by which it seeks to advance this undoubtedly legitimate end. The requirement that a permit applicant demonstrate "good and substantial reason" to carry a handgun does not, for example, advance the interests of public safety by ensuring that guns are kept out of the hands of those adjudged most likely to misuse them, such as criminals or the mentally ill. It does not ban handguns from places where the possibility of mayhem is most acute, such as schools, churches, government buildings, protest gatherings, or establishments that serve alcohol. It does not attempt to reduce accidents, as would a requirement that all permit applicants complete a safety course. It does not even, as some other States' laws do, limit the carrying of handguns to persons deemed "suitable" by denying a permit to anyone "whose conduct indicates that he or she is potentially a danger to the public if entrusted with a handgun."
>
> Rather, the regulation at issue is a rationing system. It aims, as Defendants concede, simply to reduce the total number of firearms carried outside of the home by limiting the privilege to those who can demonstrate "good reason" beyond a general desire for self-defense.
>
> . . . .
>
> The challenged regulation does no more to combat [the state's public safety concerns] than would a law indiscriminately limiting the issuance of a permit to every tenth applicant. The solution, then, is not tailored to the problem it is intended to solve. Maryland's "good and substantial reason" requirement will not prevent those who meet it from having their guns taken from them, or from accidentally shooting themselves or others, or from suddenly turning to a life of crime. . . . If anything, the Maryland regulation puts firearms in the hands of those most likely to use them in a violent situation by limiting the issuance of permits to "groups of individuals who are at greater risk than others of being the victims of crime."

*Woollard v. Sheridan*, 863 F. Supp. 2d 462, 474–75 (D. Md. 2012) (internal citations and quotation marks omitted), *rev'd sub nom. Woollard*, 712 F.3d at 865; *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417–18 (1993) (holding that the "city did not establish the reasonable fit" between a regulation prohibiting the distribution of commercial handbills and a government interest in safety and esthetics and rejecting the city's argument that it could show "a close fit between its ban on newsracks dispensing 'commercial handbills' and its interest in safety and esthetics because every decrease in the number of such dispensing devices necessarily effect[ed] an increase in safety and an improvement in the attractiveness of the cityscape.").

In light of the states' failure to demonstrate sufficient narrow tailoring in *Drake*, *Woollard*, and *Kachalsky*, the gun regulations at issue in those cases should have been struck down even under intermediate scrutiny.

III

We conclude by emphasizing, as nearly every authority on the Second Amendment has recognized, *regulation* of the right to bear arms is not only legitimate but quite appropriate. We repeat *Heller*'s admonition that "nothing in our opinion should be taken to cast doubt on longstanding

prohibitions on the possession"—or carriage—"of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27. Nor should anything in this opinion be taken to cast doubt on the validity of measures designed to make the carrying of firearms for self-defense as safe as possible, both to the carrier and the community.

We are well aware that, in the judgment of many governments, the safest sort of firearm-carrying regime is one which restricts the privilege to law enforcement with only narrow exceptions. Nonetheless, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table. . . . Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court [or ours] to pronounce the Second Amendment extinct." *Id.* at 636. Nor may we relegate the bearing of arms to a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated

into the Due Process Clause." *McDonald*, 130 S. Ct. at 3044.

The district court erred in denying the applicant's motion for summary judgment on the Second Amendment claim because San Diego County's "good cause" permitting requirement impermissibly infringes on the Second Amendment right to bear arms in lawful self-defense.[22]

**REVERSED** and **REMANDED**.

---

[22] Because we reverse on the basis of the Second Amendment issue, we do not reach any of Peruta's other claims.

## COUNSEL

Paul D. Clement, Bancroft PLLC, Washington, D.C., argued the cause for the plaintiffs-appellants. Carl D. Michel, Michel & Associates, P.C., Long Beach, California, filed the briefs for the plaintiffs-appellants. With him on the opening brief were Glenn S. McRoberts, Sean A. Brady, and Bobbie K. Ross, Michel & Associates, P.C., Long Beach, California. With him on the reply brief were Glenn S. McRoberts, Sean A. Brady, and Bobbie K. Ross, Michel & Associates, P.C., Long Beach, California, and Paul Neuharth, Jr., Paul Neuharth, Jr. APC., San Diego, California.

James M. Chapin, Senior Deputy Attorney for County of San, San Diego, California, argued the cause and filed the brief for the defendants-appellees. With him on the brief was Thomas E. Montgomery, County Counsel for County of San Diego, San Diego, California.

Stephen P. Halbrook, Fairfax, Virginia, filed the brief on behalf of amicus curiae Congress of Racial Equality, Inc. in support of the plaintiffs-appellants.

Paul D. Clement, Bancroft PLLC, Washington, D.C., filed the brief on behalf of amicus curiae National Rifle Association of America, Inc. in support of plaintiffs-appellants.

David B. Kopel, Independence Institute, Golden, Colorado, filed the brief on behalf of amici curiae International Law Enforcement Educators and Trainers Association and the Independence Institute.

Alan Gura, Gura & Possessky, PLLC, Alexandria, Virginia, filed the brief on behalf of amici curiae Second Amendment Foundation, Inc., Calguns Foundation, Inc., Adam Richards, and Brett Stewart in support of plaintiffs-appellants.

John C. Eastman, Chapman University School of Law, Orange, California, filed the brief on behalf of amici curiae Center for Constitutional Jurisprudence, Doctors for Responsible Gun Ownership, and Law Enforcement Alliance of America. With him on the brief were Anthony T. Caso and Karen J. Lugo.

Don B. Kates, Battle Ground, Washington, filed the brief on behalf of amici curiae Gun Owners of California and Senator H.L. Richardson (Ret.) in support of plaintiffs-appellants.

Neil R. O'Hanlon, Hogan Lovells US LLP, Los Angeles, California, filed the brief on behalf of amici curiae Brady Center to Prevent Gun Violence, the International Brotherhood of Police Officers, and the Police Foundation. With him on the brief were Adam K. Levin, S. Chartey Quarcoo, and Samson O. Asiyanbi, Hogan Lovells US LLP, Washington, D.C., and Jonathan E. Lowy and Daniel R. Vice, Brady Center to Prevent Gun Violence, Washington, D.C.

Paul R. Coble, Law Offices of Jones & Mayer, Fullerton, California, filed the brief on behalf of amici curiae California State Sheriffs Association, California Police Chiefs Association, and California Peace Officers Association in support of defendants-appellees. With him on the brief was Martin J. Mayer, Law Offices of Jones & Mayer, Fullerton, California.

Simon J. Frankel, Covington & Burling LLP, San Francisco, California, filed the brief on behalf of amici curiae Legal Community against Violence, Major Cities Chiefs Association, Association of Prosecuting Attorneys, and San Francisco District Attorney George Gascón in support of defendants-appellees. With him on the brief were Samantha J. Choe, Steven D. Sassaman, and Ryan M. Buschell, Covington & Burling LLP, San Francisco, California.

FILED

FEB 13 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Peruta v. County of San Diego*, No. 10-56971

THOMAS, Circuit Judge, dissenting:

In its landmark decision in *Heller*, the Supreme Court held that a complete ban on handgun possession in the home violated the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). In doing so, it reminded us that: "the right secured by the Second Amendment is not unlimited" and that it "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Significantly for our case, the Court then specifically discussed restrictions on carrying concealed weapons, explaining that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* The Court then emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions," which it labeled as "presumptively lawful." *Id.* at 626-27 & n.26. *Heller*'s pronouncement is consistent with the Supreme Court's prior observation that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281–82 (1897).

This case involves California's "presumptively lawful" and longstanding restrictions on carrying concealed weapons in public and, more specifically, an

even narrower question: the constitutionality of San Diego County's policy of allowing persons who show good cause to carry concealed firearms in public. When we examine the justification provided for the policy, coupled with *Heller*'s direction, our conclusion must be that the County's policy is constitutional.

Unfortunately, the majority never answers the question posed. Instead, in a sweeping decision that unnecessarily decides questions not presented, the majority not only strikes down San Diego County's concealed carry policy, but upends the entire California firearm regulatory scheme. The majority opinion conflicts with *Heller*, the reasoned decisions of other Circuits, and our own case law.

Therefore, I must respectfully dissent.

I

We are not asked in this case to determine the reach of the Second Amendment outside the home or to evaluate the entirety of California's handgun regulatory scheme. Rather, the narrow questions presented in this case are: (1) Does the scope of the Second Amendment extend to protect the concealed carrying of handguns in public, and (2) if so, does San Diego County's policy of allowing public concealed weapon carry upon a showing of good cause unconstitutionally infringe on that right?

Second Amendment jurisprudence has rapidly evolved in the last several years, commencing with the Supreme Court's groundbreaking decisions in *Heller* and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). Although these cases are of recent origin, *Heller* and *McDonald*, along with decisions of our sister circuits, have provided an analytical framework for examining Second Amendment challenges, which we recently distilled in *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).

The Supreme Court has not as yet defined the extent to which the Second Amendment applies outside the home, and that issue has been the subject of intense debate in the intermediate appellate courts.[1] As Judge Wilkinson has observed, the question of the extent of the Second Amendment's reach beyond the home post-*Heller* is "a vast *terra incognita* that courts should enter only upon necessity and only then by small degree." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J., concurring).

In this changing landscape, with many questions unanswered, our role as a lower court is "narrow and constrained by precedent," and our task "is simply to

---

[1] *Compare Moore v. Madigan*, 702 F.3d 933, 935–36 (7th Cir. 2012) *with Moore*, 702 F.3d at 944–49 (Williams, J., dissenting).

apply the test announced by *Heller* to the challenged provisions." *Heller v. District of Columbia*, 670 F.3d 1244, 1285 (D.C. Cir. 2011) ("*Heller II*").

In this case, we are not presented with a broad challenge to restrictions on carrying firearms outside the home. Instead, we are asked a much more circumscribed question concerning regulation of public carry of concealed firearms. As the Supreme Court emphasized in *Heller*, that issue has a much different and unique history than the Second Amendment challenge at issue in *Heller*, and the history of concealed carry restrictions differs from the history of open carry regulations. Those differences are crucial to resolution of the issues in this case.

Simply put, concealed carry presents an entirely different Second Amendment issue from possessing handguns in the home for self-defense. As the Supreme Court recognized in *Heller*, courts and state legislatures have long recognized the danger to public safety of allowing unregulated, concealed weapons to be carried in public. Indeed that danger formed part of the rationale for allowing police "stop and frisks" in *Terry v. Ohio,* 392 U.S. 1 (1968). As Justice Harlan observed in that case, "[c]oncealed weapons create an immediate and severe danger to the public." *Id.* at 31-32.

Under *Heller* and *Chovan*, we employ a two-part inquiry when reviewing Second Amendment challenges to firearm regulations. "The first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chovan*, 735 F.3d at 1134 (citing *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (internal quotation marks and citation omitted)).

"This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *Chester*, 628 F.3d at 680. "If it was not, then the challenged law is valid." *Id.* "If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny." *Id.*

II

The first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. *Chovan*, 735 F.3d at 1134. The Supreme Court has instructed that the core of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in

defense of hearth and home." *Heller*, 554 U.S. at 635.[2] Carrying concealed weapons in public by definition does not inherently involve defense of hearth and home, so the core of the Second Amendment is not implicated. Thus, we must begin by examining the conduct at issue in this case using the analysis prescribed

---

[2] In post-*Heller* jurisprudence, nearly every other circuit that has addressed this question has similarly identified the Second Amendment's core guarantee as the right of responsible, law-abiding adults to possess usable firearms in their homes. *See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013) ("*Heller* explains that the 'core' protection of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home.") (some internal quotation marks and citation omitted); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012) (describing "a right at the core of the Second Amendment" as "the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family"); *United States v. Greeno*, 679 F.3d 510, 517 (6th Cir. 2012) ("The core right recognized in *Heller* is the right of law-abiding, responsible citizens to use arms in defense of hearth and home.") (internal quotation marks and citation omitted); *Heller II*, 670 F.3d at 1255 (explaining that the "core lawful purpose protected by the Second Amendment" is that of "a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home") (internal quotation marks and citation omitted); *United States v. Barton*, 633 F.3d 168, 170 (3d Cir. 2011) ("At the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home.") (internal quotation marks and citation omitted); *United States v. Chester*, 628 F.3d 673, 676 (4th Cir. 2010) (explaining that *Heller* "clearly staked out the core of the Second Amendment" as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home") (internal quotation marks and citation omitted); *see also Peterson v. Martinez*, 707 F.3d 1197, 1218 (10th Cir. 2013) (Lucero, J., concurring separately); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1259 (11th Cir. 2012) (noting that the *Heller* Court "went to great lengths to emphasize the special place that the home—an individual's private property—occupies in our society.").

by *Heller* and *Chovan*.

A

The majority's first—and crucial—mistake is to misidentify the "conduct at issue." *Chester*, 628 F.3d at 680. The majority frames the question as "whether a responsible, law-abiding citizen has a right under the Second Amendment to carry a firearm in public for self-defense." This is certainly an important issue, but it is not the question we are called upon to answer. The Plaintiffs are not seeking a general license to carry firearms in public for self-defense—they are seeking a license to carry *concealed* firearms in public.

Properly identifying the "conduct at issue" is the lynchpin of the two-step inquiry because the first question we ask, as with all constitutional challenges based on enumerated rights, is "whether the challenged law imposes a burden *on conduct* falling within the scope of the Second Amendment's guarantee." *Id.* (emphasis added). The Bill of Rights guarantees that individuals may engage in specified protected conduct. Challenges based on the Bill of Rights seek to vindicate its guarantees by striking down laws that interfere with protected conduct. In the context of firearm regulations, "[t]he specific constitutional challenge thus delineates the proper form of relief and clarifies the particular Second Amendment restriction that is before us." *Peterson*, 707 F.3d at 1209.

Thus, the proper analytic approach is to answer the historical inquiry as to whether carrying a concealed weapon in public was understood to be within the scope of the right protected by the Second Amendment at the time of ratification. This examination must be approached with caution, bearing in mind Justice Stevens' admonition that "[i]t is not the role of federal judges to be amateur historians." *McDonald*, 130 S.Ct. at 3119 (Stevens, J., dissenting). Care is also required to avoid the danger inherent in any exercise of historiography: that we assemble history to fit a pre-conceived theory. As judges undertaking this examination, we must also set aside any personal views we may have on the important, but contentious, policy question of firearm regulation.

B

*Heller* instructed us to look to the Second Amendment's historical background to understand its scope. 554 U.S. at 592; *see also Chester*, 628 F.3d at 680. In its own consideration of the Second Amendment's history, *Heller* identified a catalogue of historical materials bearing on the provision's meaning. In examining those same sources—from the history of the right in England to the interpretations of nineteenth-century American courts and commentators—we must conclude that carrying concealed weapons has routinely been restricted, and has often been outright banned. As the majority fairly acknowledges at several

points in its extensive historical survey, nearly every source cited in *Heller* concluded that carrying concealed weapons is not part of the right to bear arms and that restrictions on carrying concealed weapons therefore do not offend the Second Amendment.

Because of the importance attached to the historical sources by the Supreme Court in *Heller*, it is necessary to examine them in some detail.

1

*History of the Right to Bear Arms in England.* Because the Second Amendment "codified a right inherited from our English ancestors," the Supreme Court looked to the history of the right in England to divine whether the Second Amendment protected an individual or a collective right. *Heller*, 554 U.S. at 592–95, 599 (internal quotation marks and citation omitted). A look at the same history suggests that the "right inherited from our English ancestors" did not include a right to carry concealed weapons in public. *See id.* at 592–95.

Restrictions on the carrying of open and concealed weapons in public have a long pedigree in England. The fourteenth-century Statute of Northampton provided that "no man" shall "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison

at the King's pleasure." 2 Edw. 3, c. 3 (1328). In *Sir John Knight's Case*, an English court explained that the statute had two purposes. 87 Eng. Rep. 75 (K.B. 1686). One "was to punish people who go armed to terrify the King's subjects." *Id.* The other was to codify the common law, which prohibited the described conduct because it promoted the sense that "the King [was] not able or willing to protect his subjects." *Id.* Ultimately, the court acquitted Sir John Knight under the statute's exception for the king's ministers and servants and anyone otherwise authorized "to keep the peace." 2 Edw. 3, c. 3 (1328).

Following the enactment of the Statute of Northampton, English monarchs repeatedly called on their officials to enforce it. *See* Patrick Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 13–30 (2012). For example, in 1579, Queen Elizabeth I called for the enforcement of the Statute of Northampton and other laws prohibiting the carrying of "Dagges, Pistolles, and such like, not on[]ly in Cities and Townes, [but] in all partes of the Realme in common high[ways], whereby her Majesties good qu[i]et people, desirous to live in peaceable manner, are in feare and danger of their lives." *Id.* at 21 (internal quotation marks and citation omitted). In 1594, the Queen again called for the enforcement of gun control laws because her subjects were being terrorized by the carrying of arms,

including concealed "pocket Dags," in public. *Id.* at 22 (internal quotation marks and citation omitted).

More than three centuries after the enactment of the Statute of Northampton, William and Mary declared "[t]hat the subjects which are Protestants may have arms for their defence suitable to their Conditions, and as allowed by Law." 1 W. & M., 2d sess., c. 2, § 7 (1689). This provision of the English Bill of Rights "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. But despite England's adoption of this right, the Statute of Northampton remained in full force and was still understood to sharply limit the freedom to carry arms in public. In his guide for British constables, Robert Gardiner interpreted the statute to mean that

> if any Person shall Ride or go Arm'd offensively . . . in Fairs or Markets or elsewhere, by Day or by Night, in affray of Her Majesties Subjects, and Breach of the Peace; *or wear or carry any Daggers, Guns or Pistols Charged*; the Constable upon sight thereof, may seize and take away their Armour and Weapons, and have them apprized as forfeited to Her Majesty.

Robert Gardiner, *The Compleat Constable*, 18–19 (1708) (emphasis added). Notably, Gardiner distinguished between going armed offensively in breach of the peace, on the one hand, and merely wearing or carrying arms, on the other. *Id.* This distinction suggests that he considered carrying weapons in public a violation

of the statute, regardless of whether doing so actually breached the peace. Charles, *supra*, at 25–28. Blackstone confirmed this understanding:

> The offense of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton, upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour.

4 William Blackstone, *Commentaries on the Laws of England* 148–49 (1st ed. 1769) (citations omitted). According to Blackstone, the Statute of Northampton proscribed the public carrying of "dangerous or unusual" weapons *because* doing so terrified the people. *Id.* Thus, in England, as in ancient Athens, it was an offense simply to go armed—or, at least, armed in a dangerous manner—in public areas. *Id.*

Certainly, this history does not provide a ready or easy answer to this case. Indeed, history—especially history as old as that recited here—is often ambiguous or contradictory. Nonetheless, from what we know, we can be sure that "the right we inherited from our English ancestors" left ample leeway for restrictions on the public carrying of firearms in the interest of public safety.

2

*Post-Ratification Commentary*. The *Heller* Court relied heavily on the post-

ratification commentary of St. George Tucker, William Rawle, and Joseph Story. *See* 554 U.S. at 605–10. Unfortunately, these commentators revealed little of their opinions about concealed weapons. Still, Rawle wrote that the Second Amendment right "ought not . . . , in any government, to be abused to the disturbance of the peace." William Rawle, *A View of the Constitution of the United States* 123 (1825). *Heller* cited this statement when it noted that, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. At the least, *Heller*'s language suggests that there is room for restricting certain manners of carrying firearms where they threaten public peace and safety.

3

*Pre-Civil War State Constitutions and Legislation*. To confirm its understanding of the Second Amendment's guarantee, the *Heller* Court looked to state legislation and state constitutional provisions from the Founding Era and subsequent generations. 554 U.S. at 600–03. These same sources support the conclusion that publicly carrying concealed weapons falls outside the Second Amendment's scope.

By the Founding era, three of the original thirteen states—Massachusetts, North Carolina, and Virginia—had expressly adopted the Statute of Northampton. Charles, *supra*, at 31-32 & n.166. There is no indication that in doing so these states meant to exclude the longstanding interpretations of the statute.

In the early nineteenth century, states increasingly limited the carrying of concealed firearms.[3] And "[m]ost states enacted laws banning the carrying of concealed weapons."[4] *Kachalsky*, 701 F.3d at 95; *see also* Saul Cornell & Nathan

---

[3] *See* Act of Mar. 25, 1813, 1813 La. Acts at 172; Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts at 39; Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts. 15 ("[E]ach and every person so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols . . . shall pay a fine."); Act of Feb. 2 1838, 1838 Va. Acts. ch. 101, at 76 (making it unlawful for a person to "habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind . . . hidden or concealed from common observation"); Act of Feb. 1, 1839, ch. 77, 1839 Ala. Acts at 67–68; Act. of Mar. 18, 1859, 1859 Ohio Laws 56 (providing that "whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty.").

[4] "*See* Act of Feb. 1, 1839, ch. 77, 1839 Ala. Acts at 67–68; Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts at 191; Act of Feb. 1, 1881, 1881 Colo. Sess. Laws at 74; Act of Feb. 12, 1885, ch. 3620, 1885 Fla. Laws at 61; Act of Apr. 16, 1881, 1881 Ill. Laws at 73–74; Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts at 39; 29 Ky. Gen.Stat. art. 29, § 1 (as amended through 1880); Act of Mar. 25, 1813, 1813 La. Acts at 172; 1866 Md. Laws, ch. 375, § 1; Neb. Gen.Stat., ch. 58, ch. 5, § 25 (1873); Act of Mar. 5, 1879, ch. 127, 1879 N.C. Sess. Laws at 231; N.D. Pen.Code § 457 (1895); Act of Mar. 18, 1859, 1859 Ohio Laws at 56; Act of Feb. 18, 1885, 1885 Or. Laws at 33; Act of Dec. 24, 1880, no. 362, 1881 S.C. Acts at 447; S.D. Terr. Pen.Code § 457 (1883); Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws at 25–27; Act of Oct. 20, 1870, ch. 349, 1870 Va. Acts at 510;

DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Ford. L. Rev. 487, 502–16 (2004). Georgia banned the sale of concealable weapons altogether, and Tennessee promptly followed suit by banning the sale of bowie knives. Act of Dec. 25, 1837, 1837 Ga. Laws 90; Act of Jan. 27, 1838, ch. 137, 1837–38 Tenn. Pub. Acts 200–01. Notably, some of these bans contained only narrow exceptions, or no exceptions at all. For example, Ohio's concealed-carry ban allowed a narrow exception for those carrying a weapon in connection with their lawful employment where a "prudent man" would carry weapons in defense of himself, his family, or his property. 1859 Ohio Laws at 56–57. By contrast, Virginia's ban had no exceptions at all, even if the defendant was acting in self-defense when using the concealed weapon. 1838 Va. Acts ch. 101 at 76.

4

*Pre-Civil War Case Law*. The *Heller* Court relied heavily on several early-nineteenth-century court cases interpreting the Second Amendment and state analogues. 554 U.S. at 610–14. For example, when the Court pointed to prohibitions on carrying concealed weapons as a prime example of how "the right secured by the Second Amendment is not unlimited," it specifically cited the 1846

---

Wash.Code § 929 (1881); W. Va.Code, ch. 148, § 7 (1891)." *Kachalsky*, 701 F.3d at 95 n.21.

Georgia case *Nunn v. State* and the 1850 Louisiana case *State v. Chandler*. *Id.* at 626. Those cases, and others relied on in *Heller*, provide some of the strongest evidence that the Second Amendment does not protect the carrying of concealed firearms in public.

In *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833), the Indiana Supreme Court succinctly declared "that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional." *Id.*

In the 1840 case of *State v. Reid*, the defendant—who had been convicted under Alabama's Act of February 1, 1839, which made it a crime for any person to "carry concealed about his person, any species of fire arms" or "any other deadly weapon"—challenged his conviction under Alabama's arms-bearing constitutional guarantee. 1 Ala. 612, 614–15, 616 (1840) (cited in *Heller*, 554 U.S. at 629). The Alabama Supreme Court began its analysis of the defendant's challenge by considering the history of the right to bear arms in England, including the English Bill of Rights, which the court considered to be the progenitor of the right to bear arms in Alabama. *Id.* at 615. After examining this history, the court held that Alabama's concealed firearm ban did not "trench upon the constitutional rights of the citizen." *Id.* at 616. The court reasoned that Alabama's Second Amendment

analogue "neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne." *Id.* Just as the English Bill of Rights allowed Parliament "to determine what arms shall be borne and how," the Alabama constitution permitted the legislature to determine that carrying concealed weapons was not a proper mode of exercising the right to bear arms. *Id.* The majority cites *Reid* as support for the theory that a ban on concealed weapons carry would not be permitted if restrictions on public carry went too far. But *Reid* plainly does not stand for that proposition. It rejected the "evil practice of carrying weapons secretly," *id.* at 616, and supported the power of the legislature to proscribe the "manner in which arms shall be borne," *id*. *Reid* cannot be construed as supporting a Second Amendment right to carry concealed weapons in public.

In the same year as *Reid*, the Tennessee Supreme Court considered a similar challenge to the constitutionality of a law criminalizing the carrying of concealed weapons. *Aymette v. State*, 21 Tenn. 154 (1840) (cited in *Heller*, 554 U.S. at 613). As in *Reid*, the court first considered the history of the right to bear arms in England, including the English Bill of Rights under William and Mary. *Id.* at 156, 157. Based on this history, the court concluded that the Tennessee legislature was well within its powers to criminalize the carrying of concealed weapons:

> To hold that the Legislature could pass no law upon this subject by which to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms, would be to pervert a great political right to the worst of purposes, and to make it a social evil of infinitely greater extent to society than would result from abandoning the right itself.

*Id.* at 159.[5] The court's opinion also included the following passage, which is quite relevant in assessing its view of legislative power:

> Supose [sic] it were to suit the whim of a set of ruffians to enter the theatre in the midst of the performance, with drawn swords, guns, and fixed bayonets, or to enter the church in the same manner, during service, to the terror of the audience, and this were to become habitual; can it be that it would be beyond the power of the Legislature to pass laws to remedy such an evil? Surely not. . . . The convention, in securing the public political right in question, did not intend to take away from the Legislature all power of regulating the social relations of the citizens upon this subject.

*Id.* at 159.

The majority concedes that *Aymette* does not support a Second Amendment right to bear concealed weapons, but argues that it is relevant to other Second Amendment rights. However, if the "conduct at issue" here–the right to bear concealed weapons in public–is not protected by the Second Amendment, the

---

[5] As the majority observes, the Supreme Court rejected *Aymette*'s conclusion that the Second Amendment enshrined only a militia-centered right. *Heller*, 554 U.S. at 613. However, the Court did not question *Aymette*'s reasoning with respect to the validity of the state's prohibition on the carrying of concealed weapons. *Id.*

existence of other rights is not relevant to our inquiry.

In *State v. Buzzard*, 4 Ark. 18 (1842), the Arkansas Supreme Court held that the Arkansas law banning the wearing of concealed weapons was not contrary to either the Arkansas or United States Constitution. *Id.* at 28. As the Chief Justice wrote:

> The act in question does not, in my judgment, detract anything from the power of the people to defend their free state and the established institutions of the country. It inhibits only the wearing of certain arms concealed. This is simply a regulation as to the manner of bearing such arms as are specified. The practice of so bearing them the legislative department of the government has determined to be wrong, or at least inconsistent with sound policy. So far, that department had a discretion in regard to the subject, over which the judiciary, as I conceive, has no control, and therefore, the duty of the courts must be the same, whether the policy of the law be good or bad. In either event it is binding, and the obligation of the courts to enforce its provisions, when legally called upon to do so, is imperative.

*Id.* at 27.

In the 1846 case of *Nunn v. State*, the defendant—who had been convicted for carrying a pistol in violation of Georgia's Act of December 25, 1837—challenged his conviction under the Second Amendment and Georgia's analogous constitutional provision. 1 Ga. at 245, 247 (cited in *Heller*, 554 U.S. at 612, 626). After considering *State v. Reid* and the Kentucky case *Bliss v. Commonwealth*, the Georgia Supreme Court concluded that a law prohibiting the

carrying of concealed weapons does not violate the right to keep and bear arms. *Nunn*, 1 Ga. at 247, 251. Relying on *Reid*, the court explained

> that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, . . . it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void* . . . .

*Id.* at 251. Because the criminal charges had not specified the manner in which the defendant carried his pistol, the court reversed his conviction. *Id.*

*Nunn* plainly does not support the notion that bearing concealed weapons falls within the protection of the Second Amendment. It stands for precisely the opposite proposition. Nonetheless, the majority embraces *Nunn* as supporting other Second Amendment rights. It argues that, if those other rights are restricted, then the legislature could not prohibit concealed carry. However, *Nunn* does not say that. Its holding is that Georgia's analogous constitutional protection of the right to bear arms did not include the right to carry concealed weapons.[6]

---

[6] The majority also claims that a later Georgia case, *Stockdale v. State*, 32 Ga. 225 (1861), explained that "to ban *both* the open and concealed carriage of pistols" 'would be to prohibit the bearing of those arms' altogether." This stretches *Stockdale* far beyond what it actually said. In that case, the defendant had been charged with violating a statute that forbade the carrying of concealed weapons. *Id.* at 226. The defendant requested the judge to instruct the jury that he was not guilty so long as he wore his pistol in such a way that other people could see that it was a pistol. *Id.* The judge refused, and instead instructed the jury that

Finally, in *State v. Chandler*, the Louisiana Supreme Court joined its counterparts in Alabama, Tennessee, and Georgia to hold that a state law criminalizing the carrying of concealed weapons did not conflict with the Second Amendment. 5 La. Ann. 489, 490 (1850) (cited in *Heller*, 554 U.S. at 613, 626). According to the court, the statute "became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons." *Id.* at 489–90. It further explained that the statute

> interfered with no man's right to carry arms . . . in full open view, which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.

*Id.* at 490 (internal quotation marks omitted). Eight years later, the Louisiana Supreme Court reaffirmed its holding, explaining that the state's concealed-carry

---

the defendant was guilty so long as *any* portion of his pistol was hidden from view. *Id.* at 226–27. The Georgia Supreme Court reversed the defendant's conviction, holding that the trial judge's instructions were erroneous. *Id.* at 227–28. The court reasoned that it is impossible to carry a pistol without concealing at least some portion of it, so requiring that every inch of the pistol be exposed to view would make it practically impossible to carry it, thereby violating *Nunn*'s admonition that any regulation that practically prohibits a person from bearing arms *openly* is unconstitutional. *Id.* at 227. *Stockdale* was a simple application of *Nunn*'s clear holding, and the majority is wrong to attribute a different meaning to it.

ban did not violate the Second Amendment because it "prohibit[ed] only *a particular mode* of bearing arms which is found dangerous to the peace of society." *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858) (emphasis in original).

To be sure, there was at least one state high court whose voice was out of tune with this nineteenth-century chorus. In the 1822 case of *Bliss v. Commonwealth*, the Kentucky high court reversed the defendant's conviction for carrying a concealed weapon (a sword in a cane). 12 Ky. at 93 (cited in *Heller*, 554 U.S. at 585 n.9). The court held that under the Kentucky constitution, any restraint or regulation on the right to bear arms, including regulations on the manner of carry, were void. *Id.* at 92, 93. Therefore, the court saw no difference between acts forbidding the carrying of concealed weapons and acts forbidding the carrying of weapons openly. *Id.*

But the reign of *Bliss* was short-lived in Kentucky. The ruling was met with disbelief by the Kentucky legislature. Indeed, "[a] committee of the Kentucky House of Representatives concluded that the state's Supreme Court had misconstrued the meaning of the state's constitutional provision on arms bearing." Saul Cornell, *The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History*, 17 Stan. L. & Pol'y Rev. 571, 586 (2006) (citing Journal of the Kentucky House of

Representatives 75. (Frankfort, Ky. 1837)). It issued a stinging criticism of *Bliss*. *Id.* And Kentucky eventually amended its constitution specifically to overrule *Bliss*. *See id.* at 587; Ky. Const. of 1850 art. XIII, § 25 ("[T]he rights of the citizens to bear arms in defence of themselves and the State shall not be questioned; but the General Assembly may pass laws to prevent persons from carrying concealed arms."). As Professor Cornell concluded, the holding of *Bliss* was "bizarre and out of touch with mainstream legal and constitutional thinking in the early Republic." Cornell, 17 Stan. L. & Pol'y Rev. at 586.

*Bliss* was clearly a judicial outlier. The courts in *Buzzard*, *Reid*, *Aymette*, and *Nunn* all considered *Bliss*'s conclusions and expressly rejected them. *Nunn*, 1 Ga. at 247–48, 251; *Aymette*, 21 Tenn. at 160; *Reid*, 1 Ala. at 617; *Buzzard*, 4 Ark. 25-26. *Reid* speculated that *Bliss*'s solitary position was the result of the unique language of Kentucky's constitution. 1 Ala. at 619. *Aymette* more directly questioned the correctness of *Bliss*'s reasoning, explaining that "there is a manifest distinction" between carrying arms secretly and carrying arms openly. 21 Tenn. at 160. *Buzzard* pointedly disagreed with *Bliss*, observing:

> However captivating such arguments may appear upon a merely casual or superficial view of the subject, they are believed to be specious, and to rest upon premises at variance with all the fundamental principles upon which the government is based; and that, upon a more mature and careful investigation, as to the object for

> which the right was retained their fallacy becomes evident. The dangers to be apprehended from the existence and exercise of such right, not only to social order, domestic tranquillity and the upright and independent administration of the government, but also to the established institutions of the country, appears so obvious as to induce the belief that they are present to every intelligent mind, and to render their statement here unnecessary.

4 Ark. 25-26.

In short, *Bliss* does not in any way alter the great weight of early-nineteenth century cases holding that carrying concealed weapons is conduct that falls outside the bounds of Second Amendment protection.

5

*Post-Civil War Legislation and Commentary*. Even though laws enacted after the Civil War were far removed from the Founding Era, the *Heller* Court found them instructive for discerning the Second Amendment's nature. 554 U.S. at 614. Likewise, the Court looked to post-Civil War commentaries for illumination. *Id.* at 616–19. These sources further cemented the understanding of the early-nineteenth-century courts that concealed carry is not protected by the Second Amendment.

By the latter half of the nineteenth century, most states had enacted bans or limitations on the carrying of concealed weapons. *See Kachalsky*, 701 F.3d at 95 & n.21 (collecting statutes). During that time, three states and one territory even

passed total bans on carrying of pistols, whether concealed or open. *Id.* at 90 (citing Ch. 96, §§ 1–2, 1881 Ark. Acts at 191–92; Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws, at 352; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws at 25; Ch. 13, § 1, 1870 Tenn. Acts at 28).

Despite these widespread restrictions on the carrying of concealed weapons, legal commentators saw no Second Amendment violations. John Pomeroy wrote that the Second Amendment's "inhibition is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152–53 (1868) (cited in *Heller*, 554 U.S. at 618). Like the Court in *Heller*, he compared the Second Amendment to the First: "The clause is analogous to the one securing freedom of speech and of the press. Freedom, not license, is secured; the fair use, not the libellous abuse, is protected." *Id.*; *see Heller*, 554 U.S. at 618.

In his edition of Kent's *Commentaries*, Justice Holmes noted a "great difference of opinion" among the state courts on whether prohibitions on carrying concealed weapons were constitutional. 2 James Kent, *Commentaries on American Law* *340 n.2 (Oliver Wendell Holmes, Jr. ed., 12th ed. 1873) (cited in *Heller*, 554 U.S. at 618, 626). After summarizing the state courts' cases (including those discussed above), he sided with the courts that found such prohibitions

constitutional: "As the practice of carrying concealed weapons has been often so atrociously abused, it would be very desirable, on principles of public policy, that the respective legislatures should have the competent power to secure the public peace, and guard against personal violence by such a precautionary provision." *Id.*

George Chase, like Justice Holmes, concluded in *The American Students' Blackstone* (1984) that concealed weapons bans were necessary to ensure public safety, and that they were widely deemed lawful: "[I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence." Chase, *supra*, at 85 n.11 (cited in *Heller*, 554 U.S. at 626) (emphasis in original).

John Ordronaux wrote that although "[t]he right to bear arms has always been the distinctive privilege of freemen," the Second Amendment does not limit a state's power to "enact[] laws regulating the manner in which arms may be carried. Thus, the carrying of *concealed* weapons may be *absolutely prohibited* without the infringement of *any constitutional right.*" John Ordronaux, *Constitutional Legislation in the United States* 241 (1891) (cited in *Heller*, 554 U.S. at 619) (some emphasis added).

In addition to these commentators cited in *Heller*, the majority recognizes other commentators who concluded that the Second Amendment was not concerned with concealed carry. For example, Henry Campbell Black wrote simply that "[t]he right to bear arms is not infringed by a state law prohibiting the carrying of concealed deadly weapons." Henry Campbell Black, *Handbook of American Constitutional Law* 463 (1895). And the editor of an 1897 edition of Blackstone wrote that "the right of carrying arms as secured by the U.S. Constitution, and generally by State constitutions, does not include the habitual carrying of concealed deadly weapons by private individuals." 1 William Blackstone, *Commentaries on the Laws of England* 144 n.91 (William Draper Lewis ed., 1897).

6

Given this extensive history, it is not surprising that in 1897 the Supreme Court endorsed the view that carrying concealed weapons is not protected conduct under the Second Amendment. *Robertson*, 165 U.S. at 281–82. In rejecting a challenge under the Thirteenth Amendment, the Court noted that the freedoms enumerated in the Bill of Rights are subject to "certain well-recognized exceptions." *Id.* at 281. As an example of such a well-recognized exception, the Court explained that "the right of the people to keep and bear arms . . . is not

infringed by laws prohibiting the carrying of concealed weapons." *Id.* at 281–82. Although this passage is old, no case, including *Heller*, has ever called it into question.

Most of our sister circuits that have considered the question have reached similar conclusions. In *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), the Third Circuit considered the New Jersey Handgun Permit Law, which required persons who wished to carry a handgun in public to apply for permit and show "justifiable need." Against a Second Amendment challenge, the Third Circuit held that "the requirement that applicants demonstrate a 'justifiable need' to publicly carry a handgun for self-defense qualifies as a 'presumptively lawful,' 'longstanding' regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee. *Id.* at 429-30.

In *Peterson*, the Tenth Circuit considered a Second Amendment challenge to Colorado's concealed handgun licensing regime, which restricted the issuance of licenses to Colorado residents. The Tenth Circuit concluded that "[t]here can be little doubt that bans on the concealed carrying of firearms are longstanding." 707 F.3d at 1210. After conducting an historical analysis, the Court concluded that "the Second Amendment does not confer a right to carry concealed weapons." *Id.* at 1211.

Although the Second Circuit did not reach the question of the scope of the Second Amendment, it concluded that "state regulation of the use of firearms in public was 'enshrined with[in] the scope' of the Second Amendment when it was adopted" and that "extensive state regulation of handguns has never been considered incompatible with the Second Amendment." *Kachalsky*, 701 F.3d at 96, 100.

D

In sum, employing the analysis prescribed by the Supreme Court, the answer to the historical inquiry is clear: carrying a concealed weapon in public was not understood to be within the scope of the right protected by the Second Amendment at the time of ratification. This conclusion is in accord with *Heller*'s recognition that there were "longstanding prohibitions" on firearms that were "presumptively lawful," 544 U.S. at 626-27 & n.26, and the Supreme Court's observation in *Robertson* that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons," 165 U.S. at 281–82. *See Peterson*, 707 F.3d at 1211. Because the right asserted is not protected by the Second Amendment, our inquiry should be at an end: San Diego County's good cause requirement for a person to carry a concealed weapon in San Diego County is constitutional. *Chester*, 628 F.3d at 680.

III

Because the act of carrying concealed weapons in public is not protected by the Second Amendment, it is unnecessary to reach the second part of the Second Amendment inquiry. However, even if we were to assume that San Diego County's good cause requirement implicates the Second Amendment, I would conclude that the San Diego County policy easily passes constitutional muster.

The second *Chovan* inquiry is whether the challenged government action survives means-end scrutiny under the appropriate level of review. *Chovan*, 735 F.3d at 1136. In Second Amendment analysis, the level of scrutiny depends on "'(1) how close the law comes to the core of the Second Amendment right,' and '(2) the severity of the law's burden on the right.'" *Id.* at 1138 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)).

The core of the Second Amendment right is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. Carrying concealed weapons in public does not implicate the core right. Assuming, for argument's sake, that the burden placed in this case on whatever Second Amendment rights extend outside the home is substantial, then application of intermediate scrutiny is appropriate. *Chovan*, 735 F.3d at 1138.

Surviving intermediate scrutiny requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Id.* at 1139 (citing *Chester*, 628 F.3d at 683).[7]

The County claims that its application of the good cause requirement protects the public peace and protects "the safety of the public from unknown persons carrying concealed, loaded firearms." As the Supreme Court has repeatedly made clear, public safety and preventing crime are important, indeed compelling, government interests. *See, e.g.*, *Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (public safety is a significant government interest); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (preventing crime is a compelling government interest).

The County argues that the good cause requirement helps protect public safety because it reduces the number of concealed firearms circulating in public.

---

[7] We are not alone in this application. Other circuits that have considered a restriction similar to the good cause requirement have applied intermediate scrutiny. *See Woollard v. Gallagher*, 712 F.3d 865, 869, 876 (4th Cir. 2013) (applying intermediate scrutiny to a Maryland statute requiring applicants to demonstrate a "good and substantial reason to wear, carry, or transport a handgun" in order to obtain a license to do so); *Kachalsky*, 701 F.3d at 96 (applying intermediate scrutiny to a New York statute requiring applicants to demonstrate "proper cause" in order to obtain a license to carry concealed handguns).

According to the County, reducing the number of guns carried in public ensures public safety by, among other things:

- Limiting the lethality of violent crimes. According to an expert declaration filed in support of the County's motion for summary judgment, even though the general availability of guns may or may not influence the absolute number of violent crimes, when guns are used in such crimes it is much more likely that the crime will result in the death of the victim.

- Limiting the ability of criminals to legally take advantage of stealth and surprise.

- Protecting police officers and ensuring their practical monopoly on armed force in public. According to the County, more than ninety percent of police officers who are killed in the line of duty are killed with guns.

- Limiting the danger to other members of the public. The decision to carry a concealed firearm in public exposes other people to increased risk of injury or death without their knowledge or control.

- Limiting the likelihood that minor altercations in public will escalate into fatal shootings.

The County presented data showing that the more guns are carried in public, the more likely it is that violent crimes will result in death and detailing the specific risks posed by concealed weapons.

Obviously, the Plaintiffs disagree with the efficacy of the policy to achieve these goals, and have marshaled evidence challenging conventional wisdom about the correlation between violence and the prevalence of handguns. But ours is not

the forum in which to resolve that debate. Rather, we owe "substantial deference to the predictive judgments" of legislative bodies. *Turner Broad. Sys. Inc. v. FCC*, 520 U.S. 180, 195 (1997). "In the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 665 (1994)). As the Second Circuit aptly explained, "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." *Id.* at 99; *accord Woollard*, 712 F.3d at 881. Further, the test on the first step of intermediate scrutiny only requires that "the government's stated objective to be significant, substantial, or important." *Chovan*, 735 F.3d at 1139.

The second inquiry in an intermediate scrutiny analysis is whether there is "a reasonable fit between the challenged regulation and the asserted objective." *Id.* First, as the majority properly notes, California does not impose a complete ban on the carrying of concealed weapons in public. Cal. Penal Code § 25400. A gun owner's residence, place of business, and private property are exempt from § 25400. *Id.* at § 25605. Carrying a concealable firearm within a vehicle is not a crime if the firearm is within a vehicle and is either locked in the vehicle's trunk or in a locked container. *Id.* at § 25610. Peace officers, retired officers, military

personnel, and retired federal officers are permitted to carry concealed weapons. *Id.* at §§ 25450, 25455, 25620, 25650. Hunters and anglers may carry concealable firearms while hunting or fishing. *Id.* at § 25640. Section 25400 does not apply to transportation of firearms to or from gun shows or similar events, *id.* at § 25535, nor does it apply to people practicing shooting targets at established target ranges, whether public or private, *id.* at 25635.[8] And, of course, California is a "may-issue" state, in which concealed public carry is allowed with a proper permit. *Id.* § 26150.

Because of these exceptions, the California Court of Appeal concluded that California's concealed carry statutes were "narrowly tailored to protect the public," and did "not substantially burden defendant's exercise of his Second Amendment right." *People v. Ellison*, 196 Cal.App.4th 1342, 1351, 128 Cal.Rptr.3d 245, 252 (Cal.App. 2011).

Second, the San Diego County "good cause" permit requirement itself does not preclude all carrying of concealed weapons in public. It limits the risk to public safety by reducing the number of guns in public circulation, but allows those who will most likely need to defend themselves in public to carry a handgun. In this way, the licensing scheme is "oriented to the Second Amendment's

[8] Carrying a concealable firearm is permitted in a number of other circumstances. *See generally id.* at §§ 25450-25650.

protections." *Kachalsky*, 701 F.3d at 98. Of course, the good cause requirement is not perfect. Not everyone who may ultimately need the protection of a handgun may obtain a permit, and there is a risk that some concealed-carry license holders may misuse their firearms. But the good cause requirement does not have to be perfect; indeed, it is unrealistic to expect any regulatory measure to perfectly solve the problem to which it is addressed, especially a problem as complex as gun violence. Rather, under intermediate scrutiny, the challenged regulation must strike a reasonable balance between the burdened right and the public need. By granting concealed-carry licenses only to those who are known to need them for self-defense, the good cause requirement strikes a reasonable balance between individuals' interest in self-defense and the public's interest in limiting the proliferation of handguns in public spaces.

When viewed objectively, the San Diego County "good cause" policy easily survives intermediate scrutiny. The government has identified significant, substantial, or important objectives and provided a reasonable fit between the challenged regulation and the asserted objective. Therefore, even if the Second Amendment protection were extended to provide a right to carry concealed weapons in public, the "good cause" San Diego County requirement would still pass constitutional muster.

IV

Rather than employing the straightforward methodology prescribed by *Chovan*, the majority wanders off in a different labyrinthian path, both in its analysis of the Second Amendment right at issue and its analysis of the government regulation in question. In doing so, it conflicts with the instruction of the Supreme Court, the holdings of our sister circuits, and our own circuit precedent. It needlessly intrudes and disrupts valid and constitutional legislative choices. I must respectfully disagree with its approach.

A

The majority never answers the question as to whether carrying concealed weapons in public is protected under the Second Amendment. Rather, it engages in a broader circular inquiry. It first exceeds the bounds of *Heller* by determining that the Second Amendment protects at least some conduct outside the home. It then reasons that because the Second Amendment protects *some* conduct outside the home, states may not completely prohibit carrying handguns outside the home. The majority then examines the California regulatory scheme and concludes that, because California bans open carry in most public areas, it must allow concealed carry without the necessity of showing good cause. Therefore, it reasons, San Diego County's "good cause" requirement must be unconstitutional.

1

The majority's logical tapestry quickly unravels under close examination. If

carrying concealed firearms in public falls outside the Second Amendment's scope, then nothing—not even California's decision to restrict other, protected forms of carry—can magically endow that conduct with Second Amendment protection.

An analogy to the First Amendment context illustrates this point. *See Heller*, 554 U.S. at 595 (analogizing the Second Amendment to the First). There are, of course, certain types of speech that do not fall within the protection of the First Amendment, such as child pornography, obscene material without serious literary, artistic, political, or scientific value, "fighting words," and speech that materially assists a foreign terrorist organization.[9] If a state decided to ban all protected First Amendment speech, would that bring child pornography, obscenity, "fighting words," and material assistance to a foreign terrorist organization under the protection of the First Amendment? Of course not. However, that is precisely the flawed reasoning that the majority employs.

The same logic applies in the Second Amendment context. If certain conduct falls outside the scope of the Second Amendment, then restrictions on that conduct are valid, regardless of the regulatory landscape governing different

---

[9]*See New York v. Ferber*, 458 U.S. 747, 764 (1982) (child pornography); *Roth v. United States*, 354 U.S. 476, 484 (1957) (obscenity); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942) (fighting words); *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2722-23 (2010) (material assistance to terrorists).

activities. *Chester*, 628 F.3d at 680. The majority simply makes up the right out of whole cloth, or perhaps more aptly put, no cloth. Regulation of unrelated conduct cannot create a new right where none existed before.

Unsurprisingly, the majority does not—and cannot—cite any authority that supports its assertion. It claims that several nineteenth-century sources cited in *Heller* support its proposition. As I have discussed, those sources support no such proposition. In *Chandler*, the Louisiana Supreme Court explained that a concealed weapons ban "interfered with no man's right to carry arms" under the Second Amendment, which it defined as the right to carry arms "in full open view." 5 La. Ann. 489, 490 (1850). In *Nunn*, the Georgia Supreme Court held that "[a] law which merely inhibits the wearing of certain weapons in a *concealed manner* is *valid*." 1 Ga. 243, 243 (1846) (emphasis in original); *see also id.* at 251. In *Reid*, the Alabama Supreme Court explained that a concealed-carry ban did not "come in collision with the constitution" because it sought to "promote personal security" by "inhibit[ing] the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others." 1 Ala. 612, 617 (1840). And George Chase's *American Students' Blackstone* notes a consensus that "statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a

particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence." 1 *The American Students' Blackstone* 84 n.11 (George Chase ed. 1884) (emphasis in original).

Although all the nineteenth-century cases cited by the majority cautioned against restrictions on the open carrying of weapons, none of them–except the discredited, outlier *Bliss*–suggests that restrictions on carrying concealed weapons implicate the Second Amendment. *See Chandler*, 1 La. Ann. at 490; *Nunn*, 1 Ga. at 251; *Reid*, 1 Ala. at 616–17. And nothing in these cases or Chase's *Blackstone* even hints that a restriction on carrying concealed weapons would become invalid if restrictions were placed on open carry. Rather, they suggest that restrictions on concealed carry are always valid, while there are limits to restrictions on open carry.

The majority concedes that it is in conflict with the Second, Third, and Fourth Circuits in *Drake*, *Woollard*, and *Kachalsky*. However, it insists that it is in accord with the Seventh Circuit's decision in *Moore*. But *Moore* did not involve a challenge to the implementation of a "good cause" requirement to carry a concealed weapon in public. Rather, it was a direct challenge to an Illinois law banning almost all forms of carrying a loaded firearm outside the home and did not involve "narrower, better tailored restrictions" such as the one at issue here. *See*

*Moore v. Madigan*, 708 F.3d 901, 904 (7th Cir. 2013) (Hamilton, J., dissenting from denial of rehearing en banc).

2

The majority essentially concedes that the Plaintiffs' challenge to San Diego County's "good cause" policy fails unless we consider California's regulatory scheme in its entirety. According to the majority, the Plaintiffs' challenge "is not an attack trained on a restriction against concealed carry as such, or viewed in isolation." Rather, the Plaintiffs "target[] the constitutionality of the entire scheme" of carry regulation in California. Indeed, if California did not restrict open carry, Plaintiffs would have no cause for complaint. And, of course, if California law permitted unrestricted concealed public carry, there would be no case at all. It is by California statute that local Sheriffs are invested with the discretion to grant concealed carry permits. Plaintiffs' real quarrel is with the statute. Their theory is that the statutory discretion afforded Sheriffs should be uniformly excised. Thus, by arguing that the Second Amendment compels the County to interpret "good cause" to include a general desire to carry a concealed gun, the Plaintiffs in reality are challenging the constitutionality of the § 26150 good cause provision. Their proposed remedy of preventing California Counties from exercising discretion eliminates the statutory "good cause" requirement and transforms it into a "no cause" limitation for the general public. Thus, Plaintiffs'

complaint and theory necessarily specifically calls into question the constitutionality of state concealed carry law. Further, by arguing that California is required to provide some outlet for public carry of handguns, it indirectly implicates the constitutionality of the entire California firearm regulation scheme.

Although the constitutionality of the entire scheme is at issue, the Plaintiffs did not name the State of California as a defendant, and the Plaintiffs have not complied with Fed. R. Civ. P. 5.1. Under that rule, if the state or one of its agents is not a party to a federal court proceeding, "[a] party that files a pleading . . . drawing into question the constitutionality of a . . . state statute must promptly" serve the state's attorney general with notice of the pleading and the constitutional question it raises. Fed. R. Civ. P. 5.1(a). In addition, the district court must certify to the state's attorney general that the constitutionality of the state statute has been questioned, and must permit the state to intervene to defend it. Fed. R. Civ. P. 5.1(b), (c); 28 U.S.C. § 2403. The rule protects the public interest by giving the state an opportunity to voice its views on the constitutionality of its own statutes. *Oklahoma ex rel. Edmondson v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008).

Given the real essence of the Plaintiffs' argument, they were required to comply with Fed. R. Civ. P. 5.1. They did not. If we are to consider the constitutionality of the entire California regulatory scheme, California should have been afforded an opportunity to defend it. And, to the extent that the majority

strikes down the entirety of California firearm regulations, it should have stayed the mandate to permit a legislative response, as the Seventh Circuit did in *Moore*. 708 F.3d at 942.

B

I must also respectfully disagree with the majority's analysis of the government regulation at issue, which directly conflicts with our circuit precedent in *Chovan*.

1

The majority acknowledges that we, like our sister circuits, employ a sliding-scale approach, where the level of scrutiny we apply to a challenged law depends on how severe a burden the law imposes on the "core" of the Second Amendment guarantee. *Chovan*, 735 F.3d at 1138; *see, e.g.*, *Kachalsky*, 701 F.3d at 93; *Heller*, 670 F.3d at 1257; *Ezell*, 651 F.3d at 708; *Chester*, 628 F.3d at 682; *United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010). But then the majority purports to take an "alternative approach," which it claims was used in *Heller*. Under that alternative approach, the majority rejects any means-ends scrutiny. In doing so, it directly conflicts with *Chovan*.

Despite whatever pedigree the majority claims for this alternative approach, we are bound to follow the law of our Circuit. Further, the majority approach has

no support in *Heller*. The *Heller* Court held only that the D.C. handgun ban was unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights" because "[f]ew laws in the history of our Nation have come close" to the severity of its restriction. *Heller*, 554 U.S. at 628, 629. The Court did not expressly reject means-ends scrutiny, and it is extremely unlikely that the Court rejected by implication such a well-established method for assessing the constitutionality of laws. Indeed, by taking care to specifically rule out rational-basis scrutiny, the Court necessarily implied that other, heightened levels of means-ends scrutiny are appropriate. *See Heller*, 554 U.S. at 628 n.27.

The majority suggests that the *Heller* Court rejected any means-ends scrutiny when it rejected Justice Breyer's "interest-balancing inquiry." *See* 554 U.S. at 634–35; *id.* at 689–90 (Breyer, J., dissenting). However, the Court did no such thing. Justice Breyer's dissent advocated against applying established tiers of scrutiny, preferring instead to decide case-by-case whether a challenged law burdened the Second Amendment at all. *Id.* at 689 (Breyer, J., dissenting). The *Heller* Court dismissed this case-by-base inquiry, noting that "[w]e know of no other enumerated constitutional right whose *core protection* has been subjected to a freestanding 'interest-balancing' approach." *Id.* at 634 (emphasis added). By this, the *Heller* Court did not disavow the means-ends scrutiny framework for evaluating burdens on enumerated rights, which has long been a fixture of

constitutional rights jurisprudence. *See generally* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007); see *also Kachalsky*, 701 F.3d at 99 n.23 (rejecting the argument that "handgun possession in public has the ring of an absolute constitutional right"). Rather, the Court meant only that severe burdens on "core protections" would fail any level of scrutiny and cannot be excused through the sort of freewheeling interest-balancing approach Justice Breyer proposed. *Heller*, 554 U.S. at 628 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster.") (internal quotation marks, footnote, and citation omitted).

The majority's new alternative approach to establishing the appropriate level of scrutiny is unsupported in Supreme Court precedent and is in direct conflict with our Circuit's precedent and the approach taken by our sister circuits.

2

The majority also errs in its alternative intermediate scrutiny analysis. The majority acknowledges the *Chovan* second step inquiry as to whether the government policy is a reasonable fit between the challenged regulation and the asserted objective. But, rather than applying that analysis, it substitutes the demanding and inappropriate least restrictive means test.

There is no support for the application of a least restrictive means test in *Chovan*, and our sister circuits have repeatedly and emphatically recognized that, in this context, intermediate scrutiny does not require the least restrictive means available. *See Masciandaro*, 638 F.3d at 474 ("[I]ntermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question."); *Heller*, 670 F.3d at 1258 (explaining that under intermediate scrutiny, there must be a tight fit "'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective'" (quoting *Bd. of Trustees of the State Univ. of N. Y. v. Fox*, 492 U.S. 469, 480 (1989)). In other words, the fit between the good cause requirement and public safety objectives must be "reasonable, not perfect." *Marzzarella*, 614 F.3d at 98.

The majority also rejects *Turner Broadcasting*'s admonition to afford "substantial deference to the predictive judgments" of legislative bodies, *Turner Broad. Sys. Inc. v. FCC*, 520 U.S. 180, 195 (1997), and criticizes our sister circuits' reliance on *Turner Broadcasting*.

However, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments." *Kachalsky*, 701 F.3d at 97; *see also Drake*, 724 F.3d at 436-37; *Woollard*, 712 F.3d at 881. This advice is particularly apt when we consider the widely-varying state

and local gun laws that are tailored to particular community needs. What law enforcement deems a critical restriction in urban areas may not be as important in rural portions of the country. Those sensitive policy assessments are best made by the respective legislative branches and, when permitted by statute, by local law enforcement officials.[10]

*Turner Broadcasting* itself provides a sound rejoinder to the majority: "Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided *and to the remedial measures adopted for that end*, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy." *Turner*, 520 U.S. at 196 (emphasis added).

Finally, the majority derides the good cause requirement as nothing more than an arbitrary, overbroad rationing system. In fact, the record supports the opposite conclusion. The County does not randomly allocate concealed-carry licenses to people regardless of need. Instead, it makes the best prediction possible

---

[10]Indeed, the California State Sheriffs Association, the California Police Chiefs Association, and the California Peace Officers Association note in their amicus brief that the diversity of communities and regions in California warrants the exercise of discretion by chief law enforcement executives to determine, in the context of the issues presented in their jurisdiction, the circumstances under which a concealed gun permit should issue.

of who actually needs firearms for self-defense, and grants concealed-carry licenses accordingly.[11]

IV

A careful examination of the narrow questions before us can only lead to the conclusion that San Diego County's "good cause" policy falls squarely within the Supreme Court's definition of "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626, 627 n.26, 636. There is no need to reach any other issue presented in the case. In dealing a needless, sweeping judicial blow to the public safety discretion invested in local law enforcement officers and to California's

[11] I would also reject the Plaintiffs' alternative equal protection claims. Their first claim is merely an attempt to bootstrap an equal protection argument to their Second Amendment claim, so it is more appropriately analyzed under the Second Amendment. *Cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001) (holding that an equal protection claim was "no more than a First Amendment claim dressed in equal protection clothing" and was therefore "subsumed by, and co-extensive with" the former). As for their "class of one" equal protection claim, the Plaintiffs did not establish a genuine issue of material fact with regard to whether they were situated similarly to the renewal applicants belonging to the Honorary Deputy Sheriff's Association ("HDSA"). *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (recognizing a "class of one" equal protection claim "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."). The HDSA renewal applicants documented specific threats or otherwise qualified for renewals, so they were not similarly situated. I would also reject Plaintiffs' remaining due process and privileges & immunities claims because Plaintiffs failed to "specifically and distinctly argue [them] in [their] opening brief." *Greenwood v. F.A.A.*, 28 F.3d 971, 978 (9th Cir. 1994).

carefully constructed firearm regulatory scheme, the majority opinion conflicts with Supreme Court authority, the decisions of our sister circuits, and our own circuit precedent.

I respectfully dissent.

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| LEONARD FYOCK, SCOTT HOCHSTETLER, WILLIAM DOUGLAS, DAVID PEARSON, BRAD SEIFERS, and ROD SWANSON,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CITY OF SUNNYVALE, THE MAYOR OF SUNNYVALE, ANTHONY SPITALERI, in his official capacity, THE CHIEF OF THE SUNNYVALE DEPARTMENT OF PUBLIC SAFETY, FRANK GRGURINA, in his official capacity, and DOES 1-10,<br><br>Defendants. | **CASE NO: CV13-05807 RMW**<br><br>**CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' STATEMENT OF RECENT DECISION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Roderick M. Thompson
Anthony P. Schoenberg
Rochelle L. Woods
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
aschoenberg@fbm.com

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 18, 2014.

/s/ C. D. Michel
C. D. Michel
Attorney for Plaintiffs